## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **COMPOUND PROPERTY MANAGEMENT LLC** | : | **Case No.   1:19-CV-00133** |
| | : | **Judge** |
| **and** | : | |
| | : | |
| **LEONE1, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **R & G CINCY INVESTMENTS LLC** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **COMPLAINT WITH** |
| **v.** | : | **CLASS ALLEGATIONS** |
| | : | **(WITH JURY DEMAND)** |
| **BUILD REALTY, INC. dba GREENLEAF FUNDING** | : | |
| | : | |
| **and** | : | |
| | : | |
| **EDGAR CONSTRUCTION, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CINCY CONSTRUCTION, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **MCGREGOR HOLDINGS, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **COWTOWN HOLDINGS, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BUILD NKY, LLC** | : | |
| | : | |
| **and** | : | |
| | : | |
| **GREENLEAF SUPPORT SERVICES, LLC** | : | |

and          :
             :
**BUILD SWO, LLC**      :
             :
and          :
             :
**GARY BAILEY, as Trustee of the Bailey Investment Trust** :
             :
and          :
             :
**GEORGE TRIANTAFILOU, as Trustee of the Bailey Investment Trust** :
             :
and          :
             :
**GARY BAILEY, as Beneficiary of the Bailey Investment Trust** :
             :
and          :
             :
**G2 TECHNOLOGIES, LLC**    :
             :
and          :
             :
**GT FINANCIAL, LLC**     :
             :
and          :
             :
**FIVE MILE CAPITAL PARTNERS LLC** :
             :
and          :
             :
**SMITH, GRAHAM & CO. INVESTMENT ADVISORS, L.P.** :
             :
and          :
             :
**FIRST TITLE AGENCY, INC.**   :
             :
and          :
             :
**GEORGE TRIANTAFILOU, Individually** :
             :
and          :
             :

2

**GARY BAILEY, Individually** :
:
**and** :
:
**STEPHEN D. KING, Individually** :
:
:
:
**Defendants.** :

Now come Plaintiffs, Compound Property Management, LLC ("CPM"), Leone1, LLC ("Leone1"), and R & G Cincy Investments, LLC ("R & G"), (collectively, "Plaintiffs"), by and through the undersigned counsel, and for their Complaint with Class Allegations in the above-captioned matter state as follows:

## I.   INTRODUCTION

1.      Build Realty, Inc. ("Build Realty" or "Build") is at the center of a long-running real-estate scam. Along with a bevy of co-conspirators, it bilks class member/investors (hereafter "Investors") using bait-and-switch tactics, duplicitous real estate agents, calculated misrepresentations, unlawful trust structures, self-dealing, falsified documents, violations of basic Ohio and Kentucky mortgagor rights, fraudulent estimates and appraisals, and lenders agreeing to violate the law for large returns. In the last two years, as counsel for Plaintiffs have made it abundantly clear to Defendants that what they are doing is unlawful, Defendants have not decreased their activities, but have instead increased them.[1]

---

[1] *See, e.g. https://www.eventbrite.com/e/nky-house-flipping-brunch-registration-49855449993#,* announcing a September 15, 2018 brunch and Investor "meet and greet" in Northern Kentucky where "Build Realty and Greenleaf Funding are excited to invite you to join us in celebrating the Opening of our NKY Brokerage . . ."

2.     While discovery in a previously dismissed state-court proceeding was in its early stages, and despite Defendants attempts to actively and fraudulently conceal the players and nature of the scheme,  Plaintiffs believe that what they have finally received to date provides a fairly clear picture of the scheme.

3.     Build lures Investors through various means including yard signs, social media posts, direct mailings, and seminars. Build touts itself as a one-stop shop for the identification, financing, acquisition, improvement, and re-selling of distressed real estate properties. The pitch is this: for $10,000 down, and no credit checks, Build will help you buy, rehab, and sell a house at great profit. But Build structures the transaction not as a purchase by the Investor but as a transaction with the property held in trust (with Build purportedly acting as fiduciary for the Investor). And the transaction is structured so that Build and its co-conspirators—not the Investor—profit at every stage.

4.     The vast majority of Investors lose money, in many cases their entire investment. The few that make a profit generally make far less than Build estimates.[2]

5.     Build claims that it has a large inventory of properties bought in bulk at a discount, and that it passes along the "discount" savings to the Investor. Instead, Build typically waits until an Investor signs a purchase contract, then closes on the property in question through one of its alter-ego shell companies and *marks up the price* for the transaction with the Investor.

---

[2] A possible exception to this is transactions involving Build associates or co-conspirators, who receive favorable treatment. For example, when an entity owned by Matt Ostendorf (a Build agent acting as Build's principal broker) failed to pay the taxes for its property, Build paid more than $7,000.00 in taxes for it so that Ostendorf's company would not lose the property. If this had been an ordinary Investor, such as the members of the Class, Build would have taken back the property, as described in further detail herein.

6.     Build claims that the Investors will be purchasing the house and has them initially sign a "purchase" contract with a non-refundable fee. The purchase contract even tells the Investor that they will be receiving a deed at closing.[3] Thus, at the time the non-refundable fee is paid, Build represents to the Investor that they will receive title to the property. Instead, Build puts the property in a trust, and ownership remains with Build through one of Build's alter-egos acting as "trustee."

7.     Build's heavily-advertised "$10,000 down payment" turns out not to be a down payment. None of the "down payment" goes toward the purchase price of the property. Instead, closing fees are manipulated so that, regardless of the price of the house, the Investor's $10,000 covers "closing costs," costs that are typically far in excess of closing costs paid on a true mortgage transaction.

8.     The "no credit check" claim, which is also heavily advertised, upon information and belief is correct—that is, Build does not appear to perform credit checks on Investors. But Build charges the Investor as part of its "closing costs" a fee for the non-existent credit check.

9.     Build requires Investors to form a limited liability company to participate in the transaction, and then puts the property in "trust" with the LLC as a supposed "beneficiary." The use of an LLC to make the investment is intended to and does deprive the Investor of the benefit of Ohio usury laws, mortgage protection laws, and other statutory protections under state and federal law, and the placement of the property in trust is a means by which Build seeks to deprive Investors of their right to a foreclosure proceeding, with the concomitant rights of redemption and

---

[3] Paragraph 24 of the purchase contracts state that the Seller (*i.e.*, Build or one of its alter-egos) "shall convey marketable title to the Real Estate by deed of limited warranty or fiduciary deed, if applicable, in fee simple absolute . . . Title shall be free, clear, and unencumbered as of Closing."

rights to excess proceeds mandated by statutory and common law.[4] Upon information and belief, both of these Investor deprivations—the inapplicability of usury laws and foreclosure rights—are touted by Build to Defendants Five Mile Capital Partners, LLC ("Five Mile") and Smith, Graham & Co. Investment Partners, L.P. ("Smith Graham") (collectively "Permanent Lenders"), lenders involved in the scheme. Both of these Investor deprivations are impermissible under Ohio and Kentucky law.

10.     Misusing its position as fiduciary, the trustee of the trust (an alter-ego of Build) engages in additional self-dealing by charging the Investor/beneficiary an above-market interest rate of 15% (the typical rate for short-term loans secured by property, called "hard money" loans, is 8-12%).[5] The trustee generally sells the note to the mortgage on the property to a Permanent Lender for an interest rate of 12%, pocketing the difference between the two rates without any disclosure to the Investor—its beneficiary—of the lender's interest in the transaction or the interest rate spread being retained by the trustee.

11.     As another gross misuse of its position as fiduciary, Build—with the assistance of First Title Agency, Inc.—tells the Investors that the money "borrowed" to pay for the rehab is placed in escrow at closing, and then requires the Investors pay 15% on these funds as well. However, these escrow account monies are not funded at the closing, but instead only become

---

[4] Ohio recognizes a statutory right to redemption under Ohio Revised Code ("R.C.") 2329.33, as well as an equitable right to redemption. The right to redemption cannot be waived or "clogged" at the making of the mortgage. *See Shaw v. Walbridge*, 33 Ohio St. 1 (1877); *Panagouleas Interiors v. Silent Ptnr. Group, Inc*., 2d Dist. Montgomery No. 18864, 2002 Ohio App. LEXIS 1305, *25 (Mar. 22, 2002).  Ohio also recognizes a statutory right to excess proceeds when a forfeited property is sold for more than is owed on the property under Ohio R.C. 5723.11. Kentucky recognizes these same rights. KRS 426.530; KRS 426.500; *Sebastian v. Floyd*, 585 S.W.2d 381, 383 (Ky. 1979).

[5] The biggest difference between the Build scheme and traditional "hard money loans" is that a typical hard money loan results with title being vested in the buyer. Here, the Investors are forbidden from taking title, a fact they do not learn until much later in the transaction (often not until the closing), and a fact that is contrary to the covenants and material representations made in the purchase contract.

funded and available to Investors once the Permanent Lender buys the loan from Build. This means that the Investors are paying interest on money that does not exist.

12.     Defendants' misuse of the escrow money does not stop there. Documents show that Defendants regularly use money set aside as escrow for the benefit of Investors to purchase other properties to sell to more Investors or to pay its operating expenses. And perhaps most egregiously, Plaintiffs have recently discovered audio recordings of a Build "executive leadership" meeting at which George Triantafilou—with everyone's assent—describes using these escrow account funds to pay $30,000 in legal fees.

13.     In addition, the rehab estimate provided by Build to the Investor is generally low and the appraised ARV (after repair value) provided by Build is generally high, thus inflating the projected profits the Investor can hope to realize. However, with the high transaction costs and interest costs, many Investors make little or no profit, even excluding the value of their time. In fact, many Investors lose upwards of $20,000. And, if the Investor misses more than one payment, the property is not "foreclosed;" instead, the Investor is dispossessed of the property by Build changing the locks, and the Investor loses any right that he or she had to proceeds from the eventual sale of the property. When this happens, the Investor also loses all of the improvements that he or she has put into the property, along with all of the money that he or she has invested. All of this is done without a judicial proceeding.

14.     This general series of misrepresentations and transactions is referenced herein as the "Build Scheme."

15.     These are just some of the illegal actions orchestrated by Defendants. More detail is set out below.

16.     In furtherance of the Build Scheme, Defendants have, *inter alia*, provided false certifications to entities such as the U.S. Department of Housing and Urban Development ("HUD"), provided false testimony under oath, and repeatedly submitted photoshopped and fraudulent bank statements and cashier's checks to various entities.

17.     This is a proposed class action brought by three companies that were Investors, and is brought on behalf of hundreds of bilked Investors. Defendants have made millions of dollars from the Build Scheme at the expense of class members. Plaintiffs bring suit under, *inter alia*, 18 U.S.C. 1961 *et seq*. (Federal Racketeer Influenced and Corrupt Organizations ("RICO")). Plaintiffs seek compensatory and treble damages, preliminary and permanent injunctive relief, declaratory relief, attorneys' fees, punitive damages, and any other relief deemed appropriate by the Court.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332, as the amount in controversy in this class action exceeds the sum or value of $5,000,000 exclusive of interests and costs and minimal diversity among the plaintiff class and Defendants is met, and under 28 U.S.C. 1331, as this Federal RICO action arises out of a United States law. In addition, because the state claims are so related to the Federal RICO claim that they form part of the same case or controversy, the Court also has supplemental subject matter jurisdiction over the Ohio and Kentucky claims under 28 U.S.C. 1367.

19.     Venue is proper in this Court pursuant under 18 U.S.C. 1965(a) because several of the named defendants to the Federal RICO allegations reside, have agents, and/or transact their affairs in this District, and under 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to the claims occurred here.

8

20.     The Court has personal jurisdiction over all Defendants under Federal Rule of Civil Procedure 4 and Ohio R.C. 2307.382 because, *inter alia*, Defendants caused tortious injury to Plaintiffs and class members in the state of Ohio. In addition, each Defendant has intentionally availed itself of the laws of Ohio by transacting business throughout the state, and by deriving substantial benefit and revenue from the transactions that caused tortious injury. Defendants have advertised, marketed, promoted, and/or profited off the Build Scheme in Ohio, which is based on several of Defendants having an interest in, using, and/or possessing real property in Ohio. As such, all Defendants could anticipate being called into court in Ohio, and personal jurisdiction over all Defendants does not offend traditional notions of fair play and substantial justice.

### III.     PARTIES

#### A.     PLAINTIFFS

21.     Plaintiff CPM is an Ohio limited liability company doing business in Hamilton County. CPM is owned and managed by Theresa Robinson. In 2016, Ms. Robinson formed CPM and became an Investor in and victim of the Build Scheme, investing in real property located at 1915 Acorn Drive, Cincinnati, Ohio 45231. In 2017, due to the actions of Defendants, CPM was unable to continue to make interest payments to Build pursuant to the promissory note that Build required it to sign, and Defendants took the property without any judicial procedure, retaining all funds paid by CPM and the excess proceeds from the subsequent sale.

22.     Plaintiff Leone1 is an Ohio limited liability company doing business in Hamilton County. Leone1 has two members—Richard Hardin and Catherine Brill. In 2014, Hardin and Brill formed Leone1and became Investors in and victims of the Build Scheme, investing in real property

located at 5121 Leona Drive, Green Township, Ohio 45238. In 2015, due to the actions of Defendants, Leone1 was unable to continue to make interest payments to Build pursuant to the promissory note that Build required it to sign, and in March 2015, Defendants took the property without any judicial procedure, retaining all funds paid by Leone1 and the excess proceeds from the subsequent sale.

23.     Plaintiff R&G is an Ohio limited liability company doing business in Hamilton County. R&G has two members—Ronnie and Gwendolyn Broadnax. In 2017, the Broadnax's formed R&G and became Investors in and victims of the Build Scheme, investing in real property located at 7801 Quarter Maine Avenue, Cincinnati, Ohio 45236.  In 2017, due to the actions of Defendants, R&G was unable to continue to make interest payments to Build pursuant to the promissory note that Build required it to sign, and Defendants took the property without any judicial procedure, retaining all funds paid by R&G and the excess proceeds from the subsequent sale.

### B.     INDIVIDUAL DEFENDANTS

24.     Defendant Gary Bailey is a resident of Hamilton County, and upon information and belief resides at 2716 Hyde Park Avenue, Cincinnati, Ohio 45209. Bailey is named as a defendant individually and as co-trustee and sole beneficiary of the Bailey Investment Trust (which is the sole member and owner of Build Realty). Mr. Bailey is at the center of the Build Scheme. Build Realty is the sole member of the following companies: Edgar Construction, LLC; Cincy Construction, LLC; Cowtown Holdings, LLC; McGregor Holdings, LLC; Greenleaf Support Services, LLC; and Build SWO, LLC, and upon information and belief, Build NKY, LLC. As described below, each of these entities acts as the alter ego of Gary Bailey and of Build. Upon

information and belief, Mr. Bailey created the structure of the Build Scheme and actively benefits from its continued use today.

25.     Defendant George Triantafilou is a resident of Hamilton County, and upon information and belief resides at 40 Muirfield Drive, North Bend, Ohio 45052. Mr. Triantafilou is a co-trustee of the Bailey Investment Trust, which is the sole member and owner of Build Realty. He is also a substantial short-term financier of Build. Along with Stephen D. King, Mr. Triantafilou gives substantial advice and direction to Gary Bailey on how to effectuate and operate Build and the Build Scheme.[6] Mr. Triantafilou is a member of the Build Executive Leadership team, each member of which has hiring and firing ability, and the authority to sign checks and enter into contracts on behalf of Build, and met regularly with Build executives[7] to discuss properties that were under risk of or actively in default, and what steps to take thereafter. Individually and as a co-trustee of the Bailey Investment Trust, Mr. Triantafilou is intimately aware of the structure of the Build Scheme and actively participates in and profits from it.

26.     Mr. Triantafilou and Gary Bailey hold themselves out to third parties as "business partners" relative to the Build Scheme.

27.     Defendant Stephen D. King is a resident of Georgia and upon information and belief resides at 450 Glenmont Court, Sandy Springs, Georgia 30350. Messrs. King and Triantafilou give substantial advice and direction to Gary Bailey on how to operate Build and effectuate the Build Scheme. Mr. King is aware of the structure of the Build Scheme, runs daily and weekly telephonic meetings of the Build Executive Leadership team, each member of which

---

[6] Derek DeVerna, a former acquisition agent for Build, described Mr. Triantafilou as Build's "CFO."

[7] Mr. DeVerna also stated that Mr. Triantafilou visited Build's office at least once a week to hold "executive meetings."

has hiring and firing ability and the authority to sign checks and enter into contracts on behalf of

Build, and has been crucial in developing sales as part of the Build Scheme.[8] Messrs. Bailey and

Triantafilou regularly defer to Mr. King for important decisions with regard to Build.[9] Under oath,

Mr. King testified that he was paid a flat fee for each real estate transaction carried out as a part of

the Build Scheme, meaning his compensation is directly linked to how many Investors the Build

Scheme can defraud. Under this rubric, he has been paid approximately $300,000 to date relative

to the Build Scheme. The true extent of Mr. King's involvement is not yet known. What Plaintiffs

do know is that Mr. King repeatedly gave false testimony at his deposition. His attempt to limit

his involvement with Build and the Build Scheme is specifically contradicted by both documentary

evidence and the testimony of Build's former Chief Operating Officer, Chris Robertson, and one

of Build's former acquisition agents, Derek DeVerna.[10] Plaintiffs also know that Mr. King is fully

integrated into the macro- and micro-level decision making[11] on Build's future, its leadership, and

its finances, and that he profits from every transaction with an Investor.

