## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**COMPOUND PROPERTY**
**MANAGEMENT, LLC, *et al.*,**

           **Plaintiffs,**                **Case No. 1:19-cv-133**
                                     **JUDGE DOUGLAS R. COLE**

      **v.**

**BUILD REALTY, INC., *et al.*,**

           **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on (i) the Motion to Dismiss of Defendants Smith, Graham & Co. Investment Advisors, L.P. and Five Mile Capital Partners, LLC (the "Financing Defendants") (Doc. 19); (ii) the Partial Motion to Dismiss of Defendant Build Realty, Inc. ("Build") and various affiliates and individuals related to that entity who are also named as Defendants in this action (collectively the "Build Defendants") (Doc. 31); and (iii) the Motion to Dismiss of Defendant First Title Agency, Inc. ("First Title") (Doc. 32). For the reasons discussed more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** those Motions. (Docs. 19, 31, 32).

## BACKGROUND OF THE ALLEGATIONS

### A.    The Underlying Transactions.

Plaintiffs in this action are three entities, suing on behalf of a putative class of such entities, each of which invested in a real estate opportunity through which the entity hoped to profit by rehabbing and "flipping" a residential property. As a general matter, Plaintiffs claim that they suffered economic harm by participating in that

real estate opportunity, and that the various Defendants all should be liable to Plaintiffs on a variety of theories based on the role each Defendant allegedly played in the endeavor.

More specifically, the Complaint outlines what it refers to as the "Build Scheme." (Pls.' Compl. at ¶¶ 1–14 (overview), #3–7. Doc. 1; *id.* at ¶¶ 44–122 (in greater detail), #20–44). According to the Complaint, the Build Defendants advertised and marketed the rehabbing opportunity with claims that investors could "purchase" a property for "$10,000 down," receive a loan to cover both the remaining acquisition cost and the rehab costs for the property, and then sell the property for more than the purchase price and rehab costs, thus pocketing the difference after they paid back the loan. (*Id.* at ¶ 3, #4). According to Plaintiffs, the Build Defendants represented to Plaintiffs (and all others similarly situated) that the Build Defendants had access to non-public sources of residential properties (*id.* at ¶ 50, #23–24), through which the Build Defendants would buy homes at lower-than-market prices and "pass the savings along" to the investing Plaintiffs (*id.* at ¶ 52, #24). In fact, Plaintiffs say, the Build Defendants were purchasing the properties from publicly available sources (like Auction.com) (*id.* at ¶¶ 61, 68, #26, 28), and, far from passing the savings along, were actually marking prices up from the already-at-market acquisition prices (*id.* at ¶¶ 72, 77, #29–30). Plaintiffs further allege that the Build Defendants represented to Plaintiffs an expected rehab budget, but that the Build Defendants deliberately set that budget far too low for the work that would be required to adequately "flip" any given property. (*Id.* at ¶¶ 13, 59, 96–102, #7, 26, 35–37). Plaintiffs also claim that the

Build Defendants provided Plaintiffs with unrealistic estimates of the likely post-rehab price for the property. Build did so by using a single appraiser that the Build Defendants knew would provide an inflated appraisal that Plaintiffs believed to be "real." (*Id.* at ¶¶ 59–60, #26). As a result of these alleged misrepresentations, Plaintiffs claim, the economics of the real estate opportunity were nowhere near as favorable as the Build Defendants had represented. (*Id.* at ¶¶ 13, 59, 96–102, #7, 26, 35–37).

Plaintiffs also allege that the Build Defendants sought to structure the transactions in ways to further disadvantage Plaintiffs. In particular, the Build Defendants did not actually "sell" the property for a given project to a given Plaintiff. Rather, the Build Defendants placed the property in a trust, with a Build affiliate acting as trustee, and then named the "purchaser" of the property (i.e., each Plaintiff here) as the beneficiary of the trust. (*Id.* at ¶¶ 70–90, #28–34). Moreover, the Build Defendants required each investor to form a limited liability company ("LLC") to serve as the actual trust beneficiary. (*Id.* at ¶¶ 9, 108, 132, #5, 38, 47). Plaintiffs claim that the Build Defendants adopted this structure in an effort to deprive Plaintiffs of certain rights that they would otherwise have as individual mortgagors of residential properties. (*Id.*)

On the financial front, Plaintiffs allege the Build Defendants misrepresented the nature of the $10,000 payment by characterizing it as a "down payment," when in fact, on every property, no matter the purchase price, the entire $10,000 was consumed in closing costs of one kind or another. (*Id.* at ¶¶ 55–57, #25). Moreover,

Plaintiffs allege that they were being charged interest on the amounts that the Build Defendants claimed were being held in escrow for each Plaintiff for expected rehab costs, when in fact those escrow accounts were not funded at the times that the Build Defendants claimed, meaning that Plaintiffs were accruing interest obligations on non-existent funds. (*Id*. at ¶ 81, #31).

According to Plaintiffs, First Title allegedly facilitated the "Build Scheme" by serving as the title agent for the transfers of property to each Plaintiff (or at least to the trust as to which a given Plaintiff was named the beneficiary). (*Id*. at ¶ 43, #19–20). Plaintiffs allege that, if a given rehab investor expressed surprise at the transactional structure (i.e., the use of a trust), a structure that Plaintiffs claim was not disclosed to them prior to closing, First Title would reassure the rehab investor that the structure was "no big deal," and otherwise provide reassurances about the transaction generally. (*Id*. at ¶ 88, #33–34). First Title also prepared various documents used in the closing, which were prepared at the direction of the Build Defendants, and which, according to Plaintiffs, assisted in locking Plaintiffs into the allegedly disadvantageous transaction structure. (*Id*. at ¶ 78, #31). Plaintiffs claim that First Title undertook these activities with knowledge of the full nature of the transaction, and with knowledge that the transactions were not a typical form of residential real estate transaction. (*See id*. ¶¶ 43, 84–90, 94, #19–20, 32–35).

The Complaint alleges that the Financing Defendants provided funding for the operations. According to Plaintiffs, a Build-affiliated company first supplied the loan to a given Plaintiff for the property's purchase price, but then the loans were bundled

and sold to the Financing Defendants, who also supplied the funding for Plaintiffs' rehab efforts. The Financing Defendants allegedly charged 12% on these "hard money loans," a rate that Plaintiffs allege is at the high end of the typical range for such loans, which Plaintiffs allege is 8 to 12%. (*Id.* at ¶ 10, #6). (At the hearing, Plaintiffs acknowledged their belief that such hard money loans are typically recourse loans, whereas the loans here are non-recourse loans, which may explain why the interest rate is at the higher end of what Plaintiffs claim is the usual range.) The Financing Defendants, like First Title, allegedly played their financing role in the "Build Scheme" with full knowledge of the underlying transactional particulars, thereby, Plaintiffs claim, themselves becoming liable for the harms that Plaintiffs allegedly suffered. (*Id.* at ¶ 39, #17).

The allegations described and summarized above do not purport to be a full accounting of all of the details set forth in Plaintiffs' 97-page, 251-paragraph Complaint. Rather, the Court is merely seeking to summarize, in broad strokes, the nature of the alleged conduct at issue here. Additional allegations are included in the discussion below, when relevant to a particular argument that the Court is addressing.

## B. The Counts In The Complaint.

Based on the "Build Scheme" generally described above, Plaintiffs filed a seven-count putative class action complaint. Count I charges that all Defendants, based on their participation in the "Build Scheme" violated the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, et seq., and

5

the corresponding Ohio Corrupt Practices Act, Ohio Rev. Code § 2923.31, et seq., both of which contain a provision that allows for civil causes of action by private parties to recover damages sustained as a result of the commission of a RICO predicate offense. (*Id.* at ¶¶ 150–94, #52–78). Count II alleges that the "Build Companies" breached fiduciary duties owed to Plaintiffs as beneficiaries of the trusts that held the rehab properties. (*Id.* at ¶¶ 198–210, #78–83). Count III asserts a common law civil conspiracy claim against all Defendants, alleging inter alia that they conspired to breach the fiduciary duties that the Build Companies owed to Plaintiffs. (*Id.* at ¶¶ 211–15, #83–89). Count IV asserts a claim of unjust enrichment against Build, alleging that Build must disgorge the property price markups that it charged the rehab investors, and must also repay Plaintiffs the value of any property improvements that Plaintiffs made, but as to which Build received the benefit, when Build reclaimed and sold the investors' properties. (*Id.* at ¶¶ 216–25, #89–91). Finally, each of Counts V, VI, and VII seek some form of declaratory judgment as to the legality or impact of some aspect of the "Build Scheme." (*Id.* at ¶¶ 226–49, #91–95). For example, Count V seeks a declaration that the Build Scheme (specifically, the use of a trust with an LLC as a beneficiary), is not sufficient to vitiate the right of redemption and the right of excess proceeds that mortgagors otherwise would have. (*Id.* at ¶¶ 226–35, #91–93). Counts VI and VII, meanwhile, seek to have the trusts declared invalid *ab initio*, either based on fraud or as contrary to public policy. (*Id.* at ¶¶ 236–49, #93–95).