### C.  BUILD DEFENDANTS

28.     Defendant Build is an Ohio corporation with its principal place of business in

Hamilton County, at 9468 Towne Square Avenue, Cincinnati, Ohio 45242. Upon information and

belief, the Bailey Investment Trust is an Ohio trust and is the current or former sole owner of Build.

---

[8] Within a year and a half of Mr. King's involvement, sales went up 200%, to a rate of 15-16 homes per month.  At his deposition, Mr. King took significant credit for Build's increase in sales.

[9] Mr. DeVerna referred to Mr. King as Build's "CEO."

[10] Mr. King testified in deposition that his only involvement with Build was providing "rah-rah inspiration[]" to Build's sales staff. This testimony is contradicted both by internal documents and by the deposition testimony of other Build participants, which indicate that Mr. King was in a leadership and decision-making role for Build.

[11] For example, it was Mr. King who instituted a quota for acquisition agents to acquire a minimum of five homes per week.

Gary Bailey and George Triantafilou are co-trustees of the Bailey Investment Trust, and Gary Bailey is the sole beneficiary of the Bailey Investment Trust. Build uses Greenleaf Funding to sell its hard-money lending program to Investors.

29. Alternatively, and upon information and belief, G2 Technologies, LLC ("G2") is the current or prospective sole owner of Build. Upon information and belief, George Triantafilou, Stephen King, and Scott Whiteside are the owners of G2, with Gary Bailey now acting as a "consultant." G2 receives proceeds from each transaction, directs the conduct of Build and, like the entities listed in the paragraph below, is an alter-ego thereof.

30. Build, G2, and the Build entities listed below (Edgar Construction, LLC, Cincy Construction, LLC, McGregor Holdings, Build NKY, LLC, LLC, Build SWO, LLC, and Greenleaf Support Services, LLC—collectively with Build and G2, the "Build Companies") share profits, commingle funds, have the same business address, have the same employees and independent contractors, provide loans to one another without sufficient consideration, treat the assets of one as the assets of all, do not regularly observe corporate formalities, and own interests in one another, such that they are all alter egos of one another and of their principal, Gary Bailey. For example (but without limitation):

    a. Gary Bailey signs the documents related to the transactions on behalf of the Build Companies and on behalf of Build Realty;

    b. All checks handed to the Build Companies as "down payment" under purchase contracts are made out to "Build" even though a different Build Company is the seller under the transaction, showing that the Build Companies share a single bank account, or that none of the Build Companies has a bank account, but instead rely upon the use of Build's;

c. The Build Companies regularly use and transmit to third parties falsified or photoshopped checks and bank statements, using the Build Companies interchangeably. For example, and as described in further detail below, Build and the Build Companies will alter the names of the account holders or payors on the same basic falsified check from one Build Company to another;

d. Build Realty owns 100% interest in each of the Build Companies;

e. The Build Companies use money loaned to Build Realty by third-party lenders to purchase and further convey parcels of real property to each other without adequate consideration;

f. Upon information and belief, the purpose of the separate Build Companies is simply to allow Build to purchase multiple properties simultaneously (or in close temporal proximity) to further advance the common Build Scheme in which all Defendants are involved; and

g. One or more of the Build Companies share counsel with Build Realty, implying that their interests are aligned despite being on opposite sides of the real estate transactions, as described below.

h. As they are all alter egos of one another, a reference to the term Build or Build Realty is also a reference to the Build Companies and vice versa, unless a different Build Company is referenced specifically and individually.

31. Defendant Edgar Construction, LLC ("Edgar Construction" or "Edgar") is an Ohio limited liability company. Upon information and belief, Edgar Construction is used by Build as an illegally unlicensed trust company for the void or voidable trusts that are central to the Build Scheme. Build also uses Edgar Construction as a purchaser in certain real property transactions

with third-party sellers of properties, and as both the seller and buyer (as trustee) in the unlawful real estate transactions (referred to generally as "Trust Transactions") undertaken by Build to deprive Investors of their statutory and legal rights. Defendant Build Realty is the sole member of Edgar Construction.

32.     Defendant Cincy Construction, LLC ("Cincy Construction") is an Ohio limited liability company. Upon information and belief, Build uses Cincy Construction as a purchaser in certain real property transactions with third-party sellers of properties, and as a seller in the Trust Transactions undertaken by Build to deprive Investors of their statutory and legal rights. Defendant Build Realty is the sole member of Cincy Construction.

33.     Defendant Cowtown Holdings, LLC ("Cowtown Holdings") is an Ohio limited liability company. Upon information and belief, Build uses Cowtown Holdings as a purchaser in certain real property transactions with third-party sellers of properties, and as a seller in the Trust Transactions undertaken by Build to deprive Investors of their statutory and legal rights. Defendant Build Realty is the sole member of Cowtown Holdings.

34.     Defendant McGregor Holdings, LLC ("McGregor Holdings" or "McGregor") is an Ohio limited liability company. Upon information and belief, Build uses McGregor Holdings as a purchaser in certain real property transactions with third-party sellers of properties, and as a seller in the Trust Transactions undertaken by Build to deprive Investors of their statutory and legal rights. Defendant Build Realty is the sole member of McGregor Holdings.

35.     Defendant Build NKY, LLC ("Build NKY") is an Ohio limited liability company. Upon information and belief, Build uses Build NKY as a purchaser in certain real property transactions with third-party sellers of properties, and as a seller in the Trust Transactions

15

undertaken by Build to deprive Investors located in Northern Kentucky of their statutory and legal rights. Upon information and belief, Defendant Build Realty is the sole member of Build NKY.

36.     Defendant Build SWO, LLC ("Build SWO") is an Ohio limited liability company. Build SWO holds the real estate broker's license used by Build, and Build uses Build SWO as a broker and administrator in the Trust Transactions undertaken by Build to deprive Investors of their statutory and legal rights. Upon information and belief, Build SWO engages in multiple violations of Ohio R.C. 4735 relative to its participation in the Build Scheme, including without limitation, Ohio R.C. 4735.61, which prohibits licensees from giving false information to a party in a real estate transaction, and by providing the Investors with intentionally confusing information as to who the licensee represents in the Trust Transactions. Defendant Build Realty is the sole member of Build SWO.

37.     Defendant Greenleaf Support Services, LLC ("Greenleaf Support Services") is an Ohio limited liability company. Upon information and belief, Greenleaf Support Services is used in Build's loan-servicing agreements with certain third-party lenders, such as Defendants Five Mile, and Smith Graham. Upon information and belief, Defendant Build Realty is the sole member of Greenleaf Support Services.

####     D.     CO-CONSPIRATOR DEFENDANTS

38.     Defendant GT Financial, LLC ("GT Financial") is an Ohio limited liability company, with two known members: George Triantafilou and Eleni Triantafilou. With full knowledge of the Build Scheme—detailed below—GT Financial provides a revolving line of credit to Build to purchase homes from third-parties and participates materially in the direction and management of the Build Scheme. GT Financial profits, *inter alia*, by receiving interest on the revolving line-of-credit used by Build and by receiving flat-fee payments for each unlawful real

estate transaction. All emails from Build requesting funds from GT Financial, and all delivery of funds from GT Financial to Build, flow through George Triantafilou. George Triantafilou has complete control over GT Financial, used his control over GT Financial to effectuate the unlawful and corrupt activity alleged in this Complaint, and, as a result, directly or indirectly caused the injuries alleged by Plaintiffs.

39.     Defendant Five Mile is a Connecticut limited liability company that does or has done substantial business with Build. Five Mile knows that Build engages in self-dealing to obtain loans and profit at the expense of the Investors, and that the trusts established through the unlawful real estate transactions are not set up to benefit the named beneficiaries but instead Build, First Title Agency, Inc. ("First Title"), Five Mile, and Smith Graham. Five Mile participates in and supports the Build Scheme by providing capital to Build to knowingly and deliberately advance the continuation of the Build Scheme to the direct detriment of Plaintiffs and the putative class members. In exchange, Five Mile generally receives interest rates of 12% on the capital it provides to Build and always receives a secured interest in the properties involved in the Build Scheme. Five Mile also directs Build as to the actions to be undertaken if and when an Investor defaults under the Build Scheme's harsh terms. Thus, Five Mile willingly reaps benefits from its deliberate and knowing role in the fraudulent Build Scheme, to the detriment of the Investors. Five Mile specifically has agreed to enter into this scheme with Build, allowing Build to be its agent for the purpose of securing the loan transactions that are fraudulently procured and are impermissible under Ohio and Kentucky law.

40.     Defendant Smith Graham is a limited partnership with offices and partners in New York and Texas. Smith Graham knows that Build engages in self-dealing to obtain loans and profit at the expense of the Investors, and that the trusts established through the unlawful real estate

transaction are not set up to benefit the named beneficiaries but instead Build, First Title, Five Mile, and Smith Graham. Smith Graham participates in and supports the Build Scheme by providing capital to knowingly and deliberately advance the continuation of the Build Scheme, to the direct detriment of Plaintiffs and the putative class members. In exchange, Smith Graham generally receives an interest rate of 12% on the capital it provides to Build and always receives a secured interest in the properties involved in the Build Scheme. Smith Graham also directs Build as to the actions to be undertaken if and when an Investor defaults under the Build Scheme's harsh terms. Thus, Smith Graham willingly reaps benefits from its deliberate and knowing role in the fraudulent Build Scheme, to the detriment of the Investors. Smith-Graham specifically has agreed to enter into this scheme with Build, allowing Build to be its agent for the purpose of securing the loan transactions that are fraudulently procured and are impermissible under Ohio and Kentucky law.

41.     The Permanent Lenders have intimate knowledge of the Build Scheme. They have reviewed all of the form documents that Build presents to Investors to effectuate the Build Scheme, they have constant communication with the leadership at Build regarding the properties they have loaned money towards, and their agents visit the greater Cincinnati area regularly to meet in person with Build's leadership and tour the properties that they are loaning money towards. Gary Bailey has repeatedly told Investors and internal Build employees or agents that the Permanent Lenders make the final decision on what to do with every single property.

42.     Build acts at the direction and with the support of GT Financial and of the Permanent Lenders in dealing with the Investors (its named beneficiaries) and the properties. Because they provide the vast majority of financing for the Build Scheme, GT Financial and the Permanent Lenders instruct Build on when to allow note extensions, when to allow late payments,

whether and how to collect deficient payments from the eventual sales of properties if they are near completion, and whether to take back properties in violation of the Investors' statutory and common law rights, all with extensive knowledge of the Build Scheme and structure of the Trust Transactions. Build and the Build Companies effectively act as a broker for GT Financial and the Permanent Lenders' funds in the illegal Build Scheme, upon the express agreement of GT Financial and the Permanent Lenders, who are fully-informed of the nature of the transaction. GT Financial and the Permanent Lenders are jointly and severally liable for Build's acts under theories of agency and/or agency by estoppel, without limitation. Build in fact acts as fiduciary or trustee for the Permanent Lenders while holding itself out as the fiduciary or trustee for the Investors.

43.     Defendant First Title is an Ohio for-profit corporation with offices in Hamilton County. Build uses First Title to profit off of Investors through: (a) inflated settlement costs; (b) the creation of fraudulent paperwork and the inducement of Investors to sign this paperwork showing payments by check and wire transfers that never take place and/or entirely fictional closing costs with terms that are directly contrary to the terms of the purchase contract Build has the Investors sign at the beginning of the transactions;[12] and (c) further perpetuation of the misrepresentation that the Investors are "buying" the properties. With full knowledge of the Build Scheme and in order to advance the Build Scheme, First Title substantiates the fraudulent misrepresentations in the Build Scheme relating to the initial purchase of a property by Build and creates the illusion of legitimacy for the Investors with respect to the Trust Transaction by its express representation at the closing. In exchange, First Title receives a significant, steady, and

---

[12] First Title receives a copy of the purchase contract at the beginning of every transaction. In addition to representing that the Investor will take title to the property, the purchase contract also represents that the Seller (*i.e.*, Build or its alter ego) will pay certain closing costs that are, instead, passed along to the Investor by virtue of the HUD-1 Settlement Statement created by First Title.

exclusive volume of closings through the Build Scheme. In fact, Build represents to Investors that using First Title is a "requirement" of participating in the Trust Transactions. This is precisely because Build knows that First Title turns an intentional blind eye to the improprieties of the Build Scheme and makes affirmative, knowing and material misrepresentations that advance the Build Scheme and Trust Transactions in order to close the transactions, resulting in great profit for both Build and First Title.[13] First Title thus participates in, and is one of many direct beneficiaries—to the detriment of the Investors—of the illegal and fraudulent Build Scheme. First Title also knowingly colludes with Build and/or Gary Bailey and George Triantafilou by representing to property sellers such as Auction.com that Build and/or Gary Bailey and George Triantafilou have deposited valid earnest money checks with First Title, when First Title and its agents know that the earnest money checks attached to signed offers to purchase properties are photoshopped and have no real value.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   THE BUILD SCHEME

44.     The Build Scheme has operated in substantially similar form since at least May 2012.

45.     The Build Scheme works as follows:

### The Bait

46.     Build Realty, acting through Gary Bailey or other agents, advertises itself through roadside signs, websites, social media, direct mail, and seminars, all offering to show people how to make money flipping homes with little money "down" and no credit checks.

---

[13] Upon information and belief, other title companies in the Greater Cincinnati area have refused to participate in these transactions due to their conspicuous inequities, making First Title's participation an integral part of the Build Scheme.

47.     Below is a picture of a typical sign found throughout the greater Cincinnati area—this one photographed on September 27, 2018 at the intersection of Ridge Avenue and Ibsen Avenue in Cincinnati, Ohio. The sign indicates that for $10,000 down a person can obtain financing, including rehab costs,  all without a credit check.[14] Build employs several people at a time to place road signs all around the Greater Cincinnati, Dayton, Columbus, and Northern Kentucky areas, with a goal of planting 75-100 signs per week. Between 2015 and mid-2018, Build planted more than 5,000 signs.



48.     Following this paragraph is a picture of an advertisement for Greenleaf Funding on the back of a vehicle. The picture was taken October 3, 2018 on Edwards Road in Cincinnati, Ohio. Above the Greenleaf Funding logo it states "Rehab financing for Real Estate Investors." Below the logo it states "10k Down" and "No Credit Check"; and the sign lists a phone number of Greenleaf Funding.

---

[14] As of December 2017, Build was spending upwards of $1,000 per week on signs for Cincinnati, Northern Kentucky, and Dayton.



49.     Below is a typical social media post. This one was posted to Facebook on January 14, 2018 by Build Agent Lorena Anticoli. It offers profit margins of 200%+ to those interested.



https://www.facebook.com/LorenaSellsCinci/photos/a.126547161410117/167791700618996/?type=3&theater

50.     Below is a screenshot from a Gary Bailey investment seminar video posted to YouTube. In the video, he falsely states that 52% of the homes that Build "sells" to Investors come from off-market sources that an investor would not have access to unless the investor went through Build. He also states that 34% of Build Investors are repeat clients. Upon information and belief, both representations are false. Build holds monthly seminars, which are videotaped and placed on the Build website and/or YouTube, repeating these and other misrepresentations, including, *inter alia*, that: (a) Build closed 217 houses to Investors in 2017[15];(b) that Build investors made an average of $10-20 thousand per "flip"; (c) that Build closed $15 million in loans in 2017 and $40 million in Cincinnati since its inception; and (d) that if Investors buy a house from Build they will get a "detailed breakdown" of everything they need for the rehab, and Build's representative will confirm that every rehab can be done for the estimated price.



---

[15] Discovery produced by Build reflects 96 loans closed in 2017.

https://www.youtube.com/watch?v=i7uXFCiYou0

51.     Build also advertises through its website and seminars that it will "help" Investors and provide them with "all of the resources they need to fix up and resell the [properties]," including "[o]ne on one consultation[s] with a licensed Build Realty Associate" and "project planning" with "[p]rofessional photos and MLS listing[s]" upon completion. However, with the signing of the purchase contract, Build attempts to absolve itself of any of its responsibilities as a real estate licensee by disclaiming that it represents the Investor at all, providing the Investor with an intentionally confusing (mis)understanding as to the relationship between Build and the Investor, and contradicting its own representations about its role in helping and representing the Investors. The disclaimer of Build Realty's agency role is also directly and unambiguously contrary to the clear fiduciary responsibility that Build Realty holds under the Trust Agreement with respect to the Investor.