6

## PENDING MOTIONS

The Build Defendants, the Financing Defendants, and First Title each filed a separate motion to dismiss.

### A.    The Build Defendants' Motion To Dismiss.

The Build Defendants seek dismissal of all claims, except for the breach of fiduciary duty claim, Count II. That is not to suggest that the Build Defendants agree that Plaintiffs have a meritorious claim as to that Count, but merely that the Build Defendants recognize that Plaintiffs have pled a facially plausible claim, and thus not one subject to dismissal at this juncture.

As to the RICO claim, the Build Defendants assert that Plaintiffs have failed to plead the necessary elements as to any of the Build Defendants, and also separately assert that the claims against certain Build Defendants fail for additional reasons. The Build Defendants move to dismiss the Civil Conspiracy count, asserting that the allegations in support of it are too conclusory to meet Plaintiffs' burden under the *Iqbal/Twombly* line of cases. And the unjust enrichment claim fails, they say, because the transactions between each of the Plaintiffs and the Build Defendants were governed by express contracts, meaning that unjust enrichment is not a viable theory. Finally, they contend that the requested declarations are wrong on the law, and thus the declaratory judgment counts should be dismissed. The Build Defendants also note that their contracts with Plaintiffs included a jury waiver, and they ask that the Court hold that the jury waiver is enforceable, and accordingly strike Plaintiffs' jury demand from their Complaint.

**B.      The Financing Defendants' Motion To Dismiss.**

The Financing Defendants, meanwhile, claim that Plaintiffs named the wrong parties. They assert that the Financing Defendants named in the suit do not in fact loan money, as Plaintiffs claim, but rather act as investment advisors to Funds, which in turn are the entities (each Fund is allegedly a separate limited partnership) that actually supply the financing described in the Complaint. They also argue that Plaintiffs have failed to set forth a viable RICO or Ohio Corrupt Practice Act claim against them. Finally, the Financing Defendants assert that the Court lacks personal jurisdiction over them, as they do not have the requisite contacts with the State of Ohio.

**C.      First Title's Motion To Dismiss.**

First Title, for its part, claims that Plaintiffs have engaged in "shotgun pleading" and have merely included First Title in their Counts based on allegations of conduct by others, without making any allegations against First Title. It also states that, as a title agent, First Title had no duty under Ohio law other than to follow the closing instructions, and that Plaintiffs have failed to make out a legally sufficient RICO (or OCCA) claim against First Title (largely for the same reasons that the Build Defendants assert).

**D.      Oral Argument.**

On January 9, 2020, the Court heard extensive argument from the parties with regard to each of these three motions. Since the argument, the parties have also supplied the Court with an example of the "closing packet," which are the documents

8

typically used to close a rehab transaction like the ones described in the Complaint. The parties agreed that, although those documents were not attached to the Complaint, the Court could consider those documents in its disposition of the pending motions to dismiss without converting them into motions for summary judgment. Based on the briefing, the argument, and the additional materials the parties provided, the three motions to dismiss are now pending before the Court for resolution.

## LAW AND ANALYSIS

### A. Standards Of Review.

The parties largely agree on the standard of review this Court must apply in reviewing a motion under Rule 12(b)(6). The court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That statement applies, however, only to factual allegations. The Court need not accept as true Plaintiff's legal conclusions. Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546–47 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under the *Iqbal/Twombly* plausibility standard, the Court plays an important gatekeeper role, ensuring that claims rise beyond the level of speculation before submitting defendants to the potential rigors (and the costs) of the discovery process. Discovery, after all, is not designed to be the method by which

plaintiffs discover whether they have a claim, but rather a process for seeking to substantiate claims as to which plaintiffs have already stated a plausible factual basis.

Of course, to the extent that some of the defendants—in particular, the Financing Defendants—are seeking dismissal on personal jurisdiction grounds, their motion is instead governed by Rule 12(b)(2). In reviewing motions under that rule, as Plaintiffs concede, "[t]he party seeking to assert personal jurisdiction bears the burden of demonstrating that such jurisdiction exists." (Pls.' Memo. in Opp'n to Financing Defs.' Mot. to Dismiss at #369 (quoting *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012))). To carry that burden, a plaintiff may not rest on its pleadings, but must set forth specific evidence supporting jurisdiction. *Id.* Where, as here, the evidence is documentary, as opposed to evidence presented during a live hearing, the plaintiff must make at least a prima facie showing of jurisdiction. *Id.* (citing *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2012)).

## B.  Personal Jurisdiction (Financing Defendants Only).

As jurisdiction is a threshold issue regarding the Court's power, the Court will start there. Personal jurisdiction has two components, one statutory and the other constitutional. That is, a court can exercise personal jurisdiction only as provided by statute, and then only consistent with the Due Process Clause of the Constitution. The latter prevents a court from exercising jurisdiction if a party lacks sufficient minimum contacts with the judicial forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985).

The Financing Defendants assert that no such contacts are present here. They claim that they do not lend money directly to Plaintiffs in Ohio, but rather only manage a Fund that does so. And they note that they have had minimal, if any, physical contact with the forum State in connection with their lending activities. Moreover, even those limited contacts were undertaken in their capacity as a fiduciary for the Funds that engaged in the actual lending activity, and thus, they claim, should not count for jurisdictional purposes.

In response to the Financing Defendants' Motion, Plaintiffs advance two arguments. First, they allege that, given their Civil RICO cause of action, they can take advantage of RICO's nationwide service of process provision. They further claim that, as a result of that statute, the only question on the jurisdictional front is whether the Financing Defendants have sufficient contacts with the United States as a whole, not whether they have sufficient contacts with Ohio. As discussed below, however, the Court is dismissing the Civil RICO claims against the Financing Defendants. Thus, whatever the effect of the nationwide service of process provision, it does not assist Plaintiffs here, as the provision itself does not apply.

Second, Plaintiffs claim that, even absent the nationwide service of process statute in RICO, the Financing Defendants have sufficient contacts with Ohio to establish at least specific jurisdiction over the Financing Defendants. While this is perhaps a close call, the Court finds that Plaintiffs have established jurisdiction on those grounds. Based on the information that the parties provided to the Court in connection with this argument, it appears that there are facts that suggest the

11

Financing Defendants have directed substantial amounts of money to parties located in Ohio in exchange for receiving assignments of loans from those Ohio parties, loans that also are secured by Ohio property. Moreover, in connection with those activities it appears that the Financing Defendants made multiple trips into the State, for example to inspect the properties that are securing the loans. As a general matter, these appear to be business activities within the State, and as such should be sufficient to give rise to personal jurisdiction, at least as to causes of action, such as those here, that arise out of those contacts.

As noted above, though, the Financing Defendants have one more arrow left in their quiver. In particular, they claim that the fiduciary shield doctrine prevents the Court from considering any contacts with the forum state in which the contacts occurred in the party's capacity as fiduciary for another entity, rather than in the party's own capacity. Here, the Financing Defendants claim that any contact with Ohio was in their capacity as a fiduciary to the Funds that actually purchased the loans, and thus cannot count as contacts by the Financing Defendants themselves.

As Plaintiffs note, the two cases that the Financing Defendants cite for this proposition involve attempts to assert jurisdiction over *individual* officers of a company in their personal capacity, based on contacts that that those individuals had in their fiduciary capacity. (Pls.' Surreply, Doc. 79-1, #662, 664–65). Plaintiffs claim that the fiduciary shield doctrine is limited to such cases, and does not apply where, as here, it is an entity that seeks to take advantage of the doctrine. (*Id.*).

12

That is an interesting issue, but not one that the Court need resolve, as a separate limitation, which Plaintiffs also raise, precludes the Financing Defendants from relying on the doctrine to avoid jurisdiction. In particular, the fiduciary shield doctrine does not apply where the person (or presumably entity, if it applies to entities) is "actively and personally" involved in the conduct at issue. (*Id.* at #665).