52.     Build advertises that it is selling homes to Investors at a discount. On its website it stated that it "purchase[d] properties in bulk from over 20 different sources and then passe[d] the savings on to [Investors]." However, the discovery to date shows that Build does not buy most properties in bulk, and that instead of passing the savings on to Investors, Build and its co-conspirators mark up the price of the properties by several thousand dollars each.

53.     For example, on May 27, 2016, Build purchased a property at 793 Delta Avenue in Hamilton County, Ohio and transferred it that same day to a trust for an Investor with a $24,000 markup.

54.     The initial markup is not affirmatively disclosed to the Investors and is in addition to the exorbitant fees charged to the Investor at the closing, including the costs associated with

Build's acquisition of the properties, for which the Investors are required to "reimburse" Build.[16] Build also, without disclosure to the Investor/beneficiary, secretly retains the interest rate spread between the 15% paid by the Investor and the lower amount (generally 12%) paid to the Permanent Lender.

55.     Build tells Investors that all they need is $10,000 down. Discovery to date shows that this is a misrepresentation. A down payment on the purchase of a home is understood in the industry to represent a percentage of the full price of the home being purchased. A down payment is separate and distinct from closing or settlement costs.

56.     For example, if you purchase a $100,000 home, "[a] 3 percent down payment means the buyer pays the seller $3,000 and then borrows $97,000."[17] Typically, the separate closing costs range from 2% to 5% of the purchase price, with the percentage amount decreasing with an increase in the value of the property.[18]

57.      Here, Build and its co-conspirators structure the transaction so that the $10,000 is paid in cash, but represents a zero percent down payment of the full price of the property. Build makes sure that all of the $10,000 goes to purported "closing costs," to pay Build and its co-conspirators. This means that closing costs range from at least 20% on a $50,000 loan to at least 5% on a $200,000 loan.

58.     For example, the HUD-1 Settlement Statement in the Leone1 transaction lists the price of the property as $55,900. Thus, the closing costs of $10,000 equal roughly 18% of the loan.

---

[16] Upon information and belief, this reimbursement cost is not disclosed to the Investor until they receive a copy of the Settlement Statement from First Title at or near closing and, even then, it is not explained unless an Investor asks about it.

[17] https://www.bankrate.com/finance/mortgages/down-payment-1.aspx, accessed December 19, 2018.

[18] https://www.zillow.com/mortgage-learning/closing-costs/, accessed November 29, 2018.

Even more egregious, the contract purchase price listed on the HUD-1 Settlement Statement in the CPM transaction is listed as $26,900. This means that the $10,000 settlement costs were more than 37% of the "purchase" price.

59.     Build and its co-conspirators draw in Investors with projected rehab estimates and "ARV's" (after repair values), showing that the ARV is significantly higher than the purchase price and rehab estimate, and will thus yield a substantial projected profit. The rehab estimates are typically lower than what they will actually cost, and the ARV's are generally higher than the Investor can reasonably expect.

60.     Build Realty generally uses a single appraiser—named Ron Sears—that it knows will provide an inflated appraisal. Gary Bailey states as much in a Google "Hangout" message sent to other Build agents on October 26, 2017, admitting in part: "a ron sears appraisal isn't a real appraisal." This is not disclosed to the Investors, who are induced to rely upon the appraisals as if they were "real."

### The Hook

61.     Once an Investor has committed to working with Build to "purchase" a property, Build or one of its co-conspirators finds a property for the Investor on any one of several property auction websites such as Auction.com or through HUD-licensed broker websites, and bids sufficiently high to ensure it is likely to win the auction. These avenues are generally available to buyers in the marketplace, including the Investors, notwithstanding Build's misrepresentations to the contrary. [19] When Build is unable to find an Investor for the property it has put under contract, it simply backs out of the contract.

---

[19] Build buys properties from a variety of sources, including estates, but upon information and belief, the majority of the properties it buys come from the MLS website and third-party auction websites, which are otherwise available to the Investor directly.

62.     After Build buys a property but before it closes on that property, Build induces the Investor to sign a contract to purchase that property. The contract for purchase lists the Investor as the Buyer and one of the Build Companies as the Seller. The same or a substantially similar contract to purchase is entered into with every Investor.

63.     The contract for purchase lists the limited liability company Investor as the buyer. Build requires the Investors to form such entities for these transactions. Upon information and belief, this is to avoid Ohio usury, mortgage, and other statutory protection laws.

64.     The contract for purchase promises the Investor "marketable title to the Real Estate by deed."

65.     Attached to the contract to purchase is another document prepared by Build that asks the "buyer" in what name the "buyer" would like to take title to the property, even though Build never intends to convey title to the Investor. This document is independently presented to the Investor before the purchase contract, to further encourage the belief that the Investor will take title to the property.

66.     Build requires the Investor pay a non-refundable fee, called a "down payment," to the Seller—Build—at the execution of the purchase contract. The down payment becomes liquidated damages to the Seller if the Investor backs out of the deal. These initial down payments range from $2,000 to $5,000. Because this amount is paid in conjunction with the purchase contract, the Investor generally pays such amount with the reasonable belief that it will be purchasing and taking title to the property, based upon—among other representations—that the Contract to Purchase executed at the initiation of the transaction says so.

**The Switch**

67. On the date of closing, Build, facilitated by First Title, engages in a double closing on the property.

68. First, Build closes on the purchase of the property from the auction website such as Auction.com or through a HUD-licensed broker by using one of the Build Companies. The money to pay for this property comes from the revolving line of credit provided by George Triantafilou, acting individually or through GT Financial. After it is requested by Gary Bailey, upon information and belief, George Triantafilou simply wires the money to First Title.

69. Because Build is financed by George Triantafilou and the Permanent Lenders, it does not have the means to pay down payments or earnest money deposits on the properties it wishes to purchase from a third-party website. As a result, to obtain these properties, Build uses Adobe Photoshop to falsify bank statements to make it look like the Build Company buying the property has sufficient funds, even though it does not, and to falsify cashier's and business checks to make it appear as if it has deposited the earnest money on a property, even though it has not. Each falsified check is made out to deposit at either First Title or Build Realty. In the case of checks written to First Title, third party sellers frequently email to obtain written confirmation that the earnest money deposit has been paid and First Title regularly responds with an email to sellers that the Earnest money in fact has been deposited. This representation is false, and in fact the Earnest Money is never funded.[20]

70. At around the same time as the double closing, the Investor is informed that he or she will never actually take title to the property but will be the purported beneficiary of the

---

[20] If a contract is terminated and calls for the earnest money to be forfeited to a seller, Build may at that juncture fund the earnest money account.

proceeds—if any—of the Trust Transaction. If the Investor backs out, he or she will lose the entirety of their initial "down payment."

71.     To further the fraud, Build never presents the Investor with a document that would assign the right to purchase the property—lawfully belonging to the Investor—to a Build Company such as Edgar as trustee. In deliberately avoiding this step, Build keeps the Investor from thinking he or she has any negotiating power against Build's unilateral change to the transaction. This failure to obtain the assignment of right to purchase the property—coupled with the purchase of the property in derogation of the Investor's contractual right—is a separate and independent fraud. By closing without an assignment of the contract in place to the trustee under the Build Scheme, First Title participates in and advances the fraud on the Investors.

72.     For the second closing, the Build Company that purchased the property from the auction website transfers the property to Edgar Construction as the trustee of a trust in which the Investor is named as the beneficiary. This second sale is at a marked-up price of usually between $5,000 and $10,000 beyond what Edgar Construction paid for the property, and this markup is not affirmatively disclosed to the Investor.  This portion of the Trust Transaction is blatant self-dealing, in violation of Build's and the Build Companies' fiduciary duties owed to the Investor by virtue of the trust relationship. A HUD-1 Settlement Statement is produced by First Title to, in part, create the illusion that the transfer is legitimate.

73.     The money to pay for both the Build Company's acquisition of this property during the first closing and the transfer from the Build Company to Edgar Construction, as trustee, in the second closing, comes from the revolving line of credit provided by George Triantafilou, acting individually or through GT Financial.

29

74.     After it is requested by Gary Bailey or another Build agent, upon information and belief, George Triantafilou simply wires the money directly to First Title to be used by whichever Build Company is purchasing the property. Because the two closings are almost simultaneous and always enabled by First Title, George Triantafilou saves money on wire fees by sending one wire for the amount necessary to purchase the property in the first closing plus the additional costs and fees that are added to the second closing for the Investor to pay.

75.     The additional costs associated with the second closing are described below and include, but are not limited to, the initial markup and exorbitant closing costs exceeding the initial $10,000.00 put "down" by the Investor. Upon information and belief, it is improper for both closings to be financed by the single wire received relative to the second closing.

76.     The Settlement Statement for the second closing—the transfer from a Build Company to Edgar Construction—is plagued with many illegalities and deficiencies. For example, the closing costs for the first closing are passed on to the Investor at the second closing without explanation, the Investor is required to purchase title insurance on a property transferred from Build to its own alter ego, and pays for a credit report that is never performed.

77.     The "purchase" price for the second closing is always several thousand dollars higher than the purchase price for the first closing. The Investor is not informed of this mark-up, which is split by Build and Build's real estate agents. The only purpose of Build first acquiring the property in the name of one of the Build Companies before further conveying it to themselves as trustee is to effectuate the initial markup of the property.[21]

---

[21] Otherwise, the entire transaction could be accomplished, but for its numerous other improprieties, by having Edgar Construction, as trustee, purchase the property from the third-party from the beginning. This is a deliberate step taken by Build and First Title to unlawfully profit at the expense of its Investors/beneficiaries.

78.     The Investor is instructed that he or she will be the beneficiary of the proceeds and rents of the trusts only if he or she signs or accedes to approximately 17 documents. Build's former COO Chris Robertson and current Closing Coordinator Leah Storie, and First Title have affirmatively testified that these same documents are used for every transaction involving the members of the class.

79.     Among these documents is a mortgage agreement that Edgar Construction signs with Build's dba Greenleaf Funding to secure the funding for the purchase of the property. This mortgage agreement is for an amount equal to the price that the Investor is "paying" for the property plus the money that the Investor is borrowing from Greenleaf Funding for rehab costs, and any other costs that Build adds to the total.

80.     In order to "induce" Greenleaf Funding to lend money to Edgar Construction, the Investor signs a document titled Beneficiary's Undertaking, in which the Investor agrees to perform all the obligations that would have been required of Edgar Construction under the mortgage agreement and related agreements, thus, affirmatively obligating the Investor as mortgagor.

81.     The Investor signs a promissory note to pay 15% annual interest on the total of both the property "cost" and the rehab funds—regardless of the amount actually advanced. Build tells the Investor that the rehab funds advanced have been placed in an escrow account for them, but the escrow funds are typically not funded until well after the closing. During that time before the escrow account is funded, the Investor is paying interest on monies that do not exist.

82.     First Title knows that the escrow accounts are not funded or will not be funded until much later, yet misrepresents that fact on the HUD-1 Settlement Statements by signing, affirming that "the HUD-1 Settlement Statement which [it] has prepared is a true and accurate account of

31

the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction" notwithstanding the "warning" that "[i]t is a crime to knowingly make false statements to the United States on this or any similar form" including penalties of fines or imprisonment.

83.    First Title has testified under oath that the escrow funds, at one point, flowed through First Title but, starting in or around 2016, started being funded directly to Build.[22] This was a change directed and required by the Permanent Lenders.

84.    First Title makes material misrepresentations on the HUD-1 Settlement Statements relative to the Trust Transactions and, since the funding of the escrow accounts goes directly to Build, makes no inquiry as to whether those accounts are actually funded at the time of closing and, thus, falsely certifies the accuracy of the statements contained in the HUD-1 Settlement Statements it prepares. Under oath, First Title repeatedly stated that it could not confirm the accuracy of specific line items on the HUD-1 Settlement Statement despite the cautionary language on the form itself.

85.    For example, on July 28, 2016, on line 104 of the HUD-1 Settlement Statement for the second closing on the property at 1822 Lincrest Drive, Cincinnati, Ohio 45240, First Title represented that the rehab escrow funds were being held by First Title and would be disbursed to Build upon closing. This was false. The rehab escrow funds were not wired to First Title until nearly two weeks later. Additionally, the funds were not managed by Build but, instead, by First Title. First Title collected a fee for each draw request, which was split between Build and First Title.

---

[22] In a deposition, First Title's corporate representative, Pat Conners, stated that during the period of time when First Title handled the escrow accounts, many of the rehab escrow accounts were not funded until weeks or months after the closing, generally when Build had found a permanent lender to buy the loan.

86.     Similarly, on July 15, 2014, on line 104 of the HUD-1 Settlement Statement for the second closing on the property at 170 Farragut Road, Cincinnati, Ohio 45218, First Title represented that rehab escrow funds were being held by First Title and would be disbursed to Build upon closing. Upon information and belief, this was false, as the rehab funds were seemingly never received by First Title and disbursed to Build. This is confirmed by an email from Gary Bailey to a number of Investors, including the Investor for the Farragut property, dated September 4, 2014, stating: "I can't thank you enough for your patience during this temporary holding period. The purchase of the loan portfolio by the new lender was finalized today, however, we are told funding will not take place until the middle of next week. . . I assure you that we will fund all of your draw requests the same day they fund their purchase."

87.     To use Greenleaf Funding (*i.e.*, Build) as a loan source, the Investor is also required to sign a document titled Collateral Assignment of Beneficial Interests, which "absolutely and unconditionally" assigns and transfers to Build all the rents and leases from the property, gives Build a security interest in all of the Investor's "present and future right, title and interest" in the property and "all other assets" of the Investor, "whether now owned or hereafter acquired." This document also states that the Investor waives his or her right to redemption and excess proceeds, which is impermissible under Ohio law.

88.     In addition to the Build documents signed at the second closing, the Investor is required to sign numerous First Title documents that repeatedly refer to the Investor as a "buyer," which furthers the material misrepresentation that the Investor will take title by and through the Trust Transaction. Upon information and belief, when asked about the discrepancies in the documents by the Investors (some referring to them as "buyers," some referring to them as

33

"beneficiaries" of the trust, and some they aren't asked to sign at all), First Title represents to the Investors that the trust structure is "not a big deal."

89.     Thus, the property is conveyed by Build to itself as trustee. The Investor is named as beneficiary, but the documents to the transaction show that the Investor-as-beneficiary quickly signs away most rights, and that the trusts themselves are set up to benefit Build and its co-conspirators, not the Investor/beneficiary. Build, the Build Companies, and First Title all directly participate in misrepresenting the true nature of the Trust Transactions to induce the Investors to continue with the same.

90.     Build and First Title manipulate the HUD-1 Settlement Statement to ensure that a total of $10,000 (including the initial payment made by the Investor when signing the Purchase Contract) is paid by every Investor as what Build and First Title falsely call a "down payment" for the property.

91.     For example, a loan on the property at 5121 Leona Drive for $60,600 on July 31, 2014, required an initial fee of $2,500 and cash due from the Investor at closing of $7,500. A loan on a property at 3975 Warwick Avenue for $129,500 on February 10, 2017, required an initial fee of $2,000 and cash due from the Investor at closing of $8,000. And a loan on the property at 2248 South Road for $270,000 on September 11, 2017, required an initial fee of $2,000 and cash due from the Investor of $8,000.

92.     Build and First Title manipulate the settlement costs to ensure that none of this $10,000 paid is ever applied as a down payment paid against the purchase price of the property.

93.     First Title is fully aware that none of the $10,000 will be used toward the purchase price of the property.

94.     First Title has intimate knowledge of the transaction used by Build, including knowledge that the Investors never receive title to the properties, that the Investors are not afforded statutorily mandated rights such as the right to redemption and the right to excess proceeds upon default, that Build is engaging in self-dealing, that no Build Company is a licensed trust company, that no money is actually wired from one Build Company to another at the second closing, that Build is improperly maintaining the difference in price of the property between each of closings in the double closing, and that the funds represented by First Title as being available for escrow repairs are not actually available upon the closing, but instead are often not available until weeks or months later, despite the fact that the Investor is required to pay interest on these unavailable funds.

95.     At the end of the closing, the Investor has paid $10,000 to be a purported beneficiary to a trust created by a Build Company transferring a property to itself as trustee. The Investor has also committed to undertake all of the trustee's obligations as mortgagor and agreed to pay 15% interest to Build.

96.     Once the rehab escrow portion of the transaction is actually funded, the Investor receives the money that is loaned for improvements to the property through periodic draws. A draw can only be made after the completion of a specific rehab project within the property. Each project is pre-budgeted by Build, with costs for improvements generally and deliberately undervalued.

97.     For example, one Investor emailed Mr. Bailey on April 5, 2014, expressing his frustration about the draw program and stating in part: "After looking at the draw schedule we see that the budget allows for a draw of $200 for the rough plumbing of a brand new bathroom on the

second floor. That doesn't even cover the costs of the materials much less the labor a plumber charges."