Indeed, in *Balance Dynamics Corp. v. Schmitt*, 204 F.3d 683, 698 (6th Cir. 2000), the appeals court specifically relied on this limitation as a basis for vacating a district court decision dismissing for lack of personal jurisdiction. There, two individual defendants claimed that the district court lacked jurisdiction over them, as their contacts with the forum State had been undertaken "in their official capacity as agents" for their corporate employer, and thus did not count for jurisdictional purposes. *Id.* While acknowledging the doctrine as a general matter, the court held that "where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice." *Id.*

Here, the Complaint alleges sufficient details regarding the Financing Defendants' "active and personal" involvement in the "Build Scheme" to prevent those Defendants from relying on the fiduciary shield doctrine to prevent personal jurisdiction from attaching based on their contacts with Ohio. That is, this is not a situation where Plaintiffs rely on others' conduct as a basis for asserting jurisdiction over these parties, which are only involved based on their role as a fiduciary. Rather, the causes of action at issue allegedly arose directly out of the Financing Defendants'

13

own conduct. Thus, the Financing Defendants cannot take advantage of the fiduciary shield doctrine to disavow their Ohio contacts and thereby prevent jurisdiction from attaching.

There is a separate question, of course, as to whether this jurisdictional ruling matters given the Court's ruling on the Civil RICO claim (and the state law Civil Conspiracy claim). The Court concludes that it does, however, for two reasons. First, Counts V, VI, and VII seek declaratory judgments, including as against the Financing Defendants. To the extent that those Counts survive (more on that below), they survive against the Financing Defendants as well, based on this jurisdictional ruling. Second, the Court is dismissing the Civil RICO claims and the Civil Conspiracy claims against the Financing Defendants without prejudice, meaning that Plaintiffs may seek to amend their allegations against the Financing Defendants, if warranted. Thus, the jurisdictional ruling is necessary to the Court's future consideration of both existing claims and any efforts to amend the dismissed claims.

## C.   Civil RICO And Ohio Civil Conspiracy Act (All Defendants).

### 1.   Elements Of A Civil RICO Claim.

To proceed beyond a motion to dismiss on a Civil RICO claim, a plaintiff must plausibly allege, *see Twombly*, 550 U.S. at 556, as to each defendant, that the defendant: (i) conducted, (ii) an enterprise, (iii) through a pattern (i.e., two or more acts), of (iv) racketeering activity. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013) (citing *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006)). Moreover, "to maintain a civil RICO suit, a plaintiff must allege an injury

14

to his business or property by reason of the RICO violation." *Smith v. Lerner, Sampson & Rothfuss, L.P.A.*, 658 F. App'x 268, 278 (6th Cir. 2016) (citation and internal quotation marks omitted).

### a. Conduct.

The Supreme Court has held that to "conduct" the affairs of an enterprise under RICO means to "lead, run, manage, or direct" those affairs., and that to "participate, directly or indirectly, in the conduct of such enterprise's affairs" means to take part in the direction of the affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993). Absent "some degree of direction," a person is not "conducting" the enterprise. *Id.* at 178. "RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179 (emphasis in original). The Sixth Circuit has also explained that "directing" "can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)).

### b. Enterprise.

Of course, to determine whether someone is "conducting" an "enterprise," one must first determine what the alleged "enterprise" at issue is. Under RICO, an enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). If the alleged "enterprise" is a corporation or other

15

entity, though, a further stricture applies. In particular, to successfully plead a RICO claim, there must be both (1) the "person" against whom the claim is asserted, *and* (2) the "enterprise" that forms one of the elements of the RICO claim. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The two cannot be the same. *Id.* Rather, there is a "separateness" requirement. *Id.* "[A] corporation cannot become an enterprise distinct from itself for RICO purposes." *Shields v. UnumProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011). "Whether the Act seeks to prevent a person from victimizing, say, a small business, or to prevent a person from using a corporation for criminal purposes, the person and the victim, or the person and the tool, are different entities, not the same." *Cedric Kushner Promotions*, 533 U.S. at 162 (internal citations omitted).

But there is a limit to how far that distinctness principle goes. To be sure, the *corporation* cannot be both the "person" and the "enterprise." But that merely means that the *corporation* cannot be the RICO defendant where it is also the enterprise. That is, a party cannot sue Corporation X in a Civil RICO action in which Corporation X is alleged to be the enterprise. Some Defendants here, though, try to read the principle more broadly, as in a sense incorporating the intra-corporate conspiracy doctrine, under which corporate officers are not separate from the corporation that they serve. Using that doctrine, they argue that corporate officers likewise cannot be the "persons" in a Civil RICO claim where the corporation is the "enterprise," as the officers are not sufficiently distinct from the corporation. But the Supreme Court explicitly rejected that approach. *See Cedric Kushner Promotions*, 533 U.S. at 163

("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legal different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that.").

That argument also runs headlong into Sixth Circuit precedent that has likewise expressly rejected that broad reading of the distinctness requirement. While admitting that the case law on the distinctness requirement is "meandering and inconsistent," the Sixth Circuit observed that "two important principles emerge: (1) individual defendants are always distinct from corporate enterprises because they are legal distinct entities, even when those individuals own the corporations or act only on their behalf; and (2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity." *In re ClassicStar*, 727 F.3d at 492.

As discussed more fully below, both of those are important principles for this case. But, as immediately relevant here, the first of the two principles precludes Defendants' argument that corporate officers cannot be named as RICO defendants in actions where the corporation they serve is alleged to be the RICO enterprise. A party cannot claim that Corporation X is the enterprise in a Civil RICO claim, and also name Corporation X as a defendant, *but* a party can name Corporation X's officers as the defendants in that action. "[I]ndividual defendants are always distinct from corporate enterprises[.]" *Id.*

17

A second aspect of RICO enterprises also comes into play given the allegations here. In particular, under the RICO statute, an enterprise need not be an entity per se. Rather, the statute also allows a plaintiff to allege an association in fact ("AIF") enterprise. "[A]n association-in-fact enterprise is a 'group of persons associated together for the common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The structure of such an enterprise "must have at least three … features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. That being said, "[s]uch a group need not have a hierarchical structure of a 'chain of command'; … and [m]embers of the group need not have fixed roles[.]" *Id.* at 948. But the group "must function as a continuing unit and remain in existence long enough to pursue a course of conduct." *Id.*

Moreover, much like the "separateness" requirement discussed above for corporate "enterprises," a separateness requirement also applies to AIF enterprises. In particular, the group's "common purpose" "must be separate from the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (citing *Turkette*, 452 U.S. at 583). That being said, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Ouwinga*, 694 F.3d at 794 (quoting *Boyle*, 556 U.S. at 947).

18

### c. "Pattern" Of "Racketeering Activity."

To establish a substantive RICO violation, a plaintiff also must allege "a pattern of racketeering activity." 18 U.S.C. § 1962(c). The "pattern" part of that "requires, at a minimum, two acts of racketeering within ten years of each other." *Ouwinga*, 694 F.3d at 795 (citing 18 U.S.C. § 1961(5)). "[T]wo acts are not necessarily sufficient," though, and a "plaintiff must show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–39 (1989) (emphasis in original)).

"RICO defines 'racketeering activity' to include numerous so-called predicate acts, including 'any act which is indictable under [various provisions of title 18 of the United States Code].'" *In re ClassicStar*, 727 F.3d at 483. But, to the extent that the predicate acts consist of claims that sound in fraud, Rule 9(b)'s heightened pleading standard also comes into play regarding that activity. *Bender v. Southland Corp.*, 749 F.3d 1205, 1216 (6th Cir. 1984).

### d. Injury.

In addition to the substantive elements that the Civil RICO statute imposes under § 1962(c), a plaintiff asserting a claim under RICO's civil remedy provision, § 1964(c), must also allege damages. To the end, the plaintiff "must allege an injury to his business or property," and that injury must be "by reason of the RICO violation." *Smith*, 658 F. App'x at 278 (quoting *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 262 (6th Cir. 2014)). "[T]he phrase 'by reason of' also incorporates

19

a proximate-cause requirement into § 1964(c)." *Id.* (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). In other words, the plaintiff must allege that the injury arose as a direct result of the conduct that violated RICO. *Id.* "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

### e.    § 1962(c) Versus § 1962(d).

In reviewing the sufficiency of the Complaint, it is also important to note that there are two different but related types of Civil RICO claims. First, if a plaintiff alleges a direct violation against a defendant, *see* 18 U.S.C. § 1962(c), the plaintiff must allege each of the four elements described above *as to that defendant*. Thus, if a plaintiff seeks to sue multiple defendants under § 1962(c), the plaintiff must adequately allege as to each defendant that the defendant (1) conducted, (2) an enterprise, (3) through a pattern of (4) racketeering activity (and that the plaintiff suffered injury to his business or property as a result).

Under 18 U.S.C. § 1962(d), though, a plaintiff can instead allege that a particular defendant *conspired* to commit a RICO violation. "To state a claim for violation of § 1962(d), a 'plaintiff must successfully allege all the elements of a RICO violation,' as well as alleging 'the existence of an illicit agreement [that included the conspiracy defendant] to violate the substantive RICO provision.'" *Aces High Coal Sales, Inc. v. Cmty. Bank & Trust of W. Georgia*, 768 F. App'x 446, 459 (6th Cir. 2019) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 411 (6th Cir.