98.     Despite paying interest on the money in his or her "escrow account," the Investor is required to actually pay for the materials, contractors, and all other costs out-of-pocket first, and then request reimbursement from the escrow account when a particular portion of rehab is completely finished. To receive a draw from the escrow account, the Investor must allow a Build employee or agent to inspect the completed project.

99.     Each inspection costs the Investor another $150, which is split by First Title and Build.

100.    The draw process is used to further defraud Investors once they have entered into the Trust Transaction.

101.    For example, in a June 9, 2015 email from an Investor to Build agent Cedric Pashi, an Investor expressed frustration with the draw process by stating:

"[the inspector] NEVER returned my calls and 2nd of all he is quite frankly being very, very picky in regards to releasing funds. For example: He would not release the funds for cabinets even though they are completely installed. He would not release the funds for the appliances even though they are in place and ready to go. He said because they 'were not hooked up.' In other words, the water line was not ran to the dishwasher or the fridge. He would not release the funds for painting and ceilings even though ALL the painting has been completed except the 'touch-up'. Cedric, I understand that he has to 'protect Gary's best interest' but quite frankly, this is ridiculous and has to change. We are paying 15% interest on the TOTAL loan amount and we have to fight just to get reimbursed for funds we have already spent. What is the purpose of borrowing money

for rehab and paying interest on it if you do not get any of the money back until the end???"

Mr. Pashi responded to the Investor by stating, "I understand your frustration . . . and *it has been an issue with all of our clients* and hopefully Gary is addressing that issue." (Emphasis added).

102.    If a project exceeds the pre-determined budget, which often occurs, the Investor is not reimbursed for the amount exceeding the initial projection, which was created by Build as a material inducement to enter the transaction. Upon information and belief, this is a recurring issue with the budget projections that has forced numerous Investors to come up with significant amounts of additional and unanticipated funds out of pocket, thereby impeding their ability to meet their other purported obligations under the Build Scheme and forcing them into default.

**The Scheme Works so Well, it gets Financed by Outside Lenders**

103.    Within two to twelve weeks of the double closing, Build sells the rights to the loans to a Permanent Lender, such as Defendants Smith Graham or Five Mile. In turn, the Permanent Lender receives a secured interest in the property and an assignment of the beneficial interest in the trust in which the property is held, and pays Build the difference between the Investor's interest payment to Build (15%) and Build's interest payment to the Permanent Lender (12%). None of this is disclosed to the Investor, the beneficiary of the Trust.

104.    The Permanent Lender is a knowing and direct beneficiary of the illegal waiver of the rights of redemption and to excess proceeds. Build effectively acts as its broker to secure the loan documents that provide the Permanent Lender with such benefits. The Permanent Lender also advises and instructs Build on whether to take properties that are in default. More than 90% of the loans that Build makes to Investors are pooled and purchased by the Permanent Lenders. The money from this sale repays the initial lender—GT Financial or George Triantafilou. The physical

loan and "trust" documents are mailed to a collateral-holder such as Wells Fargo or Bank of New York, which holds the loan documents only.

105. The Permanent Lenders typically receive 12% on the principal of each loan.

106. The funding from the Permanent Lenders, such as Smith Graham and Five Mile, is used both to pay off the short-term lender, GT Financial, and to finally fund the draws that Investors request as part of the property rehab.

107. When the Permanent Lenders buy loan pools from Build and set up servicing agreements with Build, the Permanent Lenders are fully aware of the nature of the Build Scheme.

108. The Permanent Lenders are given all of the documents that are used in the Build Scheme. The Build Scheme is explained to them by Build. The Permanent Lender is aware that that the Investors were duped into forming an LLC for the improper purpose of circumventing consumer protection and usury laws, that Investors initially sign a Purchase Contract indicating falsely that they will be taking title to the property, that no assignment of the right to purchase the property is ever signed, that the property is purchased and retained through an unlawful trust, that the placement of a Build Company as the Seller, the named lender, and Buyer/trustee of the trust creates a number of irreconcilable conflicts, that this trust structure serves the sole and deliberate purpose of protecting the Permanent Lenders' interests, that the Build Company improperly retains an interest rate spread not disclosed to the Investor to the detriment of the Investor/beneficiary, that the transaction denies Investors their statutory rights of redemption and to excess proceeds and puts the Permanent Lender in a position to directly control and decide each Investor's fate relative to these rights, and that Build regularly uses the trust structure to unfairly and unlawfully profit off of Investors by maintaining a steady flow of interest payments to the Permanent Lenders and to itself.

38

109.    For example, in a prospectus to one potential Permanent Lender sent on January 5, 2016, Build writes: "The primary feature of all of our loans is that we do not allow the Borrower to take title to the property," and "Holding each property in an individual trust that is controlled by the Lender-appointed Trustee provides an additional layer of protection and control for the Lender." As another example, in February 2013, Build wrote to another potential Permanent Lender, "Our loans are not personal loans and are not subject to usury laws."

110.    More recently, on June 1, 2018, Build described the trust structure to Smith Graham by stating, in part, the following "Advantages" to the loan structure:

    a.    "Judicial foreclosure is not required to reclaim the asset in case of default"; and

    b.    "If Borrower defaults, they are removed as Beneficiary and a new Beneficiary is named."

111.     Upon purchasing the loans from Build, Five Mile and Smith Graham are vested with full decision-making authority on what to do if an Investor fails to make a payment. When this happens, the Permanent Lenders make the decision whether to change the locks and take back the property, or to simply sell the property and keep the proceeds in derogation of the statutory rights of redemption and to excess proceeds. And, in fact, the high interest rate and the requirement that the Investors pay all rehab costs out-of-pocket before seeking reimbursement place a burden on Investors that many Investors are not capable of carrying. They were, after all, expecting to pay only $10,000 on a loan that included rehab costs.

112.    As set forth herein, GT Financial and the Permanent Lenders not only encourage and assist, but actually direct and instruct Build and the Build Companies to act as set forth above, breaching the fiduciary duties owed to the Investors and knowingly, purposely, and maliciously

violating the Investors' rights—including the right to redemption, the right to excess proceeds, and the right to a loyal and disinterested trustee—for the profit and benefit of Defendants.

113. The Build Companies act as agents for GT Financial and the Permanent Lenders in effectuating these breaches and violations, as GT Financial and the Permanent Lenders retain a secured interest in the properties and direct the Build Companies on several material, improper, and/or illegal aspects of the Build Scheme, including: (a) directing them to take back the properties (in violation of the right of redemption); (b) directing them in handling a property once taken back from the Investor (depriving the Investor of the excess proceeds to which they are entitled under Ohio law); and (c) directing them with regard to the handling of the escrow accounts, among other forms of direction.

114. Specifically, and by way of example:

 a. On June 11, 2015, Gary Bailey wrote to an Investor via email, "Once a loan is 2 months late we have to report as a default to the lender who will begin actions to take the property back and resell it." The lender for this property was Five Mile.

 b. On February 23, 2016, Gary Bailey wrote to another Investor via email, "I'm reaching out to you to help avoid an uncomfortable situation with the lenders on Glasgow . . . Their intention is to take both properties back." Five Mile was the "lender" for the Glasgow property referenced in this email.

 c. On April 15, 2016, Chris Robertson, under his title as Operations Manager for Build, wrote to the same Investor via email, "we are going to let the lender know that they are not going to receive payment for April, and that *they have the opportunity to decide what will happen with the home.* They have the opportunity to work with us to see if they will allow you more time to pay, or *they have the*

*legal right to take ownership of the property. . . I'm certain that they will take the*

*house back* if we are unable to explain to them why you are not making payments."

(Emphasis added).

d.    On June 12, 2017, Chris Robertson wrote to another Investor via email, "Our main

lender is becoming more involved in our business . . . What that means is you will

receive a letter indicating that you are in default, and have until the 30th to become

current on your loan. If you are not current on July 1st, *they will expect that we will*

*take the house (or houses) back*." (Emphasis added). The lender for this property

was Smith Graham.

e.    On August 21, 2017, Gary Bailey wrote to another Investor via email, "There is a

very real possibility that at some point tomorrow *the lender will instruct us to*

*change the locks and take the house back*." (Emphasis added). The lender for this

property was Five Mile.

f.    On November 2, 2017, Chris Robertson wrote to the same Investor as above via

email, "The lender is willing to consider another extension on your loan, but you

will have to be paid up for October and November before they will consider this . .

. if payment is not received, the loan will be in default, and they will not extend the

loan."

g.    On February 18, 2018, Gary Bailey wrote to Smith Graham via email describing

situations with two Investors who were in default and asking, "Please let me know

if there are any specific actions you would like us to take for either of these." Both

of these properties were taken back. Presumably, and upon information and belief,

Build took back these properties at Smith Graham's direction.

41

115.   On August 10, 2018, Gary Bailey wrote to several key employees and agents of Build the following, describing in detail the level of control the Permanent Lenders exerted over Build, Gary Bailey, and George Triantafilou: "

> When I use the term "the lender", I'm not referring to Build or Greenleaf in this context…The actual lender is the private equity fund in New York that bought the note from us…they are the ultimate decision makers on any loan defaults because it is their money on the line.

> Our job is to work with Borrowers, and in the case of default… we then report what actions we have taken with the Borrower each month so that they can make an informed decision as to what actions they would like us to take.

116.   George Triantafilou of GT Financial has participated in the exchange of thousands of internal Build communications (including internal policies and procedures), is intimately aware of the nature of the Trust Transactions, including the misrepresentations and omissions made and the ways in which Build acts to violate Investors' rights. As a member of Build's Executive Leadership team, Mr. Triantafilou had hiring and firing authority, could sign checks and contracts on behalf of Build, and engaged in daily and weekly telephone calls with the other members of the Executive Leadership team, including Gary Bailey and Stephen King. Mr. Triantafilou and/or GT Financial direct many of Build's actions, and even drafted an email intended to threaten a defaulting Investor with disparagement in a lawsuit, which Mr. Triantafilou suggested Build should review and send to the Investor.

117.   Mr. Triantafilou and/or GT Financial also advise Build financially, including suggesting in an email dated October 30, 2017 that Build should use "Smith Graham's

reimbursement monies or escrow account monies (after Gary files his report on the 30th)" to purchase more properties to be used in the fraudulent Build Scheme.

118.    Upon information and belief, Mr. Triantafilou has held himself out as a signatory on one or more accounts associated with Build or its affiliated companies and as a "business partner" to Gary Bailey.

119.    Mr. Triantafilou is also involved in recruiting other lenders and maintaining relationships with them, including the Permanent Lenders, and, upon information and belief, has helped Build sell the Build Scheme to other lenders by focusing on the low risk and consistent fixed returns the lenders can hope to realize through their involvement with the Build Scheme, highlighting many of the more egregious aspects of the Build Scheme as a material incentive for participating in the same.

120.    In addition to taking back the property, Build threatens to pursue legal action against the Investor if there is a deficiency after "foreclosing" on the property, even though it knows and understands that the loans to Investors are "non-recourse" loans. This is another misrepresentation and used solely as a scare tactic intended to intimidate the Investors and ensure that the Investors do not question Build's authority to act. For example, on January 6, 2016, Build wrote to one Investor saying,

> If we do not receive at least $3,000 by Friday the 8th, we are taking the following actions:
>
> > Changing the locks on the house
> > Selling the property to another investor
> > Pursuing legal action for any losses we take in reselling the property, which could  include all late payments, outstanding utilities and any amount we would net that is less than the loan amount.
>
> Please understand that this problem is not going to go away if you choose to walk away from this loan, as we will be forced to pursue you for the outstanding payments that are owed

43

121. When an Investor defaults on his or her loan, the Permanent Lender has very little risk of losing the money it has lent. This is because when Build takes back a property by changing the locks, it simply re-sells it to another Investor or an end buyer.

122. No matter how much the property is re-sold for, the Investor receives no excess proceeds, none of his or her $10,000 back, and none of the money he or she put into the property. The Permanent Lender decides the fate of Investors who have defaulted and instructs Build to act accordingly.

### Ohio/Kentucky Trust Law

123. Upon information and belief, no Build Company is licensed as a trust company, as is required under Ohio R.C. Chapter 1111 and/or Kentucky Revised Statutes ("KRS") 286.3-020(2) for the Build Companies to conduct trust business, as they are doing in the Build Scheme.

124. None of the Build Companies is eligible under Ohio R.C. Chapter 1111 for an exception to the requirement that any person "proposing to solicit or engage in trust business in this state shall apply to the superintendent of financial institutions to be licensed as a trust company." Ohio R.C. 1111.06(A).[23] Still, one of the Build Companies—Edgar Construction[24]—acts as a trustee in the transactions at issue in this lawsuit and profits therefrom as a business. The paramount purposes of requiring licensure to act a trust company in Ohio or Kentucky is to ensure (a) compliance with statutory and common law fiduciary duties (and provide oversight relative to

---

[23] Neither Build nor the Build Companies are excepted from the analogous section of the Kentucky Revised Statutes ("KRS") either.

[24] Upon information and belief, Cincy Construction has acted as trustee for a few of the Trust Transactions, but Build's standard operating procedure is to have Edgar Construction named as trustee. In any case, both companies are merely alter-egos of Build.

the same), and b) that each trust company is sufficiently bonded. Neither Build nor the Build Companies meet either of these two requirements, as set forth in Ohio R.C. 1111.06(B) or its analogous Kentucky counterpart.

125. The lack of oversight accomplished by the Build Companies operating as unlicensed trust companies results in numerous breaches of the fiduciary duties that the Build Companies owe to the Investors, including Plaintiffs and the putative class.[25] Because the Build Companies are not sufficiently bonded as is required of trust companies, it also eliminates one of an Investor's best routes of recourse against Build and its co-conspirators.

126. Build, the Build Companies, and those for whom Build acts as agent (*i.e.*, GT Financial and the Permanent Lenders), violate both Ohio and Kentucky trust law in myriad ways, including the use of material misrepresentations, fraudulent omissions, self-dealing and duplicitous tactics, which serve only to benefit the Defendants named herein and harm the Investors/beneficiaries of the Trust Transactions.

**Defendants' Fraudulent Concealment**

127. Starting in July 2017, when Defendants Build and Edgar refused to answer simple interrogatories in a now-dismissed state-court action, Defendants have acted repeatedly and consistently to obstruct discovery and fraudulently conceal the non-named members of the enterprises and/or conspiracies and the scope of the same. Because of this systematic obstruction of discovery and fraudulent concealment of the members of the Enterprises detailed below, and the patterns of racketeering carried out by the Enterprises, as detailed throughout this Complaint, Plaintiffs and the members of the Class did not discover, and could not discover through the exercise of

---

[25] Indeed, one of the factors for determining whether to license a trust company is whether the Superintendent of Financial Institutions believes it will comply with its fiduciary duties. Ohio R.C. 1111.06. *See also* KRS 286.3-020 (analogous section in Kentucky).

reasonable diligence, the existence of persons engaged in the Enterprises and conspiracies alleged herein, and the roles that those persons played in participating or directing the actions that proximately injured Plaintiffs and members of the Class.

128.    Before that time, and continuing forward until very recently, Plaintiffs and the members of the Class were unaware of (a) the names, roles, responsibilities, and rights of the Permanent Lenders, (b) the role and authority in the Build Scheme of George Triantafilou or Stephen King, (c) the extent to which the Permanent Lenders, George Triantafilou, and Stephen King had directing and decision-making authority to control the flow of escrow funds to Investors and to take properties away from Investors, and (d) the extent that First Title acted to deceive Investors at each closing. Plaintiffs and the Class had no way of understanding or knowing how they were being injured by these parties' conduct, or by the conduct of the conspiracies and Enterprises.

129.    Defendants have acted to fraudulently conceal these facts from Plaintiffs in a variety of manners. For example, after nine months of repeated attempts to understand some of the above matters, Plaintiffs were forced to notice limited Ohio Rule of Civil Procedure 30(B)(5) depositions of Build and GT Financial simply to obtain the names and roles of the Permanent Lenders. Although Plaintiffs were able to obtain the names Five Mile and Smith Graham at these depositions, they were not able to understand their complete role and authority in the Build Scheme and within the Enterprises.

130.    As part of one of those 30(B)(5) depositions, George Triantafilou repeatedly lied about his role in the enterprises, his ownership or putative ownership of Build, and his involvement on a day-to-day basis with Build.

131.    Similarly, in a sworn deposition, Stephen King repeatedly lied about his role in the enterprises, his ownership or putative ownership of Build, and his involvement on a day-to-day basis with Build.

132.     As another example of Defendants' mendacity, nine months after Defendants Build and Edgar had answered Plaintiff's Second Set of Requests for Admission, acting under new counsel, Defendants Build and Edgar propounded a "supplemental" response on Plaintiffs. In the "supplement," ten of prior counsel's denials were changed to admissions. These included the admissions that outside investors retained a secured interest in the properties, that Build requires investors to be organized as a corporation or LLC before it will provide financing, and that prior counsel had received correspondence advising him that Build and/or Edgar were required to be registered as trust businesses. Even more outrageous, Build and Edgar initially went so far as to deny that Edgar Construction serves as a trustee for one or more trusts containing real property in Ohio, which is a fundamental part of their unlawful business model.