2012)). "An agreement can be shown if the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes." *Heinrich*, 668 F.3d at 411 (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)). In other words, the plaintiff must sufficiently allege the four elements *as to someone* (to support the direct violation), and then claim that the defendant against whom the plaintiff is asserting a § 1962(d) claim joined a conspiracy with those direct violators.

Finally, in assessing a motion to dismiss a Civil RICO claim, the Court must also remain mindful of two competing admonitions. First, the Supreme Court has observed that "RICO is to be read broadly," a view that arises "not only from Congress' self-consciously expansive language and overall approach, but also … its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498–99 (1985) (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 947). And "[t]he statute's remedial purposes are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Id.* Yet, at the same time, "the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)); *see also Ponte v. Chase Bank USA, N.A.*, No. 12-13901, 2013 WL 5818560, at *10 (E.D. Mich. Oct. 29, 2013) (collecting cases from Third, Seventh, and Eighth Circuits for the proposition

that RICO was not intended to apply to garden variety fraud claims, even if accomplished through a series of wire or mail fraud acts).

Unfortunately, the tension between these competing signposts has resulted in case law that generates some confusion for lower courts that are seeking to assess the viability of a Civil RICO claim on a Rule 12(b)(6) motion. Yet, that is the task that the Court faces here, and the one to which it turns now.

### 2. The RICO Claims Against Each Defendant Based On The Alleged "Build Enterprise."

As noted above, Plaintiffs have asserted Civil RICO claims against all Defendants under both § 1962(c) (direct RICO claim) and § 1962(d) (RICO conspiracy claim). They further assert two potential "enterprises," one consisting of Build Realty, Inc., and the other an association-in-fact enterprise allegedly consisting of all Defendants. (*See* Pls.' Compl. at ¶¶ 155–58, #52–53). For analytical purposes, Defendants fall into three groups: those employed by or directly affiliated with Build (again, the "Build Defendants"), First Title, and the Financing Defendants. The Court addresses each group of Defendants, and each alleged enterprise, separately. The Court begins its analysis by considering each group in the context of the alleged "Build Enterprise."

### a. Plaintiffs Have Sufficiently Alleged Either A § 1962(c) Or A § 1962(d) Claim Against All Of The Build Defendants.

The Build Defendants consist of three individual Defendants: Gary Bailey, Stephen King, and George Triantafilou (each individually an "Individual Build Defendant," and collectively the "Individual Build Defendants"), as well as a host of

business entities (collectively the "Build Companies"), all of which, according to Plaintiffs "are all alter egos of one another and of their principal, Gary Bailey." (Pls.' Compl. at ¶ 30, #13–14). As more fully explained above, the four elements of a Civil RICO action under § 1962(c) are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. Moreover, Plaintiffs must also allege injury. Plaintiffs have met all five elements as to two of the three Individual Build Defendants and as to each of the Build Companies. As for the remaining Individual Build Defendant, Plaintiffs have sufficiently alleged a § 1962(d) conspiracy claim, but not a § 1962(c) claim.

**Conduct:** Plaintiffs have sufficiently alleged that the three Individual Build Defendants have participated (and continue to participate) in managing and directing Build. Paragraph 30 of the Complaint, for example, provides a laundry list of the various ways in which Gary Bailey allegedly directs or acts on behalf of Build. George Triantafilou is likewise alleged to be a member of Build's executive leadership team, to attend Build "executive meetings" at least once a week, to have authority to sign checks and enter contracts on behalf of Build, and to provide advice and direction to Gary Bailey on how to operate Build. (*Id.* at ¶ 25, #11). Stephen King, meanwhile, is alleged to advise Bailey on how to operate Build, and to participate in weekly telephonic meetings with the executive team. (*Id.* ¶ 27, #11–12). Moreover, Bailey and Triantafilou are alleged to defer to King for important decisions with regard to Build, and King is alleged to have instituted specific operational aspects of Build, such as "a quota for acquisition agents [at Build] to acquire a minimum of five homes

23

per week." (*Id.* at ¶ 27, n.11, #12). That is enough to meet the "conducting" prong as to each of these three Individual Defendants at the pleading stage.

The Build Companies are alleged to be operated as alter egos of one another. While that may create separateness problems (a topic discussed below), that entanglement is sufficient to establish "conduct." That is, given that each of the entities allegedly have the same employees and independent contractors, share proceeds, commingle funds, and otherwise operate as a single entity, each of the entities presumably could be said to be "managing" or "directing" the others, at least at the pleading stage.

**Enterprise:** Plaintiffs allege that Build is the "enterprise." As a corporation, Build can be an enterprise for RICO purposes. *See* 18 U.S.C. § 1964(d). The Individual Build Defendants seek to counter by asserting that, as alleged officers or alter egos of Build, they are not "separate" from Build, and that the Complaint thus fails to allege a person that is distinct from the enterprise. But, as noted above, "[i]ndividual defendants are always distinct from corporate enterprises because they are legally distinct entities[.]" *In re ClassicStar*, 727 F.3d at 492. Thus, that defense fails as to the Individual Build Defendants. And given that those Defendants offer nothing else on this prong, their argument on this issue also fails.

As to the Build Companies, it is admittedly a closer call. As a general matter, one would presume that business entities that are so closely integrated as to be "alter egos" of one another would fail the "distinctness" requirement between a RICO defendant and the "enterprise" that defendant "conducts." While that makes sense as

24

a matter of first principles, however, the Sixth Circuit's decision in *In re ClassicStar* tells a different story. There, the court held that corporate defendants are "distinct from RICO enterprises when they are functionally separate, *as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity*." 727 F.3d at 492. The allegations in the Complaint here are sufficient to meet either of these two categories. The Complaint details how each of the Build Companies performs a different role within the "Build Scheme." One of the Build Companies is used to serve as the trust company for the trusts that Build sets up for the investors. (Pls.' Compl. at ¶ 31, #14–15). Others act as purchasers for properties that are ultimately sold to those investors. (*Id.* at ¶¶ 32–35, #15–16). Others provide real estate services or act as loan servicers. (*Id.* at ¶¶ 36, 37, #16). Those are sufficient allegations of "different roles."

Separately, the Complaint alleges several ways how Build takes advantage of the apparent separation between these intermingled companies to further the allegedly fraudulent Build Scheme. For example, Plaintiffs assert that, despite the fact "they are all alter egos of one another" (*Id.* at ¶ 30(h), #14), "each of the Build Companies regularly use and transmit to third parties falsified or photoshopped checks and bank statements, using the Build Companies interchangeably." (*Id.* at ¶ 30(c), #14). The purposes of the apparently-separate-but-actually-intermingled Build Companies, Plaintiffs allege, are to allow Build to purchase multiple properties simultaneously (or in close temporal proximity) to further advance the common Build [S]cheme" (*id.* at ¶ 30(f), #14), and to extract money from the transaction through

25

"self-dealing" (*id.* at ¶ 72, #29). As for the former purpose (purchasing many properties at once), Plaintiffs claim that, because Build does not have the means to pay down payments or earnest money deposits on the properties it wishes to purchase from third-party websites, "Build uses Adobe Photoshop to falsify bank statements to make it look like the Build Company buying the property has sufficient funds, even though it does not, and to falsify cashier's business checks to make it appear as if it has deposited the earnest money on a property, even though it has not." (*Id.* at ¶ 69, #28). As for the latter purpose (fraudulent self-dealing), one way that Build takes advantage of this faux separation among the intermingled Build Companies is illustrated during the "second closing" portion of the Build Scheme, i.e., when Build sells the rehabbed home to a new purchaser. At that stage, whichever one of the Build Companies that purchased the property from the auction website allegedly transfers the property to Edgar Construction—another one of the Build Companies—which then serves as the trustee of a trust in which the Investor is named as the beneficiary, and those two Build Companies mark up the price between $5,000 and $10,000 beyond what Build had actually paid for the property, but does not disclose the markup to the Investor. (*Id.* at ¶ 72, #29). These allegations, on their own or collectively, meet the second *In re ClassicStar* category described above.

In short, Plaintiffs have sufficiently alleged an enterprise as to both the Individual Build Defendants and the Build Companies.

**Pattern of Racketeering Activity:** The Complaint stumbles somewhat on this element, both as to the Individual Build Defendants, and as to the Build

26

Companies. Starting with the former, the Complaint alleges multiple instances in which Bailey and/or unnamed "Build agents" allegedly engaged in wire fraud, and thus the Complaint is sufficient as to him. (*See, e.g., id.* at ¶¶ 68, 74, 165(e), #28, 30, 59).