133.     When Defendants did produce documents, they did so in a digital data dump, with each of six productions so plagued by deficiencies that it took Plaintiffs months and several thousands of dollars to be able to do basic comprehensive searches on the hundreds of thousands of (significantly internally duplicative) pages.

134.     Even the state court grew tired of Defendants' actions, and in June 2018, issued discovery sanctions of $10,000 against Defendants Edgar and Build, alongside a court order requiring Defendants to produce specific supplemental discovery on a monthly rolling basis and to detail by Bates-number which documents corresponded to which of Plaintiffs' Requests for Production. Defendants consistently ignored the bulk of the state court's order, provided no monthly supplement, provided no monthly update on the names of the Investors and those property addresses that Build had taken from Investors without going through judicial proceedings, and argued that they had no obligation to provide any reference to Bates-number. It was not until

January 2019 that Defendants began producing again, and each production contained substantial and significant deficiencies.

136. These are only a few examples of the constant and deliberate concealment of the matters indicated above in the state-court discovery.

136. Plaintiffs and the members of the Classes could not have discovered the alleged unlawful activity, including the conspiracies or Enterprises described herein, at an earlier date by the exercise of reasonable diligence because of the deceptive practices and deliberate obstruction of discovery employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their unlawful conduct.

137. Because the alleged unlawful conduct was affirmatively concealed by Defendants, Plaintiffs and members of the Classes had no knowledge of the alleged unlawful conduct, nor could they have had any knowledge of the alleged unlawful conduct, before late 2018 or early 2019.

## V.    CLASS ALLEGATIONS

138. Plaintiffs bring this action on behalf of themselves and the following Class—including one Subclass—pursuant to Rule 23 of the Ohio Rules of Civil Procedure:

### CLASS DESCRIPTION.

Plaintiffs and all other persons and entities in Ohio and Kentucky, individually and collectively, that invested in real property and were named as beneficiaries to a trust created through an unlawful real estate transaction engaged in by, through, or with any of the Defendants named herein, using the Build Scheme further described and defined herein, for the longest period allowed by law (the "Class").

### SUBCLASS DESCRIPTION

Members of the Class that had their properties reclaimed and resold as a result of default, without access to judicial foreclosure proceedings and the opportunity to redeem, and without receiving the excess proceeds (if any) upon subsequent sale of the property by Build.

139. The Class excludes the officers and directors, and current or former employees and/or agents, as well as immediate family members thereof, of Defendants and their parents, subsidiaries, and affiliates.

140. The Class consists of hundreds of Investors and is therefore so numerous and dispersed that joinder of all members is impracticable.

141. The Subclass consists of more than 35 Investors and is therefore sufficiently numerous and dispersed that joinder of all members is impracticable.

142. There are questions of fact or law common to the Class and the Subclass. These questions include, but are not limited to:

   a. Whether the Build Scheme is illegal;

   b. Whether Build conspired to and did engage in a pattern of deceptive misrepresentations that had the intended effect of making Investors beneficiaries of a trust, rather than title holders of property;

   c. Whether misrepresenting the investment scheme violated Ohio law;

   d. Whether Defendants violated Federal RICO and/or the Ohio Corrupt Practices Act;

   e. Whether Defendants engaged in civil conspiracies to unlawfully injure plaintiffs;

   f. Whether Build attempted to mislead potential Investors, and conceal the existence of, their fraudulent, illegal, and corrupt scheme;

   g. Whether Defendants were and are engaged in a pattern of corrupt activity;

   h. Whether the trusts created by Build's transfer of property to itself as trustee are void or voidable as against public policy, for self-dealing and for granting the Trustee a beneficial interest in the property;

49

i. Whether, notwithstanding whether the Trusts are void or voidable, Build breached its fiduciary and other obligations as trustee of the Trusts;

j. Whether the entire Build Scheme improperly "clogs" Investors' right of redemption and right to excess proceeds in violation of Ohio law by requiring Investors to sign away such rights in order to invest with Build;

k. Whether Defendants committed fraud in the inducement, fraudulent concealment, and/or theft by deception against Investors by luring them into the Trust structure by written and oral misrepresentations, including but not limited to the purchase contract for the properties with the non-refundable down payment;

l. Whether Defendants committed fraudulent concealment in order to prevent Plaintiffs from understanding who the players in the RICO/OCPA enterprises were and the full extent of the pattern(s) of racketeering; and

m. Whether Defendants violated Ohio law by mishandling funds relative to the Investors and the Build Scheme.

143. Plaintiffs' claims are typical of the Class and the Subclass and Plaintiffs are not subject to any unique defenses.

144. Plaintiffs will fairly and adequately protect the interests of the Class and the Subclass. Plaintiffs' interests do not conflict with the interests of the Class or the Subclass.

145. With the help of qualified counsel who are experienced in such litigation, Plaintiffs are capable of adequately representing the proposed Plaintiff Class and Subclass for any and all purposes in that Plaintiffs, like the other members of the proposed Plaintiff Class and Subclass, have been proximately injured by the acts of the Defendants.

146. Certification of Plaintiffs' claims for class action treatment is appropriate pursuant to Rules 23(a) and 23(b) of the Ohio Rules of Civil Procedure. Under Rule 23(b)(2), Build, by entering into and carrying out this unlawful scheme, acted on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Plaintiff Class and Subclass as a whole, halting the scheme and reversing its harmful effects. Moreover, under Rule 23(b)(1)(A), the prosecution of separate actions over these transactions by individual members of the Plaintiff Class or Subclass would create the risk of inconsistent adjudications with respect to the individual members of the Plaintiff Class and Subclass that would establish incompatible standards of conduct for the Defendants regarding the trust structures and misrepresentations.

147. Certification is also appropriate under Ohio Rule of Civil Procedure 23(b)(3), because the classwide questions concerning the Enterprises' conduct and the harm thereby inflicted on Plaintiff Class and Subclass members predominate over any questions affecting only individual Plaintiff Class and Subclass members and a class action is superior to any other available method for fairly and efficiently compensating Plaintiff Class and Subclass members for the harm they suffered as a result of the Build Scheme.

148. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual lawsuits are economically infeasible and procedurally impracticable.

149. Plaintiffs know of no difficulty to be encountered in the management of this case that would preclude its maintenance as a class action.

**VI.   CLAIMS ALLEGED AND RELIEF SOUGHT**

**COUNT I**

**Violations of the Federal RICO statute, 18 U.S.C. 1961, *et seq.*, and the Ohio Corrupt Practices Act, R.C. 2923.31, *et seq.***

150.    Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

151.    Plaintiffs seek treble damages, attorneys' fees, and equitable relief under 18 U.S.C. 1964 and Ohio R.C. 2923.34, for violations of 18 U.S.C. 1962(c) and (d), and Ohio R.C. 2923.31, *et seq.*, and conspiracy to violate Ohio R.C. 2923.31, *et seq.*

152.    This claim is brought by the Plaintiffs against all named Defendants except Build for allegations where Build is the alleged enterprise, and against all named Defendants for allegations where the enterprise alleged is as an association-in-fact. Throughout this Cause of Action only, Defendants refers only to these entities.

153.    The Defendants are "persons" within the meaning of 18 U.S.C. 1961(3) and Ohio R.C. 2923.31(G), who conducted or participated in the affairs of an enterprise through a pattern of corrupt activity, in violation of 18 U.S.C. 1962(c) and (d), and Ohio R.C. 2923.32(A)(1), and conspired to do so, in violation Ohio R.C. 2923.34(A).

154.    Plaintiffs are "persons," as that term is defined in 18 U.S.C. 1961(3) and Ohio R.C. 2923.31(G), who were injured in their business or property as a proximate result of Defendants' wrongful conduct.

**A.   The Enterprises**

155.    Build is an "enterprise" within the meaning of 18 U.S.C. 1961(4) and Ohio R.C. 2923.31(C) (the "Build Enterprise").

156. Alternatively, the Defendants acted as a group of persons associated in fact to form an "enterprise" within the meaning of 18 U.S.C. 1961(4) and Ohio R.C. 2323.31(C) (the "AIF Enterprise").

157. Both enterprises are ongoing and continuing business organizations that exist for a common purpose beyond and in addition to legal business they conduct, and that common purpose is to carry out and unlawfully profit from the Build Scheme. Both enterprises have an identifiable structure separate and apart from the pattern of corrupt activity described below.

158. Each Defendant knowingly and willingly participated in conduct of the enterprises' affairs and reaped the benefit of that conduct. Each Defendant was integral to the Build Scheme. For the Build Scheme to succeed, it requires leadership, participating real estate professionals, a complicit title agency, up-front short-term financing, escrow-account financing, and permanent lenders to purchase the short-term loan notes. Defendants fulfilled and actively participated in and/or directed these roles.

### B. The Pattern of Corrupt Activity

159. The RICO pattern of corrupt activity involved in this case consists of multiple and repeated acts of wire fraud, in violation of 18 U.S.C. 1343; money laundering, in violation of 18 U.S.C. 1956; and Transportation of Stolen Money in interstate commerce, in violation of 18 U.S.C. 2314. The OCPA pattern of corrupt activity involved in this case consists of multiple and repeated acts of wire fraud, in violation of 18 U.S.C. 1343; money laundering, in violation of Ohio R.C. 1315.56; theft by deception, in violation of Ohio R.C. 2913.02(A)(3); telecommunications fraud, in violation of Ohio R.C. 2913.05; tampering with records, in violation of Ohio R.C. 2913.42; and forgery, in violation of Ohio R.C. 2913.31. Defendants also acted to conspire to violate 18 U.S.C. 1343.

160.     All of the acts constituting the pattern of corrupt activity (as defined in 18 U.S.C. 1961(5) and Ohio R.C. 2923.31(E)) are related and continuous in that they were in furtherance of the Build Scheme and occurred repeatedly, with a threat of continuing illegal activity through the present. All of the acts amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive and victimize Plaintiffs and class members. The Defendants used the same method, the same documents, similar participants and methods of execution, and had the same results affecting the same type of victim.

161.     The Defendants took and are continuing to take these actions with the specific intent to deceive and defraud by carrying out the Build Scheme described above. Plaintiffs and the Class actually and reasonably have relied, to their detriment, on the misrepresentations and omissions that form a part of the pattern of corrupt activity.

162.     Plaintiffs and the putative class members have been directly injured in their business and property as a result of these violations. All Plaintiffs and putative class members have suffered substantial damages as a proximate result of these violations.

163.     The pattern of corrupt activity alleged and the enterprises are separate and distinct from each other. Likewise, Defendants are distinct from the enterprises.

### i.  Wire Fraud

164.      Wire fraud generally involves a scheme or artifice to defraud and the use of interstate wires in furtherance of the scheme. 18 U.S.C. 1343. Interstate wires includes not only telephone but also, for example, internet. The wire transmission does not need to convey a specific fraudulent misrepresentation or omission and a plaintiff need not show reliance on any specific fraudulent misrepresentation or omission; the wire transmission simply needs to be used in furtherance of the scheme.

165. The total number of wire fraud violations committed by Defendants in furtherance of the Build Scheme—which is a scheme or artifice to defraud—and forming part of the pattern of corrupt activity are too voluminous to recount, given that the scheme has continued unabated for many years. Specific examples of wire fraud include, *inter alia*:

a. Marketing materials and videos found on Build's website that are transmitted over interstate wires and include at least the following misrepresentations:

i. "We buy distressed properties in bulk, sell them at volume prices to real estate investors like yourself, and then provide you with all the resources you need to successfully complete your project – at no additional cost."[26] This is a misrepresentation because Build does not actually *sell* homes to Investors. Instead, Investors are named as the beneficiary of a trust controlled by Build, which quickly assigns the Investors' rights as beneficiaries over to Permanent lenders. Moreover, Build charges "additional costs" for nearly all of its services. Examples include but are not limited to: charging over $100 for each inspection of the home; charging $500 to list the home after the rehabilitation is complete; a 4.9% loan origination fee; and manipulated settlement costs, on top of the initial markup of several thousand dollars and the retained interest rate spread. Many Investors are required to put in tens of thousands of dollars of their own money to complete the rehab.

---

[26] Buildrealty.net/what-we-do/, 9/11/14 screen capture from Wayback Machine.

    ii.   "We sell deeply discounted, distressed houses to real estate investors and then provide those investors with all of the resources they need to fix up and resell the house – at no additional cost."[27] This more recent instance of wire fraud contains the same misrepresentations as "i," above.

    iii.   "Build purchases properties in bulk from over 20 different sources and then passes the savings on to you."[28] This is a misrepresentation because Build gets most of their properties in single sale auctions from websites such as Auction.com or Hubzu.com, or from the MLS. Former Build COO Chris Robertson has admitted that Build had no ability to get a better price for a property than any other buyer with online access. Additionally, Build does not pass any savings on to the Investor. Build receives these homes for the same value as anyone else who could have placed a bid. To make matters worse, Build marks up the price of the home by several thousand dollars when transferring it to the Investor—as noted previously, sometimes by as much as $24,000. The Investor is not made aware of this price increase.

  b.  Postings on social media that are transmitted over interstate wires and include at least the following misrepresentations:

---

[27] http://buildrealty.net/#step3, accessed 9/10/18

[28] Buildrealty.net, 5/17/14 screen capture from Wayback Machine.

i.  "This property is still available with incredible profit margins of 200%+."[29] This is a misrepresentation because it implies that an Investor that purchases this home will receive at least double the value of the property's purchase price and money spent making additions to the home. In reality, Investors are lucky to break even on a home "purchased" from Build.

ii.  "Greenleaf Funding provides short term rehab loans to real estate investors for the purchase and renovation of investment properties."[30] This is a misrepresentation because it states that the loans are for the purchase of properties. In reality, Investors become the beneficiary of a trust controlled by Build, rather than a purchaser.

iii.  "We sell distressed properties to Cincinnati real estate investors who are tired of missing out on all of the great deals in town."[31] This is a misrepresentation for the same reason as above.

iv.  "52% of the houses that we sold were off market—they were not on the market at all—not available on the open market."[32] This is a misrepresentation because most of the homes purchased by Build for

---

[29] Lorena Anticoli Facebook Post, 1/14/18.

[30] Greenleaf Funding Facebook Page – About, https://www.facebook.com/pg/greenleaffunding/about/?ref=page_internal, accessed October 26, 2018.

[31] Build Realty Facebook Page – About, https://www.facebook.com/pg/Buildrealty/about/?ref=page_internal, accessed October 26, 2018.

[32] Gary Bailey, 4 House Flipping Lessons in Under 5 Minutes, Mar. 6, 2018, https://www.youtube.com/watch?v=i7uXFCiYou0, at 3:36.