But the Complaint must show each of the four elements as to each defendant. And as to King and Triantafilou, the Complaint is a closer call. The Complaint alleges acts that Triantafilou has allegedly undertaken, (*see, e.g., id.* at ¶¶ 116–18, #42–43), and mentions his alleged "lies" at a 30(b)(5) deposition, but Plaintiffs do not purport the cited acts to be (and do not appear to constitute) "predicate acts" for RICO purposes. The closest the Complaint comes is alleging that Triantafilou transferred money through interstate wires in furtherance of a scheme to defraud. (*Id.* at ¶ 165(g), #64–65). Under Sixth Circuit precedent, that appears to be sufficient, if proven, to constitute wire fraud, albeit barely. *See United States v. Speer*, 419 F. App'x 562, 568 (6th Cir. 2011). Thus, the Court concludes that the Complaint has sufficiently pled this element as to Triantafilou. (Even were that not the case, though, as described below, Plaintiffs have sufficiently pled a § 1962(d) RICO conspiracy claim against Triantafilou.)

The allegations against King are even less substantial. He is alleged to have "receive[d] fee payments for his ongoing instruction in the sales and marketing programming," but that is not a "predicate act" per se. He also is alleged to act as the de facto CEO of Build, which helps on the conduct front, but not as to the "pattern of racketeering activity" element. In short, as currently drafted, there are no allegations

27

that King personally engaged in any "racketeering activity." Thus, Plaintiffs have not sufficiently alleged a § 1962(c) claim as to him.

As for the Build Companies, the Complaint alleges predicate acts of wire fraud by Greenleaf Funding (*see id.* at ¶ 165(b), #56–58), Edgar Construction (*see id.* at ¶ 165(e), #59–63), Cincy Construction (*see id.*), McGregor Holding (*see id.*), and GT Financial (*id.* at ¶¶ 165(g)(ii), 166(d), #65–67). The Court finds that the allegations are sufficient at this stage to meet the "pattern of racketeering activities" element. There are no such allegations, though, against Cowtown Holdings, Build NKY, Greenleaf Support Services, LLC, Build SWO, or G2 Technologies, and thus the § 1962(c) claims, as pled, fail against those Defendants.

**Injury:** Plaintiffs have sufficiently alleged that they were injured as a direct result of the Build Defendants' conduct of the alleged enterprise. This is true as a general matter in that each of the Plaintiffs (which are business entities) allege that, by operation of the scheme through the enterprise, they were defrauded of money. They claim that, as a result of the fraud, they understood that the up-front money that they were each supplying was a "down payment," when in reality it was for fees and expenses. (*See* Compl. at ¶ 169). The distinction between the two matters. As a down payment, the money would presumably go into building equity for the Plaintiffs, meaning that the value would still be theirs, just in a different form (equity in a house as opposed to cash). As the latter, by contrast, the expenditure would result in an immediate decrease in their wealth (by transferring it to those who receive the fees). That is enough to establish injury at the pleading stage.

**§ 1962(d) claim:** Separately, Plaintiffs also assert a § 1962(d) conspiracy claim against the Build Defendants. For the same reasons that Plaintiffs have sufficiently alleged a § 1962(c) claim against all the Individual Build Defendants, except King, the Court finds that the same allegations substantiate a § 1962(d) claim. In particular, there are sufficient allegations that each of these Defendants, with knowledge of the predicate acts, agreed to join together in furtherance of the alleged conspiracy. The same reasoning applies to the Build Companies against which Plaintiffs have successfully pled a § 1962(c) claim.

As to King, while Plaintiffs have failed to sufficiently allege a § 1962(c) claim, the Court find that Plaintiffs have sufficiently alleged a claim under § 1962(d). In particular, Plaintiffs have alleged a viable § 1962(c) claim against other Defendants, and have separately alleged that King was part of an "agreement" to undertake the allegedly fraudulent activity, even if he did not personally commit any predicate acts in furtherance of it.[1]

For similar reasons, this Court concludes that Plaintiffs have sufficiently alleged a § 1962(d) claim against the Build Companies as to which there is not a

---

[1] Although the intra-corporate conspiracy doctrine does not apply to the "separateness" (also known as the "distinctness") requirement of the "enterprise" element in a Civil RICO claim under § 1962(c), *supra* at 16, there is a separate question as to whether that doctrine may serve to limit persons or entities who are amenable to Civil RICO *conspiracy* claims under § 1962(d). The parties did not raise that question. And the Sixth Circuit has not explicitly answered it. But other circuits courts, the Eleventh Circuit in particular, have explained that the doctrine does not apply in this context. *Sun Life Assurance Co. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1213 (11th Cir. 2018) (citing *Kirwin Price Commc'ns Corp.*, 391 F.3d 1323, 1326–27 (11th Cir. 2004)). In other words, conspiracy claims can arise against persons or entities under § 1962(d), even when the intra-corporate conspiracy doctrine may prevent a common-law-conspiracy claim against that same person or entity.

sufficient § 1962(c) claim. In particular, the Complaint sufficiently pleads that these companies are all alter egos of one another, which is sufficient in the Court's view, to allege that they are all conspiring together for purposes of RICO. *See In re ClassicStar*, 727 F.3d at 492. Accordingly, the Court **DENIES** the Build Defendants' Motion to Dismiss Count I against them, although it finds that the Plaintiffs have failed to allege a viable § 1962(c) claim as to some of those Defendants.

> **b.    Plaintiffs Have Sufficiently Alleged A Civil RICO Claim Against First Title.**

Plaintiffs allege that First Title acted as the title insurer for the vast majority of the real estate transactions at issue in this case. They claim that First Title received payment from each transaction. They further allege that First Title participated in the transactions with full knowledge of the irregular nature of those transactions, and acted to reassure Plaintiffs who expressed concerns about that irregular nature. Finally, they allege that First Title transported money in interstate commerce that it knew had been secured by fraud. That is sufficient to make out a Civil RICO claim under Sixth Circuit law.

**Conduct:** Under the language in *Reves* describing how one required showing to establish "conduct" is that a party provide "some degree of direction," it is difficult to see how First Title "conducted" the Build Enterprise. *Reves*, 507 U.S. at 178. There are no plausible allegations that First Title in any way provided direction to, or exercised any type of control over, the Build Enterprise. In the Sixth Circuit's recent opinion in *Ouwinga*, though, that court clarified that "conduct" under *Reves* "can be accomplished either by making decisions on behalf of the enterprise *or by knowingly*

30

*carrying them out.*" 694 F.3d at 792 (emphasis in original) (quoting *Fowler*, 535 F.3d at 418). While the Complaint does not meet the "making decisions prong," it does meet the "knowingly carrying them out" prong. That is, the Complaint sufficiently alleges that First Title assisted the Build enterprise in carrying out the real estate transactions at issue in the alleged "Build Scheme." That appears to be enough under *Ouwinga* to meet the conduct element.

The remaining elements are also met. The "enterprise" element is satisfied by the Build Enterprise. And the "pattern of racketeering activity" is met by plausible allegations that First Title repeatedly transported money in interstate commerce that it knew had been stolen or taken by fraud. (Pls.' Compl. at ¶ 168, #68–69).

Similarly, the Complaint also sets forth a plausible § 1962(d) claim. As noted above, Plaintiffs have met their burden of pleading a viable § 1962(c) claim against many of the Build Defendants. Thus, to establish a § 1962(d) claim against First Title, Plaintiffs would merely need to allege an "illicit agreement" pursuant to which First Title joined that RICO activity, as evidenced by an "overt act" by First Title in support of that conspiracy. Plaintiffs have done so here. They have alleged that First Title, with full knowledge of the improper characteristics of the residential real estate transactions, acted to allay any concerns that the real estate investors may have as to the structure of the deal, by misleading those investors regarding the importance of those features. They further allege that First Title did so for its own financial benefit. Taken together, this is a sufficiently plausible allegation of an "overt act" in furtherance of the alleged conspiracy.

In making the finding that this is sufficient at the pleading stage, the Court is mindful about the concerns that courts have expressed that expansive interpretations of RICO could federalize broad swaths of state law fraud. At the same time, however, the Sixth Circuit's decisions in cases such as *In re ClassicStar* and *Ouwinga* do not readily admit to limiting principles, nor for that matter does the Supreme Court's decision in *Boyle*. This Court is bound to apply those decisions, which it does notwithstanding any misgivings it may have about the impact of such expansive readings of the RICO statute on the balance of power between federal and state sovereigns in policing alleged fraud. Accordingly, the Court **DENIES** First Title's Motion to Dismiss, as it relates to Count I.

### c.    The Plaintiffs Have Not Pled Either A § 1962(c) Or A § 1962(d) Claim Against The Financing Defendants.

The story is somewhat different as to the Financing Defendants. As noted above, to assert a § 1962(c) claim, Plaintiffs must allege each of the four elements as to each named Defendant. The § 1962(c) claim against the Financing Defendants fails because Plaintiffs did not plausibly allege that the Financing Defendants committed predicate acts.