Investors are from websites such as Auction.com or Hubzu.com, or listings in the MLS. Contrary to Mr. Bailey's statements, these homes are available for purchase by anyone.

c. Postings by Build agents, such as the Internet posting by Build agent Jamie Cain advertising Build's services where she states "$10,000 down, no credit check, no personal guarantee."[33] The "down payment" is not a down payment and, upon information and belief, every Investor is charged for a credit check.

d. Hundreds of additional wire communications between Defendants and outside parties conveying fraudulent information, including:

    i. In a June 3, 2014 email from Build agent Mark Arbino to an Investor, Arbino told the Investor that he would "only need the $6500 check at closing," and that Arbino needed to know the "Name or entity that [the Investor] will take Title of Property." This shows the ongoing lie told to Investors that they would take title and own the property. The lie continues until on or about the date of closing (and after the Investor has already made a non-refundable payment), when Build switches tactics and tells them that they must pay for Build to own the property.

    ii. In an October 21, 2014 email from Build agent Cedric Pashi to an Investor, Mr. Pashi stated "please please please try to get the financing application done today. There is no credit check and it'll probably take 10-15 minutes to complete." This Investor was charged a $50 credit check

---

[33] https://connectedinvestors.com/company/build-realty, accessed 11/02/2018.

fee by Build Realty dba Greenleaf Funding when he "purchased" a home from Build at 3318 Monteith Avenue, Cincinnati, OH 45242.

e. False statements that are sent through wire in contracts for the purchase of homes from Auction.com, HUD, and other online property brokers. These contracts require proof of funds and Gary Bailey, acting with Build agents, submitted over the internet proofs of earnest money deposits that had been falsified using Photoshop. For example:

    i. For the September 21, 2015 online application to purchase a property at 3937 Kirkup Avenue described above, Mr. Bailey included a document showing that the earnest money would be held in a trust account and showing a copy of a check payable to First Title. Discovery to date has shown that this cashier's check was Photoshopped. First Title, as named endorsee, acted in collusion to transmit this false document. Among other indicia that the document in question was forged, the check number listed is 18055971, which is the same check number that had already been used, for the same purpose twice in the year before (although with different dates).

    ii. On June 12, 2014, Gary Bailey acting through Edgar Construction sent an application through the wires to purchase the bank-owned/REO home property at 6092 Yosemite Drive through Bang Realty. Included in the document was an earnest money cashier's check for $4,000, payable to First Title. The check number of 18156902 is listed next to a Fifth Third Bank account belonging to Edgar Construction. This check is dated June

11, 2014, and the check number in the upper right (which should match the lower numbers) is 18055971. This is the same check number used on the 3937 Kirkup property cashier's check. The fact that the check numbers on the top right and the routing line are different shows that this check was altered.

iii. Discovery to date has shown that Build had saved a copy of this particular check in .psd (or Photoshop editing) form, and that the following layers (terms) of the cashier's check had been edited many times over the years in the following places: Check Number in Routing Line, Numeric Amount, Memo and Purchased-by line, Pay to the Order line, Check Number in the top right, Date, Signature, and Background.

iv. Build also submitted Photoshopped bank statements to online sellers such as Auction.com and HUD-brokers as proof of funds. The bank statements below provide an example. The bank statement on the top was transmitted to Auction.com on June 10, 2014, and purports to show proof of funds in a Fifth Third bank account for Edgar Construction in the amount of $189,004.32. This bank statement was edited using Photoshop from the bank statement on the bottom. Build edited and changed the account holder, the funds available, and the date and last login time and date. After succeeding in winning the property through Auction.com, Build transferred the property to Edgar Construction as Trustee of Trust 126, with Investor 403 Karenlaw LLC as beneficiary, on June 30, 2014.



v. That the photoshopped bank statements and cashier's checks were used in online applications for properties is also confirmed by the April 25, 2014 email string between Gary Bailey, former Build agent Sean Cole, and the Build Office Coordinator at the time, Jen Williams, titled "proof of funds adobe file." In this email, at 12:06 pm, Gary emails Sean Cole, saying "Sean, so you no longer have to wait on me to get these, here is the original photoshop file." Sean then forwards this message to Jen Williams, stating, "Jen, please add this to yoru[sic] list of files we use in Photoshop (the cashier's check may be the only other one). When you can spare your computer for a couple of minutes, I'd like to borrow it to work on this file for Wrenwood."

vi. The day before the April 25, 2014 email string discussing photoshopping and the Wrenwood property, Build agent Sean Cole had emailed an application—specifically referring to a bank statement as proof of funds—to the seller's agent for the property at 157 Wrenwood Lane. As proof of funds to purchase the property, they submitted a screenshot of what purports to be Cincy Construction's Fifth Third Bank account ending in 2989, last login Thursday, April 22, 2014. This was Photoshopped. For example, the purportedly computer-generated "login" for "Thursday, April 22, 2014" is incorrect—April 22, 2014 was a Tuesday.

vii.    Plaintiffs have found iterations of this photoshopped bank-account proof of funds that were modified as recently as June 22, 2018. However, due to Defendants' deliberate obstructionist tactics in discovery (as described below), Plaintiffs have not yet obtained an offer to purchase sent over the internet containing this June 2018 iteration. Nevertheless, the recent iteration shows that Defendants continued use of wire fraud to obtain properties in furtherance of their scheme is ongoing. In depositions of Build's former COO Chris Robertson and current Closing Coordinator Leah Storie regarding the Build Companies' bank accounts, both repeatedly testified that they had no knowledge of any current Fifth-Third bank accounts. As such, not only are Defendants using photoshopped bank accounts to fraudulently obtain properties, it is likely that Defendants do not even own current bank accounts with the bank shown in these falsified proofs of funds.

f.   Statements sent over wire containing false certifications. For example, in contracts for the purchase of homes by McGregor Holdings from HUD, McGregor routinely certifies that it submits the offer to purchase the property "as an owner-occupant purchaser." It also certifies that it "will occupy the property as [its] primary residence for at least 12 months." Additionally, in each transaction, a Build employee acts as broker and falsely certifies that the home has not been sold to an Investor. Furthermore, in conjunction with each application to purchase a home from HUD, HUD requires proof of funds or availability of funds for the application to be accepted and considered. In each application, Build creates a fraudulent letter

whereby it purports that Greenleaf Funding is vouching for the availability of funds for McGregor, when Greenleaf Funding and McGregor are both simply alter egos of Build Realty and in fact share the same bank account. Greenleaf Funding has no funds of its own, as averred in the letter to HUD, but relies entirely on the backing of George Triantafilou and GT Financial. For example:

    i.    HUD contract signed by Gary Bailey on behalf of McGregor Holdings on June 19, 2013 for purchase of home at 146 Junedale Drive, Cincinnati, OH 45218. The contract was received electronically by HUD on June 20, 2013.

    ii.    HUD contract signed by Gary Bailey on behalf of McGregor Holdings on May 16, 2016 for the purchase of home at 7524 Winton Road, Cincinnati, OH, 45224. The contract was received electronically by HUD June 16, 2016.

    iii.    HUD contract signed by Gary Bailey on behalf of McGregor Holdings on March 23, 2017 for purchase of home at 2438 Duck Creek Road, Cincinnati, OH 45212. This contract was received electronically on March 24, 2017.

g.  In addition to the use of interstate wires to transmit false or fraudulent information or documents, Defendants regularly committed wire fraud through use of the interstate wires in furtherance of the Build Scheme, a scheme to defraud. Every wire transfer in this case is an act of wire fraud. This would include, for example,

    i.    On August 28, 2017, Smith Graham employee Lucy Karongo confirmed to Gary Bailey that Build had transferred by wire $375,523.73 on August 21,

2017, as payment for interest on the loans Smith Graham held on several properties, including the property at 1915 Acorn, with CPM as the Investor.

ii. On January 1, 2015, Defendant GT Financial transferred by wire $67,126.67 to Defendant First Title to be used in conjunction with Edgar Construction's purchase of the property at 124 Joyce Avenue as trustee for a beneficiary Investor.

iii. The day before, First Title wired "Edgar Const/Greenleaf" $4,047.50 as the Closing Proceeds, in conjunction with the transfer of the property at 124 Joyce through a Trust Transaction.

### ii. Money Laundering

166. Defendants also committed several predicate acts of money laundering in violation of 18 U.S.C. 1956 and Ohio R.C. 1315.55. At all times, Defendants have been aware that they are involved in an unlawful scheme to defraud Investors. Defendants profit from these acts of fraud. Defendants use the proceeds from this illegal and unlawful scheme in subsequent transactions with the intent to promote, manage, establish, carry on, and/or facilitate the promotion, management, establishment, or carrying on of the illegal scheme to defraud Investors. As an example:

a. On October 20, 2017, an Investor, dba NLB Investment Properties, LLC was induced into signing a purchase contract for a property located at 2270 Adams Avenue, Cincinnati, Ohio 45212.[34] The Investor paid $2,000 as "down payment" for the property, which was to be sold to her by Cincy Construction, represented by Gary

---

[34] Unsurprisingly, Build had placed the property under contract the month earlier using a fraudulent earnest money check made out to deposit with First Title.

Bailey. The check was made out to Build Realty. The Investor had been given a very high appraised rehab value and been told that her rehab budget was very low.

b. On November 1, 2017, the Investor arrived at closing and was informed that she would not actually be taking title to the property. Instead, she had the option of going forward with the transaction or losing her $2,000 "down payment." The Investor did not understand the unlawful trust structure she was forced to accede to, but based upon the promises of the Build Enterprise, went forward with the transaction. The documents memorializing the unlawful real-estate transaction were signed by then-Build Realty Chief Operating Officer Chris Robertson, and notarized by Pat Conners, of First Title. The Settlement Statement and HUD-1 attachment were prepared by Pat Conners of First Title. The Investor never signed any document assigning the right to purchase the property to Build.

c. At closing, the Investor paid an additional $8,000 in cash, which went to pay Build $195 for an administrative fee and $450 for a "Rehab inspection fee," GT Financial $450 for a "document prep fee," and First Title $175 for Settlement Services, $175 for an Abstract or Title Search, $75 for a Title Binder, and $1,172.25 for Title Insurance, despite the fact that the Build Enterprise was purchasing the property from *itself*. The principal amount of the loan was $233,022.08. After closing, Stephen King was paid $800 from this transaction, for his broad role in advising and directing the Build Enterprise Scheme and inducing Investors to buy into the Scheme.

d. The Investor paid 15% on the loan to the Build Enterprise, which forwarded that 15% to George Triantafilou and GT Financial. This amounts to $34,953.31 in interest per year, or $2,912.78 per month. The Investor paid 15% interest on the rehab escrow

funds, even though there was no money placed in the escrow account at closing, and no money in that account until the loan was bought by Smith Graham.

e. On November 20, 2017, $228,000 of the loan was placed in a pool with other loans and sold to Smith Graham. All the documents from each property were reviewed by, accepted, and then sold to Smith Graham. On this property alone, Smith Graham made 12% on the principal, $2280 per month. Build Enterprise kept $570 per month on this property. This particular pool— "Group 35" for Smith Graham—was small and had only three properties, but from these three properties alone Smith Graham could expect to make $79,830 per year ($6,652.50 per month), and Build could expect to make $19,957.5 per year.

f. Smith Graham's purchase of the note freed up substantial capital from the Build Enterprise's revolving line of credit with GT Financial and George Triantafilou. As a result, Build was able to purchase additional homes, to be sold in the next pool to Smith Graham. Smith Graham knew about the fraud used by the Build Enterprise to induce Investors into paying the down payment, and then to accede to the unlawful real-estate transaction. This knowledge eliminated Smith Graham's concerns about the security of its investment.

167. As indicated above, each of the Defendants conducted a transaction with the purpose of promoting, managing, establishing, carrying on, or facilitating the promotion, management, establishment, and carrying on of the corrupt activity—the theft by deception and telecommunications or wire fraud. As more Investors are duped by the Build Enterprise Scheme, each Defendant makes more money, and so acts to encourage these corrupt activities.

### iii. Transportation of stolen money in interstate commerce

168.    Defendants also committed several predicate acts of transportation of stolen money in interstate commerce, in violation of 18 U.S.C. 2314. This statute prohibits the transportation, transmission, or transfer in interstate or foreign commerce any … money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." With each unlawful and fraudulent sale of a property to an Investor, Defendants violated this statute in furtherance of their scheme. As examples:

    a. On or about March 20, 2018, one of the putative class members was induced to sign up for the Trust Transaction by Build related to a property at 2177 Crane Avenue in Hamilton County, Ohio. Having already paid a non-refundable $2,000 "down payment" that was instead applied to improper costs, this Investor paid another $8,000 to First Title. On that same day, First Title wired Build $6,443.50 as settlement for Greenleaf Funding's "Loan Origination Fee." The money was therefore transmitted in interstate commerce, with First Title and Build both knowing that the money had been stolen or taken by fraud.

    b. On or about March 29, 2018, one of the putative class members was induced to sign up for the Trust Transaction by Build related to a property at 1086 Benz Avenue in Hamilton County, Ohio. Having already paid a non-refundable $5,000 "down payment" that was instead applied to improper costs, this Investor paid another $5,000 to First Title. On that same day, First Title wired Build $5,096 as settlement for Greenleaf Funding's "Loan Origination Fee." The money was therefore transmitted in interstate commerce, with First Title and Build both knowing that the money had been stolen or taken by fraud.

c. As stated above, the goal of the Enterprise(s) is to close at least five Trust Transactions per week. Discovery to date has shown that Build has sold approximately 260 properties to Smith Graham through the end of November 2018. If only $5,000 of the money stolen or taken by fraud from each Trust Transaction was transferred in interstate commerce, this amounts to approximately $1,300,000 in 2018 alone.

### iv. Theft by Deception

169. Defendants also repeatedly engaged in theft by deception in furtherance of the Build Scheme and forming part of the pattern of corrupt activity. Under Ohio R.C. 2913.01 *et seq.*, no person may, "with purpose to deprive the owner of property … knowingly obtain or exert control over … the property … by deception." Deception is "knowingly deceiving another or causing another to be deceived by any false or misleading representation." Because the down payment will never be considered as equity in the property, but will instead go to the pockets of Defendants, the taking of an Investor's nonrefundable down payment as part of the "purchase contract" constitutes Theft by Deception, in violation of Ohio R.C. 2913.02. Specific examples of theft by deception include, *inter alia*:

a. 7801 Quarter Maine Ave, Cincinnati, Ohio 45236, placed under purchase contract by Ronnie and Gwendolyn Broadnax, dba R&G Cincy Investments, LLC. On May 24, 2017, the Broadnax's signed a contract with Cincy Construction, represented by Gary Bailey, to purchase this property, paying $2,000 as down payment. The check was paid to Build Realty. Build never intended for R&G to purchase and take title to the property, and R&G never was allowed to purchase and take title to the property, and so this exchange constitutes theft by deception.

b. 1915 Acorn Drive, Cincinnati, Ohio 45231, placed under purchase contract by Theresa Robinson, dba Compound Property Management, LLC. On October 19, 2016, Ms. Robinson signed a contract with Edgar Construction, represented by Gary Bailey, to purchase the property, paying $3,000 as down payment. The check was paid to Build Realty. Build never intended for CPM to purchase and take title to the property, and CPM never was allowed to purchase and take title to the property, and so the exchange constitutes theft by deception.

170.    In addition, Build heavily advertises that it does not run credit checks on Investors. However, every Investor pays a fee for a "Credit Report," which the HUD-1 Settlement Statement shows is remitted to Build by First Title at the second closing. At that point, the Investor must either pay the "Credit Report" fee or back out on the transaction and lose the entirety of their "down payment," which is always several thousand dollars. In reality, the Investor has no choice but to pay for a credit check that Build expressly represented would not take place and that discovery has shown does not take place.

### v.  Ohio Telecommunications Act

171.    Many of the specific predicate acts of Wire Fraud above are also violations of the Ohio Telecommunications Act, Ohio R.C. 2913.05. This statute prohibits any person from knowingly disseminat[ing], transmit[ting], or caus[ing] to be disseminated or transmitted by means of a wire … telecommunication, telecommunications device … any writing, data, sign, signal … or image" with the purpose of carrying out a fraudulent scheme. Each act of Wire Fraud above, therefore also constitutes a predicate violation of the Ohio Telecommunications Act.

### vi.  Tampering With Records

172.    Gary Bailey and agents of Build committed several additional predicate acts of Tampering with Records in violation of Ohio R.C. 2913.42(A)(1). This statute prohibits a person, "with purpose to defraud," from "falsify[ing] … any writing." "Writing" is defined under Ohio R.C. 2913.42(F) as any "document, letter, memorandum, note, paper or other thing having in or upon it any written, typewritten, or printed matter." As discussed above, over the course of years, Gary Bailey and agents of Build falsified cashier's checks and bank statements with the intent to obtain properties as a benefit to Build. As examples of the falsified cashier's checks:

    a.  The cashier's check dated September 18, 2015, suggesting that McGregor had deposited a $1,000 check with First Title to be held as earnest money for a property at 3937 Kirkup Avenue, Cincinnati, Ohio 45213 in the event that McGregor did not purchase the property from U.S. Real Estate Services. As described above, the cashier's check was Photoshopped and had no value.

    b.  The cashier's check dated June 11, 2014, suggesting that Edgar Construction had deposited a $4,100 check with First Title to be held as earnest money for a property at 683 Crenshaw Lane, Cincinnati, Ohio 45240 in the event that Edgar Construction did not purchase the property from Fannie Mae. The cashier's check was Photoshopped and had no value.

    c.  The cashier's check dated June 18, 2014, suggesting that Edgar Construction had deposited a $1,000 check with First Title to be held as earnest money for a property at 1 Apache Court, Hamilton, Ohio 45140 in the event that Edgar Construction did not purchase the property from a private seller. The cashier's check was Photoshopped and had no value.

### vii. Forgery

173.   Under the same set of facts, and in each of these examples, Gary Bailey and agents of Build committed several predicate acts of Forgery in violation of Ohio R.C. 2913.31. This statute prohibits a person, "with purpose to defraud," from "forg[ing] any writing so that it purports to be genuine when it actually is spurious." In addition to the cashier's checks, as discussed above, Gary Bailey and agents of Build forged proof of funds documents to send to property sellers such as HUD, with the purpose of obtaining the properties. As examples:

a.   The Photoshopped screenshot of what purports to be McGregor's Fifth-Third Bank checking account ending in 2989, altered to try to make a screenshot taken in August 2013 appear as if it's a screenshot taken in October 2013. This document was sent as part of an online application to purchase a property from HUD. It is not genuine, but "spurious," and was used to fraudulently obtain property from HUD.

b.   The Photoshopped screenshot of what purports to be McGregor's Fifth-Third Bank checking account ending in 2989, altered to try to make it appear as if the screenshot was taken on Thursday, September 18, 2015. September 18, 2015 was a Friday. It is not genuine, but "spurious," and was used to fraudulently obtain property from U.S. Real Estate Services.

c.   The Photoshopped screenshot of what purports to be Cincy Construction's Fifth-Third Bank checking account ending in 2989, altered to try to make it appear as if the screenshot was taken on Thursday, April 22, 2014. April 22, 2014 was a Tuesday. It is not genuine, but "spurious," and was used to fraudulently obtain property from seller Joann Washburn.