In the multitudinous paragraphs included in the Civil RICO (Count I) portion of the Complaint, there are multiple pages dedicated to discussing the alleged predicate acts. These acts include wire fraud, money laundering, transportation of stolen money, theft by deception, Ohio telecommunications act violations, tampering with records, and forgery. (Pls.' Compl. at ¶¶ 159–77, #53–73). The sole allegation directed toward the Financing Defendants in the litany of alleged wrongdoing is that

32

those Defendants are claimed to have purchased the loans that had been made to the rehab investors (*id.* at ¶ 166(e), #67), thereby "free[ing] up substantial capital from the Build Enterprise's line of credit[.]" (*Id.* at ¶ 166(f)).

In the Complaint, however, Plaintiffs also have alleged that the Financing Defendants made these loans on commercially reasonable terms. It is an interesting question whether the mere act of lending money on commercially reasonable terms, without more, can constitute a "predicate act." But, even if so, at argument Plaintiffs appeared to concede that the Financing Defendants are not in fact the entities that provide the loans. Rather, as the Financing Defendants note, they manage a Fund, but it is that Fund (a distinct business entity) that provides the financing itself. Absent any allegation of predicate acts, the 28 U.S.C. § 1962(c) claim against the Financing Defendants fails as a matter of law.

Plaintiffs separately allege a § 1962(d) claim against the Financing Defendants. That claims fails for a different reason. As described above, § 1962(d) is directed towards conspiracies. As Plaintiffs correctly observe, not every conspirator needs to commit a criminal act in furtherance of the scheme in order to have liability. It is enough if the person joins the conspiracy and undertakes an overt act, legal or illegal, in furtherance of it. *Salinas v. United States*, 522 U.S. 52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.").

The problem for Plaintiffs on this front, though, is that they have not plausibly alleged that the Financing Defendants agreed to join a conspiracy, or that they

intended to take an act in furtherance of any such conspiracy. Once again, the only allegations against the Financing Defendants appear to be that they loaned (if you believe the Complaint) or oversaw a Fund that loaned (which appeared to be the case at argument) money on commercially reasonable terms that was secured by residential real estate located in Ohio. To be sure, Plaintiffs assert in conclusory fashion that the Financing Defendants "knew" of the allegedly nefarious structure at issue for these transactions, and that they participated anyway. But even if those allegations were sufficiently non-conclusory to be accepted at true at this stage, all that the allegations plausibly show is that the Financing Defendants (either on their own behalf (based on the allegations in the Complaint), or as the manager for the Fund) were engaging in due diligence activities to better understand the purposes to which the loan proceeds would be put, and the rights that the Financing Defendants (or the Fund) would have in the event of default on the loan.

Whatever threshold is necessary to "join" a conspiracy, allegations that a lending company engaged in due diligence with regard to its lending activities cannot, and should not, be enough to plausibly establish such "joinder," even at the pleading stage. *See United States v. Webb*, 359 F.2d 558, 562 (6th Cir. 1966) ("[N]either association with conspirators nor knowledge that something illegal is going on by themselves constitute proofs or participation in a conspiracy.") (citing *United States v. Falcone*, 311 U.S. 205 (1940)); *see also In re Reciprocal of Am. Sales Practices Litig.*, No. MDL 1551, Civ.A. 04-2313, 2006 WL 1699403, at *7 (W.D. Tenn. June 13, 2006) (collecting cases; rejecting such joinder at the pleading stage). Nor do allegations that

34

the lending entity received what Plaintiffs themselves admit is a commercially reasonable rate of return on those loans plausibly set forth illegal conduct.

That is especially true given the nature of the Financing Defendants' alleged participation here. At root, the Plaintiffs' claim in this suit is that the Build Defendants convinced residential rehab investors to pay higher-than-market prices for residential real estate, and that the prospects for profiting on the sale of that real estate once rehabbed were not good. Why would a lender knowingly agree to provide non-recourse funding for such an activity? That is, imagine that the Build Defendants are selling the rehab-investor Plaintiffs a property at $50,000 that is actually only worth $20,000. It is difficult to believe that a financing entity would rush to participate in that scheme by forwarding the $50,000 in loan proceeds in exchange for a non-recourse loan on property worth far less. Yet, that is essentially the role that Plaintiffs claim that the Financing Defendants performed here. That simply does not meet the plausibility standard under *Iqbal/Twombly*.

At argument, the Court inquired whether there was any evidence that the Financing Defendants had somehow obtained other benefits from the transaction—a per-closing fee, or something of that nature. Plaintiffs' counsel asserted that he believed that this was the case, but admitted there were no such allegations in the Complaint.

At bottom, based on oral argument, it appears that there is agreement among the parties that the current allegations in the Complaint inaccurately describe the role that the Financing Defendants play (as the Complaint asserts those Defendants

are the actual lender, when in fact they are not). And, in any event, the allegations fail to make out a plausible claim either as to § 1962(c) or § 1962(d). Accordingly, the Court **GRANTS** the Financing Defendants' Motion as to Count I and hereby **DISMISSES WITHOUT PREJUDICE** that Count.

> **3.** **Plaintiffs Have Failed To Sufficiently Allege An Association-In-Fact Enterprise.**

In addition to pleading a claim based on the Build Enterprise, Plaintiffs have also sought to plead a Civil RICO claim in Count I based on an alleged association-in-fact enterprise allegedly consisting of all Defendants. As noted above, Plaintiffs have pled a sufficient Civil RICO claim, either under § 1962(c) or § 1962(d) as to the Build Defendants and First Title, so the Court need not consider this enterprise as to those Defendants in order to deny their respective Motions to Dismiss this Count.

As to the Financing Defendants, however, the Court found that the claim based on the Build Enterprise failed. Thus, the Court must consider whether the claim against the Financing Defendants fares any better when predicated on the AIF enterprise. The Court concludes that, for two reasons, it does not. First, Plaintiffs have failed to sufficiently allege an AIF enterprise. Second, even if they had, as noted above, they have failed to plausibly allege that the Financing Defendants engaged in a "pattern of racketeering activity," as opposed to merely acting as a typical commercial lender.

In order to establish an AIF enterprise, Plaintiffs must allege a group that is united by a "common purpose." The RICO statute, for example, lists unions as a type of potential AIF enterprise. A union is not a formal business entity, like a corporation,

36

but it is a durable association that is pursuing a common purpose—the shared employment interests of its members. The Sixth Circuit has also confirmed that, consistent with the example of a union, the "common purpose" that defines the AIF enterprise "must be separate from the pattern of racketeering activity in which it engages." *Frank*, 4 F.3d at 1386.

Yet, here, the only common purpose that the Plaintiffs claim binds the members of the alleged AIF enterprise is their purported common desire to participate in the allegedly fraudulent scheme. That is not enough. And this Court reaches that result while fully cognizant of the Sixth Circuit's admonition that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Ouwinga*, 694 F.3d at 794 (quoting *Boyle*, 556 U.S. at 947). This Court reads that to mean that the evidence used to prove the pattern may coalesce with the evidence used to prove the common purpose, but Plaintiffs must nonetheless allege a common purpose that is separate from the alleged racketeering activity—they have failed to do so. Accordingly, Plaintiffs have failed to allege an AIF enterprise.

Apart from that, for the reasons that the Financing Defendants have not allegedly "joined" the Build Scheme, Plaintiffs have failed to plausibly allege that the Financing Defendants engaged in a "pattern of racketeering activity" in connection with any AIF enterprise. Based on the allegations in the Complaint, the Financing Defendants lent money on commercially reasonable terms. Plaintiffs assert in a conclusory fashion that the Financing Defendants did that with full awareness that

37

the loans were undersecured, and that the transaction was designed to cause Plaintiffs to default on the undersecured loans. The Court discounts the plausibility of those conclusory allegations. As noted above, why would lenders willingly agree to act as the undersecured creditors on non-recourse loans made at interest rates that are commercially reasonable for fully secured loans? That makes no sense, and thus fails to meet the "plausibility" threshold. Without some explanation of how the Financing Defendants are profiting from those activities, there is simply not enough there.

For either, or both, of these reasons, the Court finds that the alleged AIF enterprise does not cure the shortcomings in the Complaint as to the Financing Defendants. Thus, the Court **GRANTS** the Motion to Dismiss Count I as to the Financing Defendants, but **WITHOUT PREJUDICE** as to Plaintiffs' ability to re-plead the claim to provide the necessary allegations as to the Financing Defendants, if they can.

**D.      Plaintiffs Have Sufficiently Pled A Civil Conspiracy Claim As To The Build Defendants And First Title, But Not As To The Financing Defendants.**

In Count III, Plaintiffs purport to allege a civil conspiracy claim against all Defendants. For much the same reasons as set forth above, the Court finds that the claim survives as to the Build Defendants and First Title, but not as to the Financing Defendants.