174. The foregoing examples of Build and the Build Companies Photoshopping bank statements and cashier's checks not only further the overarching fraud being perpetrated against the Investors, but they are integral to the Build Scheme. Without tampering with these documents to show funds that aren't really available or that weren't actually deposited, Build and the Build Companies would not be capable of acquiring the properties that are ultimately the corpus of the trusts used in the Build Scheme in the volume that they are otherwise able to achieve using such means.

175. For example and upon information and belief, Build could not simultaneously or in close temporal proximity show that both Cincy Construction and McGregor Holdings each have substantial funds available to them for the acquisition of new properties under the strict requirements of bidding on websites such as Auction.com or Hubzu.com. This would significantly limit the number and frequency of properties that Build and the Build Companies could acquire, limiting their business under the Build Scheme.

176. Similarly, discovery to date has shown that Build and the Build Companies do not close on the properties until they are already under contract with an Investor, and generally walk away from their acquisition contracts if they are unable to find an Investor for such property.

177. The requirement of earnest money is intended to circumvent the precise situation Build creates by Photoshopping the same. This gives them an unfair competitive advantage in the acquisition market and has a direct and proximate relationship with the Investors, as they would not be able to otherwise acquire the properties in the same volumes if they were not using fraudulent documents.

**C.      The Role of the Defendants in the Federal RICO violations and the Ohio Corrupt Practices Act Violations**

178.     Each Defendant has conducted itself with the purpose of directing, promoting, establishing, carrying on, or facilitating the promotion, establishment, or carrying on corrupt activities with knowledge of and an agreement to further the same.

179.     Each Defendant has been involved in and participated in the conduct of the enterprises alleged.

180.     Gary Bailey and the Build Companies' activities are designed to promote, carry on, or facilitate the pattern of corrupt activity detailed above, including the falsifying of documents and fraudulent misrepresentations made to both the Investors and third parties, with the necessary assistance of First Title as described throughout this Complaint.

181.     Although Ohio law gives the buyer of a property the choice of title company, Build requires Investors to use First Title to close. Build also uses First Title to close on properties it purchases, in substantial part because First Title knows that Build does not actually deposit earnest money checks as part of the acquisition process. Discovery to date has shown that First Title in fact actively assists Build in covering up the falsified earnest money checks by notifying Build when the seller requires additional proof or stalling the seller to give Build time to deposit a real check.

182.     George Triantafilou and GT Financial loan money to Build to promote or facilitate the promotion and carrying on of these corrupt activities and give significant direction to the Build Enterprise and/or AIF Enterprise as to mishandling the funds involved therein and acting to purposefully harm the Investors, among other instructions. In exchange for their participation and direction, George Triantafilou and GT Financial receive significant profits from the Build Scheme, which they hold themselves out as being a significant part of. Mr. Triantafilou has been described

as the *de facto* Chief Financial Officer of Build, attends all of the Executive Leadership meetings, regularly discusses profits and losses and Build's financial position with the executive team, and has the authority to hire and fire and sign contracts and checks on behalf of Build.

183.    Stephen King receives fee payments for his ongoing instruction in the sales and marketing programming aspects of the Build Enterprise and/or AIF Enterprise, designed to induce more Investors into the Build Scheme, in furtherance of the same corrupt activity. Mr. King does much more than just marketing, and has been described by former Build agent Derek DeVerna as the *de facto* Chief Executive Officer of Build. He runs all of the Executive Leadership meetings, often by phone, instituted a quota system for number of Trust Transactions per week, and makes decisions regarding what role certain employees fill at Build. In 2018, Mr. King instituted a completely new business model rollout for Build, and before that, starting in 2016, under Mr. King's leadership, Build modified its business model to emphasize sales using the Trust Transaction, even going so far as to give real estate agents additional commissions for each Trust Transaction closed. Mr. King takes great credit for the increase in number of Trust Transactions in the two years he has been leading Build.

184.    In late 2016, George Triantafilou and Gary Bailey entered into an option agreement to sell 100% of the shares of Build—owned by the Bailey Investment Trust—to G2. Subsequent emails and correspondence suggest that this option transaction has been carried out, although there is conflicting information on this point. G2's ownership is supported by, *inter alia*: Gary Bailey emailed key vendors to switch the name of the company holding licenses from Build Realty Inc. to Build's "parent company," G2; and emails suggesting that George Triantafilou, Stephen King, and a third person are now the owners of Build, through ownership of G2 Technologies. As such,

this direction, control, and indeed ownership place George Triantafilou and Stephen King—alongside Gary Bailey—as key figures participating in and directing the RICO/OCPA enterprises.

185.    The Permanent Lenders purchase notes to free up Build's cash availability, giving them a secured interest in the properties involved therein and the ability to direct Build's activities with regard to such properties, and with the intent of luring in more Investors, so that the Permanent Lenders can receive even greater profits. The Permanent Lenders know, understand, and encourage the fraudulent transactions underlying the RICO/OCPA claims. The Permanent Lenders direct and order Build and its agents and employees with regard to the management and disposition of properties that the Investors are trying to rehab.

186.    All Defendants have knowledge of the improprieties of the Build Scheme and purposefully and affirmatively act in agreement and in furtherance of the same.

187.    All Defendants have also knowingly received proceeds derived from a pattern of corrupt activity.

188.    Gary Bailey and the Build Companies receive proceeds from the initial $10,000 that Investors pay them, proceeds from acting as a real estate brokerage with regard to the properties, proceeds from the initial markup of the property, proceeds from the difference between the interest rate Build pays to the Permanent Lenders and that which the Investors pay Build—such as the interest rate spread that Build keeps in exchange for servicing the loans—and the excess proceeds if the property is taken back and resold upon Investor default.

189.    George Triantafilou and GT Financial have received hundreds of thousands of dollars for Build's use of the revolving line of credit and the flat fees they receive on a per-property basis at closing, for fraudulent wire transfer fees and other fictitious costs, all in addition to whatever fees George Triantafilou has earned as putative owner of Build.

190. Stephen King has received over $300,000 in fees on a per-property basis in the last two years for his involvement, in addition to whatever fees he has earned as putative owner of Build, and any other fees he deliberately misled about during his perjury-filled deposition.

191. Five Mile has made hundreds of thousands of dollars buying notes from Build and collecting interest on the same so that Build can pay back GT Financial and George Triantafilou and use the money to conduct more unlawful transactions.

192. Smith Graham has made millions of dollars on interest payments by buying notes from Build, so that Build has more available cash in its line of credit from GT Financial and George Triantafilou.

193. First Title has made hundreds of thousands of dollars by virtue of their exclusive arrangement whereby Build requires that the Investors close with First Title, monopolizing the market on the improper, but lucrative, Build Scheme and retaining a steady and voluminous stream of title work in exchange for its activities as part of the Build Enterprise and/or AIF Enterprise.

194. Plaintiffs and the Plaintiff Class have suffered direct and proximate injury as a result of Defendants' violations of Federal RICO and the Ohio Corrupt Practices Act.

**D.      The Conspiracy in Violation of 18 U.S.C. 1962(d) and Ohio R.C. 2923.32**

195. All Defendants have knowingly entered into the conspiracy either throughout or during the class period and are, therefore, jointly and severally liable for the injuries the conspiracy has caused. The Plaintiffs and Investors have been proximately injured as a result of this conspiracy to violate Federal RICO and the Ohio Corrupt Practices Act.

196. No individual Defendant, alone, could carry out all components of the Build Scheme.

197.    Each Defendant benefited from the conspiracy, to the detriment of Plaintiffs and the Plaintiff Class.

## COUNT II
## Breach of Fiduciary Duty

198.    Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

199.    Notwithstanding that the trusts created by the Build Scheme are unlawful and void or voidable, the Investors were all beneficiaries under trusts for which Edgar Construction or another Build Company served as trustee.

200.    Both Ohio and Kentucky law imposes strict obligations on trustees, including the obligation of fiduciary duties to the beneficiaries of the trust.

201.    Additionally, to ensure compliance with these fiduciary obligations, trust companies/businesses (*i.e.*, those which accept and execute trusts of property, serving as a trustee, executor, administrator, guardian, receiver, or conservator, and providing fiduciary services as a business) are required to be licensed as such by the State of Ohio and the Commonwealth of Kentucky. Upon information and belief, neither Build, nor any of the Build Companies, including Edgar Construction, are properly licensed as trust companies under Ohio R.C. 1111 or KRS 286.3-020.

202.    As Trustee, Edgar Construction owed certain fiduciary duties to the Investors, including a duty to administer the trust in good faith and in accordance with the interests of the Investors and a duty of loyalty (which prohibits self-dealing), among others.

203.    Specifically, each of the Trust Codes (Ohio R.C. 5801.01, *et seq.*/KRS 386B) require one or more of the following key duties of trustees, without limitation:[35]

    a.  Good faith;

    b.  "[T]hat the trust have a purpose that is lawful [and] not contrary to public policy";

    c.  That the "trustee shall administer to the trust solely in the interests of the beneficiaries;"

    d.  Loyalty/not to engage in self-dealing;

    e.  To accept only "reasonable" compensation for acting as trustee;

    f.  To keep the beneficiary reasonably informed about the administration of the trust and the facts necessary to protect the beneficiary's interests; and

    g.  All duties arising from equity or common law.

204.    Build and the Build Companies, including Edgar Construction, are all alter egos of one another. Former Build COO Chris Robertson testified under oath that Edgar Construction employees are Build employees. Therefore, inasmuch as employees and agents of Edgar Construction are obligated to act with the care of a trustee, so too are Build and the other Build Companies.

205.    Relative to every trust, Build and the Build Companies routinely act with a complete disregard of their duties as trustee and breach the same by:

    a.  administering the trusts in bad faith;

    b.  making material misrepresentations to their Investors/beneficiaries relative to the terms and structure of the Trust Transactions, including, without limitation, falsely representing that the Investor is purchasing the property;

---

[35] The trusts involved in the Trust Transactions are non-charitable inter vivos trusts under Ohio R.C. 5801.02.

c. engaging in self-dealing by purchasing properties as trustee from themselves and/or their alter-egos at marked-up prices, none of which is disclosed to the Investors;

d. inducing the Investors to go along with the Trust Transactions using improper means such as fraud, both misrepresentations and omissions, and by threatening to improperly take back the properties and sue the Investors;

e. structuring the Build Scheme and Trust Transactions for the benefit of Build, the Build Companies, and the other named Defendants herein rather than for the sole interest of the Investors as both the Ohio and Kentucky Trust Codes require, including, for example designing the Build Scheme to allow for Build to take title to the property before it conveys to itself as trustee, for the sole purpose of marking up the purchase price for which the Investor is responsible;

f. taking undisclosed and improper fees and markups at nearly every stage of the improper Trust Transactions, including, without limitation, the initial markup of the purchase price and the interest rate spread;

g. taking entirely fictional fees at closing, including, without limitation, credit report fees;

h. acting in collusion with others to take money from the Investors to pay for Build's own acquisition closing costs;

i. requiring the Investors to execute the Collateral Assignment of Beneficial Interest in favor of Build at the time of the mortgage and other Trust Transaction documents, which is an unequivocal and legally impermissible violation of the Investors right to redemption under both Ohio and Kentucky law;

j.    failing to keep the Investors informed about the material aspects of the Trust Transactions and even providing false information relative to the same;

k.    failing to disclose GT Financial or George Triantafilou and the Permanent Lenders' respective interests in the Trust Transactions, including the fact that Build gives such lenders secured interests in the individual properties held in trust for the Investors;

l.    often refusing to release the funds allegedly being held in escrow for the Investors to use to improve the properties, leading to a significant increase in likelihood of default;

m.    capitalizing off of the Investor's inability to comply with the extremely harsh and one-sided terms of the Trust Transactions that Defendants had structured;

n.    taking compensation that is not "reasonable under the circumstances";[36]

n.    profiting from their role as trustee as a business and in ways not permitted, especially considering the lack of required licensure;

o.    selling the properties to a third-party buyer without giving notice to or obtaining consent from the Investors, who held/hold a beneficial interest in those properties, as to the sale, upon any instance of default;

---

[36] For example, not even the $10,000 payment to Build and other Defendants is acceptable or reasonable, as Build profits from the payment and to the extent that, if the Investor does not accede to Build's demands and sign the document titled Beneficiary's Undertaking, the Investor will lose the "down payment" it paid to Build. Moreover, a substantial portion of this payment was procured through fraud, as it was paid with the understanding that the Investor would be "purchasing" and taking title to the property for which they rendered the payment. Essentially, if the Investor decides not to move forward with the Trust Transaction once they learn its true nature, the money they initially put "down" is forfeited and retained by Build. This is not "compensation that is reasonable under the circumstances," as limited by Ohio R.C. 5807.07; *see also* KRS 386B.8-050.

p. stripping the Investors of their interest in their respective properties upon default, without opportunity to cure or redeem the properties, by selling the properties without notice or foreclosure and retaining all profits, including but not limited to the initial markup, the interest spread, the improvements attributable to the Investors funds or work, and the excess proceeds to which Plaintiffs would have been entitled[37] had Build foreclosed on the properties; and

q. administering the trust for an improper purpose—allowing Build, the Build Companies, GT, and/or the Permanent Lenders to profit from the Trust Transactions to the detriment of the Investors and to take back the properties without affording the Investors their statutory and equitable rights, such as the right of redemption and the right to the excess proceeds that may result from a foreclosure sale.

206. The foregoing list is, unfortunately, not exhaustive of the ways in which Defendants act in breach of the fiduciary obligations set forth under Ohio and/or Kentucky law.

207. Discovery to date has shown a complete absence of training or understanding by Build that Build, Edgar, or their agents or employees owed a fiduciary duty to the Investors/beneficiaries. Instead, Build, Edgar, and their agents and employees believed they owe trustee duties to "the property," even to the detriment of the Investor/beneficiary.

208. As noted elsewhere herein, many of the breaches and violations of the Investors' rights were undertaken by Build at the direction of GT Financial, George Triantafilou, Stephen King, and the Permanent Lenders and would not have been achievable without the collusion of

---

[37] What this means in practice is that when a property claimed to be in default is re-sold to a third-party buyer, if the sale price is in excess of the note amount outstanding, Build does not give the proceeds to the Investor, but simply keeps the excess proceeds as additional profit. This "excess" or "surplus" is due and owing to the Investor under both Ohio and Kentucky law.

these individuals and First Title, including full knowledge of the structure of the scheme and their agreement to it.

209.    Defendants all acted in furtherance of the fraud perpetrated against the Investors with knowledge that Build and the Build Companies owed the Investors fiduciary duties and with a purpose to harm the Investors for the sole benefit and profit of the Defendants named herein.

210.    As a direct and proximate result of Build's numerous breaches of their fiduciary duties to the Investors, the Investors have been damaged in excess of the jurisdictional amount, in an amount to be proven at trial, including but not limited to all damages specifically identified elsewhere herein.

## Count III
## Civil Conspiracy

211.    Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

212.    Defendants have engaged in a civil conspiracy to unlawfully injure Plaintiffs and the Plaintiff Class. Their actions evidence a malicious combination with the purpose of causing injury to the property of Plaintiffs and the Plaintiff Class in a way not competent for one alone, resulting in actual damages.

213.    Defendants have purposely committed, aided, and/or benefitted from the underlying unlawful or tortious acts, without a reasonable or lawful excuse, to the injury of Plaintiffs and the Plaintiff Class.

214.    The unlawful or tortious acts of the Defendants are attributable to each other. All Defendants have agreed to and acted in pursuance of a common plan or design to commit unlawful or tortious acts, actively took part in it, and ratified and adopted the wrongdoer's act done for their benefit.

215. Although the unlawful or tortious acts are too numerous to recount, examples of the underlying unlawful or tortious acts that give rise to this claim for civil conspiracy are detailed below.

    **a.**    **Civil Conspiracy to Commit Fraud**

        i. The Build Scheme is a fraudulent scheme, as previously set forth. That fraud is a tortious act independent of the conspiracy and, as also previously set forth, each of the Defendants has committed overt acts in furtherance of that conspiracy.

        ii. Fraud

            1. Build committed the tortious act of defrauding Investors in every Trust Transaction.

            2. For example, in each Trust Transaction, a Build Company entered into a contract to sell a property to the Investor. Despite its representation otherwise, Build knew that it had no intention of honoring the purchase contract. Build knew that at the second closing it would simply take the contractual right to purchase the property away from the Investor without a written assignment of this right or consideration offered.

            3. The right-to-purchase representation was made falsely by Build with the intent of luring the Investor into relying upon Build's contractual promise of the right to purchase.

            4. Whether or not an Investor's right to purchase a property will be taken away without assignment or consideration is material to the

transaction in that it is a fact that is likely to make a reasonable buyer reconsider his or her decision, and each Investor reasonably relied upon Build's representation that the Investor would have the right to purchase the property, so long as the Investor did not assign away the right for consideration.

5. As a result of Build's fraud here, each Investor was unlawfully denied the right to purchase the property or to assign the right to purchase the property for consideration.