Under Ohio law, a civil conspiracy is "a malicious combination of two or more persons to injure another person or property, in a way not competent for one alone,

38

resulting in actual damages." *Dixon v. Huntington Nat'l Bank*, 2014-Ohio-4079 (Ohio Ct. App.). Here, that is met as to the Build Defendants acting in combination with First Title.

The civil conspiracy cannot just consist of the various Build Defendants, as under the intra-corporate conspiracy doctrine, a corporation cannot be alleged to have conspired with its own officers (i.e., the individual Build Defendants). *Ziglar v. Abbasi*, --- U.S. ----, 137 S. Ct. 1843, 1867 (2017) (citation omitted). Similarly, as all of the various Build Companies are alleged to be alter egos and have identical ownership structures, they do not constitute separate entities that can combine, but are rather a single entity.

That single Build entity, however, can combine with First Title, and the Court finds that Plaintiffs have successfully alleged that here. According to Plaintiffs, First Title is separate from Build. The combination of the two was necessary for the Build Scheme, as Build needed a title agent to close the transactions. First Title is alleged to have performed that role as to a large number of transactions, with full knowledge that the transactions were structured in a way to harm the investors. Plaintiffs also identify a sufficiently plausible profit motive for First Title's participation in the conspiracy. That is enough at this stage, and thus the Court **DENIES** the Motion to Dismiss this claim as to First Title and the Build Defendants.

As to the Financing Defendants, though, for the same reasons set forth above, Plaintiffs have once again failed to plausibly allege a reason for those Defendants to participate in such a scheme. That is, there are no factual allegations that establish

a plausible inference as to how or why the Financing Defendants would agree to join a conspiracy under which their role is to make undersecured loans. The Court thus **DISMISSES** this claim as to those Defendants **WITHOUT PREJUDICE**.

**E.      The Court Dismisses The Unjust Enrichment Claim As To First Title, But Not As To The Build Defendants.**

Build moves to dismiss the unjust enrichment claim on the grounds that Plaintiffs are also pursuing a contract claim against Build. Indeed, as Build observes, Plaintiffs have alleged that they have some seventeen contracts with various Build entities. First Title, on the other hand, moves to dismiss the unjust enrichment claim on the grounds that Plaintiffs do not allege that First Title was unjustly enriched. Rather, the only entity against which Plaintiffs make such allegations is the entity defined as "Build" in the Complaint. The Court agrees with First Title, but disagrees with Build.

Start with Build. Build is certainly correct that a party cannot *recover* on both a breach of contract theory and an unjust enrichment theory. Or, even more broadly, a party cannot obtain relief in unjust enrichment when the subject matter of its claim is covered by a valid contract. But the "valid" part of "valid contract" matters. Moreover, the Federal Rules of Civil Procedure expressly allow parties to assert all of their potential claims "regardless of consistency." Fed. R. Civ. P. 8(d)(3). As a result, where a party is challenging the validity of the contract at issue, that party may allege unjust enrichment as an alternative theory of recovery. Should the Court (or a jury) determine that the contract(s) that govern the transaction are valid, of course,

the unjust enrichment claim will fail as a matter of law. But that is a question for a different time.

As to First Title, the story is a little different. In response to First Title's observation that the unjust enrichment claim does not appear to be alleged against First Title, Plaintiffs respond by arguing that "the factual allegations throughout the Complaint sufficiently establish the elements" of an unjust enrichment claim. (Pls.' Memo. in Opp'n to First Title's Mot. to Dismiss, Doc. 50, #442). But the Complaint does not appear to bear that out. To be sure, the unjust enrichment claim (Count IV) includes the boilerplate language that it "incorporate[s] by reference each of the allegations in the Complaint," (Pls.' Compl. at ¶ 216, #89), but the unjust enrichment allegations are tied only to Build. More specifically, recall that, under Ohio law, the elements of unjust enrichment are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit in circumstances where it would be unjust to do so. *Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 776 (6th Cir. 2019) (quoting *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (2005)). Kentucky law is basically the same. *See Dixie Fuel Co. v. Straight Creek, LLC*, No. 08-326, 2011 WL 845828, at *4 (E.D. Ky. Mar. 8, 2011).

Now compare those elements to the Complaint. The Complaint alleges that Build "marks up the price of the property," (Pls.' Compl. at ¶ 217, #89–90), Build "retains the price markup as profit", which means that the Investor has "unknowingly conferred a benefit on Build that Build knew of, and it is unjust to allow Build to

41

retain the markup" (*id.* at ¶ 218, #90); and then Build also takes steps to exacerbate the likelihood of Investor default, and, if that occurs, unjustly keeps the value of any improvements that have been made (*id.* at ¶¶ 219–24). In short, it is Build that is alleged to have committed (and benefitted from) the unjust enrichment, not First Title. Plaintiffs try to supplement the allegations in their Complaint through their opposition to the motion to dismiss, but that is not how pleading works. Accordingly, their unjust enrichment claim against First Title is **DISMISSED WITHOUT PREJUDICE**.[2] If Plaintiffs can allege a benefit that Plaintiffs have conferred on First Title, and that it would be unjust for First Title to retain such benefit, they need to allege that in their Complaint. The same is true if Plaintiffs intend to assert this claim against the Financing Defendants.

**F.      The Court Denies The Motion To Dismiss The Declaratory Judgment Counts (Counts V, VI, And VII).**

In addition to seeking monetary and injunctive relief, in their Complaint, Plaintiffs request declarations on three topics: (1) that the structure of the Build transactions (i.e., the use of trusts naming a Build entity as trustee and the investors as beneficiaries) violates the Plaintiffs' rights to redemption in their property (Count V); (2) that the trusts themselves are void or voidable as a result of fraud in the inducement (Count VI); and (3) that the trusts are voidable as violative of public policy (Count VII). According to Build, each of the requests fails as a matter of law.

---

[2] More generally, the Court holds that the Complaint fails to state a claim for unjust enrichment against any Defendants other than the Build Defendants.

As to the first, Build claims that the statutory right to redemption only applies "where the debtor is also the title owner and mortgagor," (Build Defs.' Partial Mot. to Dismiss, Doc. 31, #238), which is not the case here, given the trust structure. And, as for the declarations regarding the trust, Build contends that they should be denied, as Plaintiffs have failed to tender back (or offer to tender back) the consideration that they purportedly received for entering the trust agreements (e.g., the rehab loans that were extended to them). Moreover, Build observes that the properties at issue have already been sold, and that the Court lacks the authority to order them conveyed back—essentially an argument that any injury Plaintiffs may have suffered as a result of the trust is no longer subject to remedy by way of declaration.

Federal courts have jurisdiction to hear declaratory judgment actions. By statute, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. But federal courts cannot answer just any question. As the Sixth Circuit has noted, the Declaratory Judgment Act "does not broaden the jurisdiction granted to the federal courts by the Constitution and statutes enacted pursuant thereto," and accordingly, "there still must be a case or controversy before a federal court can assume jurisdiction and reach the merits" of a declaratory judgment action. *Brennan v. Rhodes*, 423 F.2d 706, 706–07 (6th Cir. 1970). Distinguishing between "actual controversies" and "attempts to obtain advisory opinions" can be a "difficult task." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir.

2004) (citing *Kardules v. City of Columbus*, 95 F.3d 1335, 1343–44 (6th Cir. 1996)).

"Thus, the Supreme Court has held that when considering the potential mootness of

a claim for declaratory relief, 'the question is "whether the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance

of declaratory judgment."'" *Coal. for Gov't Procurement*, 365 F.3d at 459 (first quoting

*Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974); then quoting *Maryland*

*Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 275 (1941)). And, for reasons this

Court has explained elsewhere, because mootness goes to justiciability, the inquiry

must be done on a claim-by-claim basis. *See Solis v. Emery Fed. Credit Union*, No.

1:19-cv-387, 2020 WL 2319718, at *6 (S.D. Ohio May 11, 2020) (Cole, J.) (explaining

that "a party cannot combine a justiciable claim with a non-justiciable claim, and

then argue that the court's power over the former likewise gives power over the

latter").

The reason that the Court raises this concern as to the declaratory judgment

requests here is that, as Build observes, the properties at issue (those at one time

associated with the three Plaintiffs) have long since been sold. Thus, there is nothing

to which the right to redemption could attach. Nor would "undoing" the trust

transactions change anything about property ownership in real life. This is not, for

example, an action by Plaintiffs seeking to substitute their own names, in place of the

trustee, on the deeds to the property at issue. Nor are the proceeds from any sale of

the underlying properties being held in a separate account, from which the Court could order disbursements.