6. The Permanent Lenders have knowledge of these fraudulent conveyances because they have reviewed the form contracts and agreements that are signed by all Plaintiffs and members of the Plaintiff Class. Despite this knowledge, the Permanent Lenders have continued to fund the fraudulent Build Scheme with the intention of advancing the Build Scheme and profiting from it.

7. First Title has direct knowledge of these fraudulent acts. Despite this knowledge, First Title has—and continues to—act as the closing agent on every single transaction entered into by Plaintiffs and the Plaintiff Class. As the closing agent for each of these fraudulent conveyances, First Title acts with the intention of advancing the fraudulent Build Scheme and profiting from it.

8. As discussed above, George Triantafilou and GT Financial have intimate knowledge of the entire Build Scheme. Despite this knowledge, George Triantafilou and GT Financial have continued

to fund and direct the operations of the Build Scheme, with the intention of advancing the Build Scheme and profiting from it.

9. As discussed above, Stephen King has intimate knowledge of the entire Build Scheme. Despite this knowledge, Stephen King has continued to direct the operations of the Build Scheme, with the intention of advancing the Build Scheme and profiting from it.

iii. Fraudulent Concealment

1. Defendants had a duty to disclose the purchase price markup paid by Investors. Defendants have acted to fraudulently conceal this markup from Plaintiffs and the Plaintiff Class. Plaintiffs and the Plaintiff Class have suffered damages from this concealment in the amount of the markups.

2. Defendants had a duty to disclose the interest rate spread paid to Build. Defendants have acted to fraudulently conceal this spread from Plaintiffs and the Plaintiff Class. Plaintiffs and the Plaintiff Class have suffered damages from this concealment in the amount of the interest rate spread (as discussed above, this interest rate spread is typically 3%).

3. Defendants have additionally acted to fraudulently conceal the true nature of the scheme and the participants in the enterprises. For example, after almost a year of unanswered discovery requests on the issue, it took court-ordered Rule 30(b)(5) depositions of Build

and GT Financial to obtain even the names of the Permanent Lenders.

4. On August 24, 2018, new counsel for Defendants Build and Edgar propounded on Plaintiffs' counsel "supplemental" responses to Plaintiffs' Second set of Requests for Admission, which had been answered by prior counsel on November 30, 2017. In the "supplement," ten of prior counsel's denials were changed to admissions. These included the admissions that outside investors retained a secured interest in the properties, that Build requires investors to be organized as a corporation or LLC before it will provide financing, that prior counsel had received correspondence advising him that Build and/or Edgar were required to be registered as trust businesses, or that Edgar served as a trustee for any trust containing real property in Ohio.

5. As part of one of those 30(B)(5) depositions, George Triantafilou repeatedly lied about his role in the enterprises, his ownership or putative ownership of Build, his involvement on a day-to-day basis with Build.

6. Similarly, in a sworn deposition, Stephen King repeatedly lied about his role in the enterprises, his ownership or putative ownership of Build, his involvement on a day-to-day basis with Build.

7. These are only a few examples of the constant and consistent deliberate concealment of the parties in the prior state-court action

discovery, which, in part, led to the imposition of $10,000 sanctions against Defendants Build and Edgar.

**b.      Civil Conspiracy to Breach a Fiduciary Duty**

    i. The Build Scheme is responsible for hundreds of breaches of fiduciary duty, as set forth above in Count II. These breaches are unlawful or tortious acts committed by Build, independent of the conspiracy, and, as set forth above, each of the Defendants have committed overt acts in furtherance of these breaches, and these acts have damaged each Investor/beneficiary.

    ii. Each of the Defendants have intimate knowledge of the Build Scheme (as set forth above) and the various breaches of fiduciary duty.

**c.      Civil Conspiracy to Commit Theft**

    i. The Build Scheme is responsible for hundreds of criminal acts of theft by deception, as previously set forth in Count I. These thefts are unlawful acts independent of the conspiracy. Each theft constitutes a tortious act under Ohio R.C. §2307.60.

    ii. The Permanent Lenders have knowledge of the specific language in the documents signed by Plaintiffs and the Plaintiff Class.

    iii. Despite knowledge of the specific language in the documents signed by Plaintiffs and the Plaintiff Class, the Permanent Lenders continue to fund the operation of the fraudulent Build Scheme—including the theft by deception that is consistently committed by Build.

iv. The Permanent Lenders receive a direct benefit from the unlawful theft by deception in the form of monetary proceeds from the illegal Build Scheme.

v. As discussed above, George Triantafilou and GT Financial have intimate knowledge of the entire Build Scheme. Despite this knowledge, George Triantafilou and GT Financial have continued to fund and direct the operations of the Build Scheme, with the intention of advancing the Build Scheme and profiting from it.

vi. As discussed above, Stephen King has intimate knowledge of the entire Build Scheme. Despite this knowledge, Stephen King has continued to direct the operations of the Build Scheme, with the intention of advancing the Build Scheme and profiting from it.

vii. First Title has direct knowledge of the theft committed by Build. Despite this knowledge, First Title has—and continues to—act as the closing agent on every single transaction entered into by Plaintiffs and the Plaintiff Class. As the closing agent for each of these fraudulent transactions, First Title acts with the intention of advancing the fraudulent Build Scheme and profiting from it.

### COUNT IV
### Unjust Enrichment

216. Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

217. In all Trust Transactions, Build marks up the price of the property from the first closing to the second. The closings are generally simultaneous, and the mark-up is always

thousands of dollars. As discussed above, this is done entirely to profit off of the unwitting Investors.

218.     When the property is sold to an end buyer, Build retains the price markup as profit, having done nothing but create a double closing for the sole purpose of making this profit. Thus, the Investors unknowingly conferred a benefit on Build that Build knew of, and it is unjust to allow Build to retain the markup, or the profits earned off of the interest paid on the markup principal.

219.     Moreover, the Investors often pay for various improvements at their respective properties using their own funds, either by choice or, in many cases, as a direct result of Build refusing to release the improvement funds allegedly held in escrow. These expenses often cause or contribute to the Investors ultimate default.

220.     Upon default, Build sells the properties with all such improvements.

221.     The value of the improvements increases the value of the properties.

222.     Build has actual knowledge of all such improvements, as it often receives incremental photographs of the properties as improvements are being made and/or conduct inspections of the properties prior to sale.

223.     Build retains the proceeds from the sale of the properties including the proceeds derived from and directly attributable to the improvements made by the Investors, and the Excess Proceeds to which the Investors are statutorily entitled.

224.     In addition to the statutory mandate that the Excess Proceeds be returned to the defaulting borrower, Build acknowledges that the Excess Proceeds belong to the Investors in the Collateral Assignment of Beneficial Interest and the Combined Security Agreement and Assignment of Rents and Leases.

225.     Under the circumstances, it is unjust to allow Build to retain the proceeds derived from the markup or improvements. As such, the Investors have been damaged in excess of the jurisdictional minimum, in an amount to be determined at trial.

## COUNT V
## Declaratory Judgment that the Build Scheme Violates the Investors' Right of Redemption and Right to Excess Proceeds

226.     Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

227.     Ohio and Kentcuky statute and common law require that mortgage loans be accompanied by certain rights in a defaulting mortgagor, including a statutory right of redemption (Ohio R.C. 2329.33/KRS 426.530) and that excess proceeds from the re-sale of the property through foreclosure be remitted to the mortgagor (Ohio R.C. 5723.11/KRS 426.500).

228.     Both the Ohio and Kentucky Supreme Courts have zealously guarded these rights and avoided all attempts to circumvent the right of redemption as an impermissible "clog" on the borrower's rights.  *See Shaw v. Walbridge*, 33 Ohio St. 1 (1877); *Panagouleas Interiors v. Silent Ptnr. Group, Inc*., 2d Dist. Montgomery No. 18864, 2002 Ohio App. LEXIS 1305, *25 (Mar. 22, 2002); *Sebastian v. Floyd*, 585 S.W.2d 381 (Ky. 1979).

229.     While a mortgagor may subsequently part with the right of redemption by agreement, no agreement can be made at the making of the mortgage which causes the mortgagor to waive or forfeit its right of redemption. Additionally, any subsequent agreement must include independent and adequate consideration and be fundamentally fair, *e.g*., not induced by fraud or undue influence.

230.    Courts have applied this concept to deeds in lieu of foreclosure executed at the same time as the mortgage, as well as land installment contracts, demonstrating the strength with which the law favors such rights.

231.    Here, the Defendants require the Investors to sign the Collateral Assignment of Beneficial Interest with the making of the Mortgage. This document is akin to a deed in lieu of foreclosure in that it causes the Investor to waive its right of redemption in the event of default. It is akin to a land installment contract inasmuch as it is financed by Build or a Build Company with a Build Company retaining title.

232.    While Edgar Construction is named as Mortgagor in the Mortgage executed as part of the Trust Transaction, this is a farce. Edgar Construction has essentially no obligations under the transaction documents. Instead, the Beneficiary's Undertaking unequivocally states that the Investor is obligated as the mortgagor under the Trust Transactions.

233.    Defendants even recognize the Investors' right of redemption, as the Collateral Assignment of Beneficial Interest explicitly asks them to waive it.

234.    Under both Ohio and Kentucky law, the Trust Transactions are void or voidable as violating the right of redemption. *See Panagouleas Interiors,* at *35 ("Since the deed in lieu of foreclosure is invalid [as depriving the mortgagor of the equity of redemption], foreclosure proceedings must take place and excess proceeds, if any, should be returned to [the mortgagor]."); *Watkins v. Eads*, 2014 Ky. App. Unpub. LEXIS 369, *10 ("The forfeiture clause at issue in this case clearly violates the holding in *Sebastian* and *Slone* and also contravenes KRS 426.525 and KRS 426.530. The forfeiture clause in Watkins' contract is void and of no effect. The circuit court erred as a matter of law in enforcing the same.")

235.     The Court should declare the Trust Transactions violate the Investors' right of redemption and right to excess proceeds and return to class members all excess proceeds that were retained by Build, the Build Companies, GT Financial, or the Permanent Lenders.

**COUNT VI**

**Declaratory Judgment that the Trusts are Void or Voidable as Induced by Fraud**

236.     Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

237.     Ohio law states that "a trust may be created only to the extent that its purposes are lawful, not contrary to public policy, and possible to achieve. A trust exists, and its assets shall be held, for the benefit of its beneficiaries in accordance with interests of the beneficiaries in the trust." Ohio R.C. 5804.04. Similarly, KRS 386B.8-010 states: "the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries." *See also* KRS 386B.8-020(1) ("A trustee shall administer the trust solely in the interests of the beneficiaries."). None of the trusts at issue in this case contained assets held for the benefit of the beneficiaries—instead, the trusts were created to hold assets for the benefit of the Defendants. As such, the trusts themselves were created for purposes contrary to public policy, and to support an unlawful transaction.

238.     Under Ohio law, a trust "is void to the extent its creation was induced by fraud, duress, or undue influence." Ohio R.C. 5804.06. As alleged above, each of the trusts at issue in this case was seeded with a corpus only as the result of fraud upon the Investors.

239.     The Court should declare these trusts void *ab initio*, or voidable, return to class members all money that they paid as subjects of the trust scheme, and where a property has not yet been sold to an end-buyer, appoint an impartial third-party receiver to assist class members finalize rehab and sale of the property.

COUNT VII
**In the Alternative, Declaratory Judgment that Trusts are Void or Voidable as Against Public Policy**

240.     Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

241.     Defendants profit off of Investors through use of the trusts created by Build.

242.     These trusts are created by having Build transfer real property to itself, in direct contradiction of longstanding Ohio and Kentucky law. Going back more than seventy years, it has been the law of Ohio that a trustee may not "sell to himself as trustee his individual property or property in which he has a personal or beneficial interest." *In re Binder's Estate*, 137 Ohio St. 26, 27-28 (1940); *see also Ulmer v. Fulton*, 129 Ohio St. 323, 335 (1935) ("It is a salutary rule of long recognition that a trustee cannot sell his individual property to himself as trustee."). The Kentucky Supreme Court then cited *In re Binder's Estate* in the *Bryan* case for the proposition that trustees are not to engage in self-dealing by transferring property from one trust or entity in which it has an interest to another. *Bryan v. Security Trust Co.*, 296 Ky. 95, 101 (1943). Build also has a beneficial interest in the property as Greenleaf Funding is the Assignee in the Collateral Assignment of Beneficial Rights that Build Realty requires Investors to sign.

243.     Although Plaintiffs have alleged numerous and substantial injury, "for a particular undertaking to be against public policy, actual injury need not be shown. It is enough if the potentialities for harm are present." *Ulmer*, 129 Ohio St. at 336

244.      "The sale of a trustee of its own property to the trust is void as against public policy," and "[t]he rule is imperative that a trustee cannot buy his own property from himself for the purpose of the trust. It makes no difference that the sale is intrinsically a fair one and for a full

consideration. The policy of equity is to remove every possible temptation from the trustee." *Id.* (internal citations omitted).

245.    Likewise, in Kentucky, "a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction[.]" KRS 386B.8-020(2).

246.    The trusts created by Build are void against public policy because they are created by Build transferring its own property to itself as trustee.

247.    The trusts created by Build are additionally void against public policy because they constitute self-dealing.

248.    The trusts created by Build are also void against public policy because Build has a beneficial interest in them through Greenleaf Funding.

249.    The Court should declare these trusts void *ab initio*, or voidable, return to class members all money that they paid as subjects of the Build Scheme, and where a property has not yet been sold to an end-buyer, appoint an impartial third-party receiver to assist class members finalize rehabilitation and final sale of the property.

### Punitive Damages

250.    Plaintiffs reallege and incorporate by reference each of the allegations contained in this Complaint as though fully alleged herein.

251.    The conduct of the Defendants was knowing, intentional, done with malice and/or aggravated or egregious fraud, demonstrated a complete lack of care, and was done in conscious disregard of the rights of Plaintiffs and the Plaintiff Class with a great probability of causing

substantial harm to them. Plaintiffs and the Plaintiff Class are therefore entitled to an award of punitive damages, in conjunction with the foregoing claims for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray:

A.    That the acts alleged herein be adjudged and decreed to be unlawful in violation of federal statutory law and state statutory and common law and that the Court enter a judgment declaring them to be so;

B.    That Plaintiffs and the Class recover all measures of damages allowable under the federal and state statutes identified herein and the common law, and that judgment be entered against Defendants in favor of Plaintiffs and the Class;

C.    That the Court issue injunctive relief prohibiting the Defendants from continuing the Build Scheme or any similar scheme including, *inter alia*, enjoining:

    1.    The misrepresentations and omissions used in furtherance of the Build Scheme, including but not limited to the misuse of the term "down payment," the false "purchase contract," the falsifying of financial documents, and the failure to disclose the true nature of the Build Scheme including the markups and self-dealing;

    2.    the use of unlicensed trust transactions; and

    3.    the breaches of fiduciary duties to the extent one or more Defendants holds itself out as acting as trustee or represents the Investors in a fiduciary relationship, and/or to the extent one or more Defendants act as principal for one or more Defendants who act as trustee or fiduciary for the Investors;

D.     That the Court declare that the Build Scheme/Trust Transactions violate the Investors' right to redemption and right to excess proceeds;

E.     That the Court declare that the trusts, induced by fraud and/or created in contravention to public policy, are void or voidable;

F.     That the Court appoint an independent Trustee or Receiver to oversee the trust corpuses and ensure that the beneficiaries' interests are protected through the sale of the properties to end buyers;

G.     That Defendants be ordered to pay restitution, including disgorgement of all profits rendered from the Build Scheme, as provided by law;

H.     That Plaintiffs recover the costs and expenses of suit, and reasonable attorneys' fees as provided by law;

I.     That Defendants be ordered to pay treble damages as provided by law;

J.     That Defendants be ordered to pay punitive damages; and

K.     That the Court order such other and further relief as the Court deems just, necessary and appropriate.

Respectfully submitted,

  _/s/ Christopher P. Finney_
Christopher P. Finney (0038998)
Justin Walker (0080001)
Casey Taylor (0095966)
FINNEY LAW FIRM, LLC
4270 Ivy Point Blvd., Suite 225
Cincinnati, Ohio 45245
Telephone: (513) 943-6665
Facsimile: (513) 943-6669
_chris@finneylawfirm.com_
_justin@finneylawfirm.com_
_casey@finneylawfirm.com_

W.B. Markovits (0018514)
Terence R. Coates (0085579)
Zachary C. Schaengold (0090953)
Dylan J. Gould (0097954)
MARKOVITS, STOCK & DeMARCO, LLC
3825 Edwards Road, Suite 650
Cincinnati, Ohio 45209
Phone:  (513) 651-3700
Fax:   (513) 665-0219
*bmarkovits@msdlegal.com*
*tcoates@msdlegal.com*
*zschaengold@msdlegal.com*
*dgould@msdlegal.com*

*Counsel for Plaintiffs and Putative Class*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

*/s/ Christopher P. Finney*