Rather, the declarations seem designed to answer questions of law that Plaintiffs believe that they could use to advance other claims. For example, if Plaintiffs have been "deprived" of a "right to redemption," presumably any foregone monies associated with that right may be an aspect of their claim for damages under Civil RICO (as the RICO Defendants fraudulently induced Plaintiffs to enter the trust structure). Or perhaps it is instead an aspect of their claim for breach of fiduciary duties against the trustee. That is, the claim may be that the Build Company that served as trustee "owed" Plaintiffs the excess proceeds that Plaintiffs would have received had they been afforded their right to redemption.

But, in this regard, it is not clear that the Court's answer to the question actually matters. If Plaintiffs do have a right to redemption, then presumably they would argue that they have an entitlement to any excess proceeds generated by the sale of "their" properties. But, if they don't have a right to redemption (as a result of the trust structure), then presumably they would claim that the value of the right that they lost (as a result of Build's adoption of the trust structure discussed above) would be measured, at least in part, by the same excess proceeds amount. Or, alternatively, to the extent that the trust arrangement is valid, then that same amount would presumably (at least according to Plaintiffs) be one measure of the harm caused by the trustee's breach of fiduciary duty. In short, however the Court rules on the legal question, the extent to which the proceeds that Build received by

selling the property exceeded the amounts that Plaintiffs owed on the property seem to be an aspect of the damages that Plaintiffs will seek to claim one way or the other.

That being said, the answer arguably matters, at least enough to satisfy mootness concerns, in that the Court's resolution of the issue may change the nature of the argument as to *why* Plaintiffs are allegedly entitled to the excess proceeds. If Plaintiffs do not have a right to redemption, for example, then presumably the trustee did not breach any duty with regard to that right by selling the property. Thus, the Court concludes that the requests for declaratory judgment are not moot.

But, to say that those claims are not moot is not the same as saying that they should be decided now, which is what the parties request, at least as to some of the declarations. Indeed, the above discussion highlights potential concerns about reaching the merits now. As Build argues, and Plaintiffs acknowledge, the current structure does not fit neatly into the redemption statutes, given the divergence in identity between the debtors (i.e., Plaintiffs) and the mortgagors/title holders (the trustee). Plaintiffs seek to elide this distinction by claiming that the trust structure is "akin to a deed in lieu of foreclosure[.]" (Pls.' Compl. at ¶ 231, #92). But "akin to" is not "the same as." Thus, if the trust structure is valid, the Court would tend to agree with Build that the redemption statutes do not apply. (In saying that, the Court is not intending to address the separate question of whether that excess proceeds amount could still serve as a measure of damages under one of the other claims.)

But "if valid" is an important proviso concerning the trusts here. That is especially true given that the other two declarations that Plaintiffs seek (in Counts

46

VI and VII) are that the trust structure is "void *ab initio*" for one reason or another. If they were to prevail on those claims, and the trust structures are thus void, then presumably, the result of that would be that the beneficial owner (Plaintiffs) should instead be recognized to have been[3] the actual owner. If that were to occur, though, that would perhaps cast Plaintiffs' "right of redemption" argument in a different light, as now the divergence between debtor (i.e., a plaintiff) and owner (i.e., the Build entity serving as trustee) would disappear. But, the question of whether a trust is void *ab initio*, especially on the grounds alleged here, is heavily fact dependent, and the Court is not inclined to reach that issue without further factual development.

Accordingly, the Court will not dismiss the declaratory judgment counts, but likewise declines to reach their merits at this early juncture in the litigation.

## G. The Court Defers Any Decision Regarding The Enforceability Of The Jury Waiver.

Finally, Build asks the Court to strike Plaintiffs' jury demand in light of the express jury waiver included in some of the contractual agreements between one or more of the Build Companies and Plaintiffs. Plaintiffs respond that Build's request is premature.

In a federal court action, including as to any state claims included within that action, the right to a jury is determined as a matter of federal law and procedure. *See Hergenreder v. Bickford Senior Living Grp.*, 656 F.3d 411, 420 (6th Cir. 2011) ("The

---

[3] Again, the properties themselves have been sold to unrelated parties, and the Court has no authority to order the transfer back to Plaintiffs.

question of right to a jury trial is governed by federal and not state law[.]") (quotation and citation omitted). The Seventh Amendment provides parties that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const., amend. VII. As the text indicates, this Seventh Amendment right extends only to "Suits at common law," which the Supreme Court has held does not include claims seeking equitable relief (as such matters would have been heard, at the time of the founding, in courts of equity, rather than at common law), nor statutory claims that do not derive from, or correspond to, common law claims. *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937). But, as to the latter, it appears that courts agree that the Seventh Amendment jury right does extend to actions in which a plaintiff asserts Civil RICO claims. *See In re ClassicStar*, 727 F.3d at 497–99 (Merritt, J., concurring in part and dissenting in part) (assuming that the Seventh Amendment jury right extends to Civil RICO claims). As the court explained in *Maersk, Inc. v. Neewra*, "a [C]ivil RICO claim closely resembles an action sounding in tort that would have been recognized as legal in 18th-century England." 687 F. Supp. 2d 300, 340 (S.D.N.Y. 2009). "More importantly, … the relief authorized by § 1964(c) is distinctly legal, not equitable, in nature. Thus, Civil RICO actions under § 1964(c) are legal, and the jury right attaches to it." *Id.* at 341.

But, the Seventh Amendment right to a jury, like other constitutional rights, can be waived. *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 565 (6th Cir. 2012). Of particular relevance here, "[i]t is clear that the parties to a contract may by

prior written agreement waive the right to jury trial." *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir. 1985) (citations omitted). That is what Build contends occurred here, based on the plain language of many of the agreements that Plaintiffs signed—and that form the basis for their suit now—in which they waived a right to a jury.

For such a waiver to be valid, "this court must ask whether the waiver was knowing and voluntary." *Hergenreder*, 656 F.3d at 420. The Sixth Circuit requires courts to consider the following five factors in determining whether a waiver of jury rights meets that test:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the [party] had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Id.*

The parties do not meaningfully dispute the legal construct for deciding whether Plaintiffs have waived their right to a jury here. Rather, the principal current dispute goes to when the Court should make that determination. Build argues that the Court can decide now, while Plaintiffs—pointing to the factual nature of the five-factor test—assert that the decision should await further factual development.

In support of its view that the Court should decide now, rather than wait, Build refers the Court to five cases which it contends stand for the proposition that courts routinely decide this question at the pleading stage, at least where, as here, the plain language of the agreement is unambiguous. (*See* Build Reply Br., Doc. 59, #490–91). But, in the Court's view, those cases do not quite carry the day.

49

Two of the five, *Aracri v. Dillard's, Inc.*, No. 1:10-cv-253, 2011 WL 1388613, at *5–7 (S.D. Ohio Mar. 29, 2011), and *Franklin Bank v. Tindall*, No. 07-13748, 2008 WL 937488, at *8 (E.D. Mich. Apr. 7, 2008), involved agreements to arbitrate. To be sure, such agreements result in a waiver of the jury right, but arbitration agreements present very different timing issues from pure jury waivers. When faced with an agreement to arbitrate, courts must decide, up front, whether a matter is going to proceed in the judicial or the arbitral forum—there is no option to wait. Here, by contrast, there is.

In the remaining three cases, it appears that the parties were seeking to recover *on the very contracts that had the jury waiver provision. Poynter v. Ocwen Loan Serv., LLC*, No. 3:13-cv-773, 2017 WL 2779489, at *3–6 (W.D. Ky. June 27, 2017); *Integra Bank Nat'l Ass'n v. Rice*, No. 3:11-cv-49, 2011 WL 2437789, at *4–5 (W.D. Ky. June 14, 2011); *Starnes Family Office, LLC v. McCullar*, 765 F. Supp. 2d 1036, 1055–56 (W.D. Tenn. 2011). That is, in those cases, the parties did not claim that the contracts were unenforceable due to fraud, but rather were asserting the rights that the agreements gave them. And in at least two of those cases, the parties had been represented by counsel in negotiating the terms of the agreement. Not surprisingly, as the parties were seeking to vindicate their rights under the agreements, the courts concluded that they had to take the bad with the good.

Here, by contrast, Plaintiffs are not seeking to assert their contractual rights under the agreements. Indeed, if anything, they would presumably assert that the agreements are invalid as they were allegedly procured by fraud. The Court agrees

that such allegations, even if true, do not necessarily vitiate the jury waiver in the contracts—the language was express, unambiguous, and prominent—but it does convince the Court that further factual development is warranted before reaching a final decision on the issue. That is especially true as no prejudice arises to any party by deferring a decision on the issue until closer to trial in this matter. Accordingly, the Court declines to decide that issue now.

  **SO ORDERED.**

May 26, 2020
**DATE**

        **DOUGLAS R. COLE**
        **UNITED STATES DISTRICT JUDGE**