## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

COMPOUND PROPERTY
MANAGEMENT LLC, *on behalf of
itself and all others similarly
situated*,

                      Plaintiffs,

    v.

BUILD REALTY, INC., *d/b/a*,
GREENLEAF FUNDING, *et al.*,

                    Defendants.

Case No. 1:19-cv-133
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Plaintiffs Compound Property Management LLC, Leone1, LLC, R&G Cincy Investments, LLC, Pyramid Investment Group, LLC, and Ratio Models, LLC (collectively "Plaintiffs") contend that Defendants Build Realty, Inc., Edgar Construction, LLC, Cincy Construction, LLC, McGregor Holdings, LLC, Cowtown Holdings, LLC, Build NKY, LLC, Greenleaf Support Services, LLC, Build SWO, LLC, Gary Bailey, George Triantafilou, G2 Technologies, LLC, GT Financial, LLC, and First Title Agency, Inc. (collectively "Defendants") violated the 1961 Racketeer Influenced and Corrupt Organizations ("RICO") Act, along with the Ohio Corrupt Practices Act, trust law, and various equitable doctrines, when they allegedly engaged in a pattern of defrauding investors through the Defendants' property-flipping business enterprise. Seeking to vindicate their own rights, as well as the rights of all others similarly swindled (or so Plaintiffs claim), Plaintiffs now move

the Court to certify this matter as a class action under Federal Rule of Civil Procedure 23. (*See* Mot. for Class Certification, Doc. 155).

For the reasons explained more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Certify (Doc. 155). Specifically, the Court **GRANTS** certification for Plaintiffs' civil RICO claim (part of Count I) and breach of fiduciary duties claim (Count II), but **DENIES** certification for Plaintiffs' Ohio Corrupt Practices Act (part of Count I), civil conspiracy (Count III), and unjust enrichment (Count IV) claims. Finally, the Court finds Plaintiffs lack standing to pursue their declaratory relief claims and so **DISMISSES** Plaintiffs' Count V, Count VI, and Count VII **WITHOUT PREJUDICE**.

The Court **APPOINTS** Plaintiffs Compound Property Management LLC, Leone1, LLC, R&G Cincy Investments, LLC, Pyramid Investment Group, LLC, and Ratio Models, LLC as class representatives for the class, and **APPOINTS** Plaintiffs Compound Property Management LLC, Leone1, LLC, R&G Cincy Investments, LLC, and Ratio Models, LLC as class representatives for the subclass. The Court **APPOINTS** the Finney Law Firm, LLC, and Markovits, Stock & DeMarco, LLC as class counsel.

## BACKGROUND

Plaintiffs, a collection of small real-estate investor LLCs, allege that Defendants engaged in a complex scheme to defraud them and others like them. (Doc. 155). They contend that Defendants' labyrinthine business model maximized opportunities to generate money for Defendants by violating investor expectations,

contractual agreements, and (at least as to some Defendants) fiduciary duties. (*See id.*). Defendants, meanwhile, argue in their Response that they operated a legitimate enterprise with many satisfied investors and they fully advised investors of the risks and rewards their system offered. (Doc. 183, #7579–88). Because the arrangement's specifics matter, the Court begins there.

## A.    Build Realty's Business Model

Defendants' business model (what Plaintiffs call the "Build Scheme") is to help investors purchase, rehab, and resell homes (a practice sometimes called "flipping"). Defendants began by identifying and acquiring rights to purchase "properties with rehab potential."[1] (*Id.* at #7573). After acquiring a right to purchase a property for a set price, Build Reality prepared an estimate of the improvement costs needed to "flip" it for profit. (Doc. 183-1, #7640–41). Defendants simultaneously solicited investors for these properties through various means, including roadside signs, a website, mailed brochures, seminars, and word-of-mouth. (Reply, Doc. 219, #10344). Signage included the phrases "$10k down, including rehab $$$" and "no credit check!" (Doc. 193-10, #9728; Doc. 185, #8027). Advertisements also trumpeted that "Build purchases properties in bulk from over 20 different sources and then passes the savings on to you." (Doc. 193-8, #9723). After recruiting investors, Defendants paired each investor to a property (or multiple properties) for that investor to "purchase," rehab, and resell. (Doc. 183,

---

[1] From what the Court can tell, Build Realty does not formally purchase the property until confirming an investor. Before that time, Build executes option contracts that give Build the rights to purchase once an investor is secured.

#7574). About 200 to 250 investors enrolled. (*See* Doc. 193-12, #9735–58; Doc. 185, #8031–32; Doc. 193-9, #9726).

With property and investor paired, a set of transactions unfolded. Defendants refer to this as "the double closing." (Doc. 183, #7574). First, Defendant Build Realty closed on the property from the initial seller using short-term funding Defendant GT Financial provided. (*Id.*). Defendants call this the "Buy Side" of the double closing. (*Id.*). Soon after, Build Realty sold the property's title to its subsidiary, Defendant Edgar Construction (which Defendants call the "Sell Side"). (*Id.*).

That latter transaction is key to the dispute here. The Sell Side transaction was not a straightforward sale. Rather, Build transferred legal title in the property to Edgar Construction ("Edgar") as trustee of a state-law trust.[2] (*Id.*). The property was the corpus of the trust, Edgar the trustee, and an investor-created LLC (LLCs like Plaintiffs here) the trust's beneficiary. (*Id.*). In connection with this Sell Side transaction (from Build to Edgar, as trustee), the investor LLCs received and signed settlement disclosures, including notice that Edgar took legal title to the property as trustee. (*See* Doc. 180-25, #6190). Investors also agreed to "reimburse actual closing costs incurred by Seller [i.e., Build] for the purchase of this property from the owner of record." (*See, e.g.*, Doc. 192-7, #9387). In other words, the investors agreed to pay Build's *Buy Side* closing costs. This obligation, however, was subject to a "cap" on the total "closing costs and funding fees associated with this property."

---

[2] In the Complaint, Plaintiffs seemingly allege some trusts are governed by Ohio law and some by Kentucky law. (*See* Doc. 1, #93 (discussing both Ohio and Kentucky trust law)). Now, Plaintiffs appear to argue Ohio law alone governs. (*See* Doc. 155-1, #3194 (alleging Defendants violated "federal and Ohio law"); Doc. 191, #9295–96 (complaining Defendants failed to license the trusts in Ohio)).

(Doc. 192, #9327–28; Doc. 192-8, #9407). First Title Agency, Inc., typically conducted both the Buy Side and Sell Side closings. (Doc. 183, #7575).

Also at the Sell Side closing, Edgar (now holding legal title as trustee) executed a mortgage agreement with its parent, Defendant Build Realty. (Doc. 183, #7576; Doc. 180-21, #6157). As part of that same transaction, Edgar executed a note with Build Realty[3] in which it agreed to pay to Build Realty the total of (1) the Sell Side price, plus (2) the amount Build Realty estimated the investor needed to make improvements, plus (3) various costs tacked on by Build Realty, minus (4) the $10,000 payment the investor made. (Doc. 183, #7576). To use an example, imagine Build transferred the property to Edgar Construction on the Sell Side at a stated price of $100,000, and Build estimated the structure required $50,000 in remodeling. Further, ignore briefly the third category—tacked on costs. The note would be in an amount of $100,000 + $50,000 - $10,000 = $140,000. Afterward, Build Realty would assign the note and mortgage to GT Financial to secure GT's interest in the property (recall GT put up the initial purchase funding). (Doc. 186, #8204). Even after assignment, though, the borrower paid Build Realty directly and Build Realty then used that same money to pay GT (until, as described below, GT sold its interest in the note). (*Id.* at #8217).

---

[3] Defendants represent to the Court that "investor companies executed mortgage agreements with and received a construction loan from Build Realty's in-house mortgage lender Greenleaf Funding." (Doc. 183, #7576). That is perhaps a bit of a misstatement for two reasons. First, as Defendants clarify in a footnote: "More precisely, Edgar Construction as trustee executed the mortgage agreement and the investor agreed to assume the obligations under the mortgage agreement." (*Id.*). Second, Greenleaf Funding is not an "in-house mortgage lender" of Build Realty—it is Build Realty. (Doc. 186, #8154 ("Build Realty, Inc., and Greenleaf Funding is one and the same.")).

Build Realty structured the note as a "Balloon Payment Promissory Note." (Doc. 180-19). Under the note, the borrower needed to pay monthly installments on the full amount at a 15% interest rate, with a balloon principal payment at the end of the loan term when the investor sold the rehabbed property. (Doc. 180-19, #6143).

As discussed, Build Realty originally executed the loan with Edgar. But at the Sell Side closing, the investor LLC assumed Edgar's obligations under the mortgage agreement and note, making that LLC liable for the loan. (*Id.*; Doc. 88-1, #871–72). But because it was the LLC, rather than the LLC's individual owner, that assumed the obligations, the individual owner could walk away from the loan and investment at any time. (Doc. 88-1, #871–82). If so, the investor LLC would default and lose the right to sell the property, but the individual owner lost only the money already spent (typically the $10,000 and any interest payments the LLC made) and incurred no further liability. (*Id.*). In other words, Build did not require individual owners to personally guaranty the loan.

Although the note's total amount included the estimated rehab costs (suggesting that the lender had made those funds available), Build Realty/GT Financial did not immediately fund an escrow account containing that rehab cost amount. Rather, the rehab funding emerged when GT Financial sold its interest in the note to a third-party lender. (Doc. 186, #8198). From the money it received selling the note (presumably the face amount of the note), GT Financial reimbursed itself the amount it had advanced to Build for the original property acquisition (the Buy Side price). (*See id.* at #8198, 8210). Build, meanwhile, kept for itself the

6

difference between its Buy Side price and its Sell Side price (the markup on the property). And the estimated rehab amounts (which made up the rest of the loan sale proceeds) went into escrow. (*See id.*). Build Realty served as the loan servicer and held the escrowed rehab funds (once funded) for later disbursement. (*Id.* at #8210; Doc. 192-1, #9335).

When GT Financial[4] sold its interest in the note to a third-party lender, it did so at a stated interest rate ranging from 8% to 15%, although most often 12.5%. (Doc. 186, #6216–18, 8227). As described above, the investor LLC was paying Build Realty monthly interest payments calculated as 15% of the loan amount. The difference between that 15% rate and the interest rate specified in the third-party note generated some more profit for Build as the loan servicer. That rate difference continued to generate a monthly profit for Build Realty until the investor completed the rehab, sold the property, and paid off the balloon note. (*See id.*).

During the life of the loan, the investors rehabbed their properties. Using the Build Realty estimate as a guide, the investor LLCs submitted "draw requests" to Build Realty to receive the escrowed rehab funds. (Doc. 192-1, #9335; Bailey Decl., Doc. 183-1, #7641). Although giving investors latitude in determining how to carry out the work, Build Realty would issue checks only after inspecting the property to

---

[4] One of the difficulties in this case is that the parties often use "Build" or "Build Realty" to refer to the entire group of Defendants. That sometimes obscures exactly which Defendant allegedly did what. To illustrate, although Plaintiffs allege "Build sold the loan to the permanent lender" (Doc. 191, #9291), from the Court's review of the materials, it appears GT Financial, rather than Build Realty, that actually held and sold the note. (Doc. 186, #8183, 8211). For purposes of this Opinion, though, it does not particularly matter exactly which corporate defendant did so.

ensure they completed the work. (Doc. 183-1, #7641). Build Realty issued checks to the investor's LLCs directly. (Doc. 180-34, #6307).

Once the investor concluded remodeling, the investor chose a list price and listing agent and then marketed the property. (Doc. 183-1, #7641). If a buyer emerged, the investor LLC directed Edgar (as trustee, and thus legal title owner) to sell the property to that buyer. (*Id.*). Sale proceeds first satisfied the loan (any outstanding interest plus the principal) and the closing costs (e.g., real estate commissions, title fees, etc.) associated with the ultimate sale, with any excess proceeds then going to the investor as profit for the investor's rehabbing efforts. (*Id.*).

As the description shows, there are many moving parts. The Court acknowledges it may have misstated some aspects of the transaction along the way. But for current purposes, that is largely irrelevant—what mainly matters is each investor experienced the same structure. To summarize that structure: (1) investors paid $10,000 to Build Realty to receive a loan to "purchase" and remodel a house; (2) during the duration of the loan, investors paid only interest[5] and fronted rehab expenses to be reimbursed by Build Realty from the loan; and (3) investors then marketed and sold the property, reaping any profits above their accrued obligations

---

[5] So far as the Court can tell, Build Realty effectively extended investors a line of credit for the funds needed for improvement. Investors apparently paid interest on the entire amount of the line of credit, starting at closing, rather than on the disbursements they received from the line of credit. Moreover, investors fronted the actual improvement costs, receiving reimbursement from the line of credit only once they had approval from Build inspectors (even though the investors were already paying interest on the full amount of the improvement funds). Of course, individual investors also had the luxury to walk away from the loan without incurring further personal liability.

under the loan and other fees. But neither the investor nor his or her LLC ever held legal title to the property. Rather, during the entire process, an investor's only interest in the property was as a beneficiary (technically, the LLC was the beneficiary) to a trust in which Build Realty's subsidiary, Edgar Construction, served as trustee.[6]

Build Realty and its affiliates identified both properties and investors, acquired the properties, "loaned" funds to investors to "purchase" the properties,[7] held rehab funds in escrow, disbursed those same funds as investors performed the specified improvements, and oversaw the process. Throughout, Build Realty's subsidiary, Edgar Construction, maintained legal ownership of the property, while the investor used Build's "loan" proceeds to improve it. Build Realty then recouped its expenses when the investor sold the property. And if the investor walked away or defaulted, no trouble. Build Realty already owned the property through Edgar. Finally, as explained below, Build Realty profited at many steps along the way.

## B. Plaintiffs' Allegations About The Build Business Model

Plaintiffs refer to the above business model as the "Build Scheme," painting a portrait of an enterprise aimed at misleading and defrauding investors. They

---

[6] The Court notes that some documents seem to describe Edgar Construction as a seller and the investor as a buyer. (*See, e.g.*, Doc. 192-7, #9395). Yet both parties represent to the Court that investors never took legal title to the property at closing. (*See* Doc. 183, #7574–7579; Doc. 191, #9303 ("[N]o Plaintiff actually received a deed or title.")).

[7] The Court puts "loan" and "purchase" in quotation marks because these transactions do not function like traditional real estate loans or purchases. Namely, investors did not receive a loan, but instead assumed a loan that Build Realty issued to its own subsidiary, Edgar Construction. Further, investors never "purchased" any interest in the property other than a beneficial interest. The Court, however, take no position at this time as the legality or propriety of these arrangements.

advance nine main claims of misrepresentation and wrongdoing against Build Realty, and its affiliates and subsidiaries. (Doc. 191, #9286–93). The Court discussed those claims in an earlier Opinion. (*See* Doc. 131, #2232–37). But because Plaintiffs have tweaked their claims preceding two years and because the mechanics of Plaintiffs' claims are relevant for class certification, the Court will again briefly describe each.

First, Plaintiffs contend that Build Realty secretly inflated purchase prices between its initial purchase of the property and its subsequent "sale" to the investor (between the Buy Side and the Sell Side of the double closing). (Doc. 191, #9286). While Build touted its process created savings for investors compared to a direct purchase, Plaintiffs claim that was not true. Despite Build Realty claiming it bought in bulk or "volume," creating discounts for investors, Plaintiffs say Build made one-off purchases from publicly available property sources. (*Id.*). In other words, Build paid market prices for the property and then surreptitiously inflated the purchase price on the Sell Side for investors. Thus, Plaintiffs say, investors were paying above-market prices, rendering Build's claim that it "passed the savings along to investors" untrue. (*Id.* at #9286–87). And, as each investor agreed to a "cap" on closing costs and funding fees, Plaintiffs also contend this hidden markup from Buy Side to Sell Side (amounting to an undisclosed profit for Build Realty at the investor's expense) should have counted toward that cap. (*Id.*). In effect, Plaintiffs claim that Build Realty exceeded the contractual limit once you account for that hidden markup. (*Id.*). Finally, Plaintiffs contend that the fiduciary duties arising

10

from the trust arrangement created on the Sell Side required Build Realty (or at least Edgar Construction, as trustee) to disclose the markup and purchase-method information. (*Id.*).

Second, Plaintiffs argue that Build Realty "misapplied" the $10,000 that investors paid at closing. (*Id.* at #9288). Plaintiffs say investors expected the "down payment" to contribute to, and thus reduce, the principal the investor owed on the property. (*Id.*). But Plaintiffs allege that Build Realty instead used the entire $10,000 to pay costs and its own largely undisclosed fees—creating no actual equity in the property for the investor. (*Id.* at #9289; Doc. 192, #9325). And, by doing so, Build further exceeded the capped "closing costs and funding fees." (Doc. 191, #9288–89).

Third, Plaintiffs contend that Build Realty wrongly charged investors interest on not-yet-obtained funds. (*Id.* at #9290). Recall that, at the second closing, Plaintiffs assumed a 15%-interest loan meant to cover the "purchase" of the property, plus the estimated rehab expenses and closing costs. (Doc. 183, #7576). Closing documents certified that funding supported that entire loan amount at time of closing. (*See, e.g.*, Doc. 192-3). And interest payments based the full loan amount—including undisbursed rehab amounts—began to accrue immediately following closing. (Doc. 185, #8076). But investors did not have immediate access to those funds. (Bailey Decl., 183-1, #7641). Instead, investors had to submit draw requests as work progressed. (*Id.*). Perhaps more importantly, Plaintiffs argue that, in most cases, Defendants did not even immediately *acquire* the funding allocated

11

for rehab. (Doc. 192, #9325–26). Rather, Build secured that rehab funding only when GT Financial sold the loan to a third-party lender, which could take days or weeks. (Doc. 186, #8198). Yet, during that interim, Build Realty still allegedly charged the investors "interest" on the full "loan," including those not-yet-in-existence rehab funds. (*See* Doc. 185, #8073–74).

Fourth, Plaintiffs contend that Build Realty violated the fiduciary duties it owed to investors by surreptitiously profiting off an interest rate markup. (Doc. 191, #9291). After the investor's LLCs assumed the 15% interest loan, GT Financial routinely resold the notes at a lower rate, typically 12.5%, allowing Build Realty as loan servicer to pocket the difference. (Doc. 186, #6216–18, 8227). Plaintiffs argue this hidden practice violated duties of loyalty and disclosure that Build Realty, as "trustee" through its relationship with the actual trustee Edgar Construction, allegedly owed to the investor beneficiaries. (Doc. 191, #9291). That is, Plaintiffs believe that Build Realty's actions can be imputed to Edgar, given that Edgar is "a wholly-owned subsidiary of Build with the same business address and no separate employees." (*Id.* at #9287).

Fifth, Plaintiffs return to their charge that Build Realty and its affiliates routinely charged costs and fees over the contractual limit agreed to at closing. (*Id.* at #9292). Plaintiffs incorporate here many complaints described above.

Sixth, Plaintiffs argue that Build Realty harmed investors in connection with a credit check fee. (*Id.*). Build Realty advertised it would not check potential investor's credit (Doc. 193-10, #9729), and Build executives attested no such check

ever occurred (Doc. 187, #8507). Yet Plaintiffs say investors uniformly paid $50 for a purported "Credit Check" at closing. (*See* Doc. 193-11, #9732).

Seventh, Plaintiffs complain that investors paid a $400 to $450 "document preparation fee" to "Jack Donenfeld" at closing. (Doc. 191, #9292–93; Doc. 193-11, #9732). But Plaintiffs argue Donenfeld played no part in preparing documents for closing beyond the work he did to create the initial templates. (Doc. 191, #9292–93). Thus, they say, the fee "was a sham charge" (presumably retained by Build Realty). (*Id.*).

Eighth, Plaintiffs conclude that Build Realty intentionally structured its operations to deprive investors of their state-law rights as mortgagees. (*Id.*). Without the trust arrangement, investors would enjoy traditional foreclosure rights, like the right of redemption and the right to excess proceeds. (*Id.*). According to Plaintiffs, Build Realty illegally structured its business model as a trust to deprive investors of these rights.[8] (*Id.*).

Based on these allegations of misrepresentations and wrongdoing, Plaintiffs, investors into the Build Realty business model, advanced a litany of legal claims. These include: a civil RICO claim predicated on mail fraud (part of Count I), an

---

[8] In their Memorandum in Support of their Motion to Certify, Plaintiffs also allege Defendants "[had] Class Members sign a purchase contract stating that they will take legal title in their LLC name 'by deed of warranty,' but then put[] the property at issue into a trust completely controlled by Defendants," "misuse[d] … escrow monies entrusted to Defendants," and "use[d] … fraudulent and photoshopped checks, certified checks, and bank statements to effectuate the buy side transactions." (Doc. 155-1, #3199–200). However, Plaintiffs only cite to their Complaint to substantiate these allegations. Absent factual support, the Court declines to credit these assertions for purposes of class certification.

Ohio Corrupt Practices Act claim (part of Count I), claims for breach of fiduciary duties (Count II), civil conspiracy (Count III), and unjust enrichment (Count IV), along with declaratory judgment claims seeking a declaration that Defendants violated investors' foreclosure rights (Count V) and that Edgar's trusts are void or voidable (Counts VI & VII). (Doc. 1, #52–95).

Now over three years into litigation, Plaintiffs seek to certify a class action to press the above claims. (*See* Doc. 155). Plaintiffs propose the following class:

> Plaintiffs and all other persons and entities in Ohio and Kentucky, individually and collectively, that invested in real property and were named as beneficiaries to a trust created through a real estate transaction engaged in by, through, or with any of the Defendants named herein, using the Build Scheme further described and defined herein, for the longest period allowed by law (the "Class").

(Doc. 155-1, #3195).[9] Separately, Plaintiffs propose the following subclass:

> Members of the Class that had their properties reclaimed and resold as a result of default, without access to judicial foreclosure proceedings and the opportunity to redeem, and without receiving the excess proceeds (if any) upon subsequent sale of the property by Build.

(*Id.*).

---

[9] In their memorandum in support of class certification, Plaintiffs initially proposed the following class:

> Plaintiffs and all other persons and entities in Ohio and Kentucky, individually and collectively, that invested in real property and were named as beneficiaries to a trust created through an unlawful real estate transaction engaged in by, through, or with any of the Defendants named herein, using the Build Scheme further described and defined herein, for the longest period allowed by law (the "Class").

(Doc. 155-1, #3195). After Defendants accused Plaintiffs of proposing an improper "fail-safe" class (*see* Doc. 183, #7603–06), Plaintiffs revised their proposed class by removing the word "unlawful" before "real estate transaction." (*See* Doc. 191, #9297).

As they have throughout this case, Defendants vigorously dispute all the accusations. They claim they fully informed investors of the proposed arrangement, that the investors were sophisticated, and that they knew enough to understand the risks and rewards entailed. (Doc. 183, #7573–75). More relevant for class certification, Defendants chiefly contend that the individualized nature of the investors' experiences makes Plaintiffs' claims unfit for class resolution. (*Id.* at #7579–98). Defendants highlight multiple differences, including among the properties themselves, the various investors' characteristics, the way investors learned of Build Realty, each individual investor's understanding of the trust model, side-agreements various investors had, their individual rehabbing experiences, and even differing effects from disruption that Plaintiffs' counsel Chris Finney allegedly caused (more on that later). (*Id.*). Separately, Defendants argue Plaintiffs failed to carry their burden to show the other prerequisites of certification, including numerosity, commonality, typicality, adequacy, predominance, and superiority. (*Id.* at #7601–34).

## LEGAL STANDARD

A class action represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To justify departing from the typical named-parties-only rule, a putative class representative must make certain showings. First, under Federal Rule of Civil Procedure 23(a), the named plaintiff(s) must show that: (1) the class is

15

so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a). These requirements limit the potential abuse of the class action mechanism by ensuring that the class claims are "fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

Beyond satisfying the four factors Rule 23(a) identifies, though, a putative class also must meet one provision of Rule 23(b). Here, for reasons discussed below, the Court addresses only one of those provisions—Rule 23(b)(3). Certification under this provision requires consideration of two issues—predominance and superiority.

As to the former, to certify under this subsection, the court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." This "predominance" inquiry is like, though "more stringent" than, Rule 23(a)(2)'s "commonality" requirement, with predominance said to "subsume[]" or "supersede[]" commonality. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). In other words, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)['s commonality requirement]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem*, 521 U.S. at 623–24).

16

Superiority, on the other hand, requires the court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "superiority" requirement aims to "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 adv. comm. n. to 1966 amend.).

Rule 23(b)(3) lists four non-exhaustive factors "pertinent" to the "predominance" and "superiority" analyses. These include—(1) "the class members' interests in individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) "the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).

Whether a court may appropriately certify a class is separate from whether the putative class, as defined, will succeed on the merits of the claims. That said, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350). Indeed, the Supreme Court has directed courts to undertake a "rigorous analysis" before certifying a class—an analysis that "frequently entail[s] 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Dukes*, 564 U.S. at 350). While this "rigorous analysis" might involve *some* consideration of

the merits, though, courts do not have "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

At bottom, a "district court has broad discretion to decide whether to certify a class. [The Sixth Circuit] has described its appellate review of a class certification decision as 'narrow,' and as 'very limited.'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citations omitted).

## LAW AND ANALYSIS

As described above, Plaintiffs must clear multiple hurdles to succeed on their motion for class certification: Rule 23(a)'s requirements of numerosity, commonality, adequacy, and typicality, as well as at least some subset of Rule 23(b)'s various requirements.[10] And Plaintiffs must make those showings as to each claim for which they seek certification. *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) ("[A] court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate."); *Dominguez v. United Parcel Serv., Co.*, No. EDCV 18-1162, 2020 WL 4390376, at *3 (C.D. Cal. June 12, 2020); *D.O. v.*

---

[10] Rule 23(b)(3) also contains an "implied ascertainability" requirement. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017) ("[A] 'class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" (quoting *Young*, 693 F.3d at 537–38). The Court has determined the class is ascertainable because discovery has produced an investor list containing all potential class members. (Doc. 193-12). Defendants protest that Plaintiffs' proposed class is not ascertainable because it is an improper "fail-safe" class. To Defendants, the class is a "fail-safe" as it is defined based on Defendants' "unlawful" conduct. (Doc. 183, #7603–07). But even if Plaintiffs' initial class improperly used the term "unlawful" before, that issue became moot when Plaintiffs amended and removed that term.

*Haddonfield Bd. of Educ.*, No. 10-cv-631, 2012 WL 860669, at *2 n.3 (D.N.J. Mar. 21, 2012).

In objecting, Defendants don't give an inch. They contest certification at every step and as to every claim.

The Court, however, determines it should certify the class for Plaintiffs' civil RICO and breach of fiduciary duties claims—but only those claims. Both claims satisfy each of the Rule 23(a) requirements, and each also falls within the scope of Rule 23(b)(3). That is not to suggest that the Court believes it likely (or unlikely) that Plaintiffs will prevail on those claims. Rather, the Court merely determines that it is appropriate to address Plaintiffs' civil RICO and fiduciary duties claims, whether meritorious or not, on a class-wide basis. That is not true, however, for the remaining claims.

Thus, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs Motion to Certify (Doc. 155-1). Specifically, the Court **GRANTS** certification for Plaintiffs' civil RICO and breach of fiduciary duties claims and **DENIES** certification for Plaintiffs' Ohio Corrupt Practices Act, civil conspiracy, and unjust enrichment claims. Finally, the Court finds Plaintiffs lack standing to pursue their declaratory relief claims and so **DISMISSES** Plaintiffs' Count V, Count VI, and Count VII (Doc. 1).

## A. Plaintiffs Lack Standing To Pursue The Three Declaratory Judgment Claims.

The Court begins with a threshold issue—subject-matter jurisdiction. Plaintiffs pursue seven claims using eight theories[11]—five theories seek damages for past harms and three seek declaratory relief. (Doc. 1, #52–95). As to the latter, Plaintiffs seek two declarations: (1) Defendants violated Plaintiffs' rights as mortgagees to redemption and excess proceeds, and (2) the trusts are void or voidable. (Doc. 1, #92–95). Now, with the benefit of discovery, the Court sua sponte determines Plaintiffs lack standing to pursue their declaratory judgment claims.

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under the Constitution, their jurisdiction extends solely to "cases" or "controversies." U.S. Const. art. III. One aspect of that limitation is that a plaintiff must have standing to proceed. And standing is not dispensed in gross. Rather, a plaintiff must show they have standing for each claim they intend to pursue. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Because standing is an aspect of subject-matter jurisdiction, courts may raise standing sua sponte. *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012). Moreover, a court can raise the issue at any time. *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016). No matter when the issue is raised, however, the Court must evaluate standing as of the time plaintiffs filed suit. *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 580 (6th Cir. 2012).

---

[11] Count I puts forward both Plaintiffs' civil RICO claim and their Ohio Corrupt Practices Act claim.

These standards apply with full force to class actions, or more accurately to the named plaintiffs who seek to proceed on behalf of a putative class. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "It is well settled that, at the outset of litigation, class representatives without personal standing cannot predicate standing on injuries suffered by members of the class but which they themselves have not or will not suffer." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002).

To have standing, a plaintiff must have an injury-in-fact. *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). The injury must be concrete and particularized, actual or imminent. *Id.* And it must be fairly traceable to the challenged conduct and redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, Plaintiffs' Complaint named three original plaintiffs: Compound Property Management LLC, Leone1, LLC, and R&G Cincy Investments LLC. (Doc. 1, #1). As to these Plaintiffs' civil RICO, Ohio Corrupt Practices Act, breach of fiduciary duties, civil conspiracy, and unjust enrichment claims, they say they lost money because of Defendants' conduct, and they now seek to recover money damages. Money damages are a quintessential example of a concrete and particularized injury that is redressable by judicial decision. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021).

The same is not true, however, for Plaintiffs' declaratory judgment claims. "Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief." *Kanuszewski v. Mich. Dep't of Health & Hum.*

*Servs.*, 927 F.3d 396, 406 (6th Cir. 2019). "When seeking declaratory … relief, a plaintiff must show actual present harm or a significant possibility of future harm … ." *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). Plaintiffs cannot do so for their declaratory relief claims here.

Start with the declaration they seek as to their mortgagee rights. When filing the Complaint, the three original Plaintiffs lacked an identifiable ongoing or future injury from Defendants' alleged violations of their mortgagee rights. In Plaintiffs' own Complaint, they allege that Defendants "took [Plaintiffs'] property without any judicial procedure, retaining all funds paid by [Plaintiffs] and the excess proceeds from the subsequent sale." (Doc. 1, #9–10). What the Complaint alleged, discovery confirmed: Each named Plaintiff has long since lost control of (or at least whatever minimal interest they had in) the property they sought to flip. (*See* Doc. 183, #7638 (listing the "[r]eason(s) [Plaintiffs were] unable to resell property *prior to default*" (emphasis added)); Doc. 180, #5913 (acknowledge property had been resold to third-party); Doc. 176, #3802 (same); Doc. 214, #10246). So to the extent that "reclaiming" the property violated Plaintiffs' rights, that violation occurred and cannot now be undone by any declaration the Court may enter. To be sure, Plaintiffs could (and perhaps do) seek damages for the harm they suffered in connection with the default. But a declaratory judgment is an improper vehicle for such retrospective relief.

Turn to Plaintiffs' request to have the trusts declared void or voidable. The only asset ever placed in trust was the property each named Plaintiff intended to rehab. (*See, e.g.*, Doc. 185-25). This appears to have been the trusts' sole purpose.

22

But as discussed, before the filing the Complaint, Edgar Construction had long since resold each original Plaintiff's property. (Doc. 1, #9–10). To the extent the trusts even still exist, nobody has ever suggested their mere continuing existence poses an actual or imminent risk of concrete harm to Plaintiffs. To be sure, Plaintiffs are upset that the trusts were created, but "purported indignation" is not a concrete injury. *See Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021).

The bottom line is the three original named Plaintiffs have never articulated a concrete injury they are now suffering or will suffer in the future from the ongoing existence of their single-purpose trusts. Their Complaint only demands that the trusts be dissolved so that any money in them can be returned to Plaintiffs and other class members. (*See* Doc. 1, #93–95). There is no suggestion, though, that such funds even exist. In fact, despite thousands of pages of documents and testimony, the Court remains uncertain whether the original Plaintiffs' trusts themselves continue to exist or instead already have been terminated by Edgar Construction. *See* Ohio Rev. Code § 5804.14 (permitting a trustee, in limited circumstances, to terminate a trust where the costs to maintain the trust exceed its value).

In fairness, Plaintiffs seek class wide relief, and some class members could have value remaining in their trust. Arguably those class members have an imminent potential injury. But the three original Plaintiffs do not. "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have

23

been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis*, 518 U.S. at 357 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)).

In sum, the named Plaintiffs have standing to pursue their civil RICO, Ohio Corrupt Practices Act, breach of fiduciary duties, civil conspiracy, and unjust enrichment claims. But they lack standing to demand the requested declaratory relief described in Count V, Count VI, and Count VII. The Court thus **DISMISSES** those counts **WITHOUT PREJUDICE**.

### B. Plaintiffs Do Not Even Attempt The Necessary Showings To Certify Their Ohio Corrupt Practices Act And Civil Conspiracy Claims.

Before exploring the merits of the remaining claims, the Court next turns to another threshold issue. In order to obtain class certification, a plaintiff must "affirmatively demonstrate" its entitlement to class certification at every step. *Dukes*, 564 U.S. at 350. Plaintiffs have not even attempted to do so for their Ohio Corrupt Practices Act and civil conspiracy claims. Nowhere in their briefing do Plaintiffs argue, or even discuss, how those claims meet the requirements under either Rule 23(a) or any category of Rule 23(b). Given their failure to address these matters, the Court **DENIES** Plaintiffs' Motion to Certify as to their Ohio Corrupt Practices Act and civil conspiracy claims.

### C. The Court Finds Plaintiffs Meet The Requirements Of Rule 23(a) For Their Remaining Claims.

The Court now turns to the remaining claims to consider the merits of the certification issue. On that front, the Court first addresses Rule 23(a)'s

requirements. As noted, the Court must undertake the analysis on a claim-by-claim basis. Plaintiffs make that somewhat difficult, however, as they largely eschew a claim-by-claim analysis under Rule 23(a), preferring instead to discuss compliance on a case wide basis. That said, the Court finds that Plaintiffs satisfy all of Rule 23(a)'s requirements as to the claims that remain—civil RICO, breach of fiduciary duties, and unjust enrichment.

### 1.   The Proposed Class And Subclass Satisfy The Numerosity Requirement.

"There is no strict numerical test for determining impracticability of joinder." *In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Still, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004). That said, "while 'the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative.'" *Golden v. City of Columbus*, 404 F.3d 950, 965–66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)).

As noted above, Plaintiffs propose a class of all Ohio and Kentucky investors named as beneficiaries to a Build Realty trust going back for the longest term permitted by law. (Doc. 191, #9297). Separately, Plaintiffs propose a subclass of all class members whose properties Build Realty reclaimed and resold because of default. (Doc. 155-1, #3195).

Both Plaintiffs' class and subclass meet the numerosity requirement. Plaintiffs' putative class contains between 200 and 250 members. This determination stems from an investor list and Defendant testimony. (*See* Doc. 193-12, #9735–58; Doc. 185, #8031–82; Doc. 193-9, #9726). Moreover, Plaintiffs' putative subclass approximates two dozen. (*See* Doc. 193-12, #9738–42). With over two hundred potential class members and two dozen subclass members, the Court agrees "that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

Defendants urge a different result, arguing Plaintiffs failed to support their claims of class size. (*Id.*). But the Court has examined the list of investors produced by Defendants in discovery and determined that the class appears to comprise between 200 and 250 members. (*See* Doc. 193-12, #9735–58). Indeed, Build Realty executive Gary Bailey admitted as much at his deposition. (Doc. 185, #8031–82). Plaintiffs' class and subclass meet numerosity.

### 2. Plaintiffs' Putative Class Members Share Common Questions Of Fact And Law.

"To demonstrate commonality, the plaintiffs' 'claims must depend on a common contention … of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350). "[W]hen the legality of the defendant's standardized conduct is at issue, the commonality factor is normally met." *Castellanos v. Worldwide Dist. Sys. USA, LLC*, No. 2:14-cv-12609, 2016 WL 11678220, at *6 (E.D. Mich. June 20, 2016)

(quoting *Gilkey v. Cent. Clearing Co.*, 202 F.R.D. 515, 521 (E.D. Mich. 2001)). Although similar to Rule 23(b)'s predominance requirement, commonality presents a lower threshold of inquiry. *See Amchem*, 521 U.S. at 609.

The Court agrees that Plaintiffs have met the commonality requirement. As Plaintiffs show, Defendants carried out a uniform business plan with investors for years, using similar advertising, forms, practices, and legal entities. (*See, e.g.*, Docs. 117-1, 117-2, 117-3, 117-4, & 117-5). Put differently, Plaintiffs attack Defendants' overarching business practices, practices that all putative class members experienced—allegedly inflated property costs, misapplied "down" payments, fees above the contractual cap, etc.

Indeed, it strikes the Court that much of the debate between the parties boils down to the legal meaning of certain payments and representations. For example, Plaintiffs categorize certain expenses, like the $10,000 payment, as falling within the capped "costs and fees." (Doc. 191, #9291–92). For their part, Defendants do not categorize those expenses as such. (Doc. 183, #7609–10). Thus, the legal meaning of the contractual cap and what expenses fall within its terms will probably resolve much of the parties' debate. That is, if certain expenses do not properly fall within that cap, then Plaintiffs have not been damaged by paying those amounts nor have Defendants been unjustly enriched in receiving them. And that result will be common to all who took part in the same set of transactions. That satisfies commonality.

Defendants push back. First, Defendants claim that while some overlap may exist, too many factual differences pervade among putative class members' experiences. (Doc. 183, #7579–98, 7612–15). But right from the outset, Defendants undermine their own argument. Before attempting to distinguish among individual class members, Defendants open by offering a seven-page "overview of Build Realty's general operations under the trust model." (*Id.* at #7572–79). That overview illustrates class wide commonality by outlining the similarities in investor's experiences with Build Realty. And that is the point—Plaintiffs' view is that these "general operations" themselves defrauded investors, allegedly giving rise to liability under civil RICO.

Turning to the fiduciary duties claim, it likewise attacks conduct that applies to the class. Edgar served as trustee for all class members and interacted with each similarly, at least as to disclosing any "hidden markups" or things of that nature. The same is true for the unjust enrichment claim. As noted, a basis for that claim is that Defendants exceeded the cap as to the investors, therefore being unjustly enriched. But the investors' payments were credited in the same manner, and against the same types of expenses, in each case. That meets commonality as to those claims. And if Defendants allege not *enough* commonality exists, that argument more properly sounds in predominance, a separate inquiry the Court addresses below.

Next, Defendants attempt a sleight of hand. They shift the commonality analysis from whether common questions exist to instead asking whether resolution

28

of the common questions will "materially advance the litigation" *based on what Defendants say the answers should be*. (*Id.* at #7608–10). In essence, Defendants ask the Court to find no common questions exist because Defendants disagree with the tacit assumptions underlying Plaintiffs' proposed common questions. Certainly, the Court must consider whether the proposed common questions will "advance the litigation." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). It would not advance the litigation, for example, for Plaintiffs to allege that all class members have a common hair color or taste in music. But that is not the case here. Plaintiffs allege meaningful common questions related to Defendants' potential liability. That is enough. If Defendants are asking the Court to use the commonality analysis to resolve factual disagreements, the Court declines.

Defendants next turn from fact to law. They cite a wealth of case law to support their understanding of the law on the merits of the claims. (*Id.* at #7608–12). No doubt this research will come in handy later, but the Court need not consider it at this stage. In fact, by presenting case law to dispute the merit of Plaintiffs' claims as a whole, Defendants tacitly concede their legal position *can* be resolved on a class wide basis.

Defendants' citation to *Chaz Concrete Co., LLC v. Codell*, No. 3:03-52, 2006 WL 2453302 (E.D. Ky. Aug. 23, 2006), does not bolster their commonality argument. (Doc. 183, #7612). In *Chaz*, plaintiffs attempted to certify a class for a civil RICO claim predicated on mail fraud where the defendants fraudulently bid on government construction contracts. 2006 WL 2453302, at *2. But while the action

failed on the predominance prong, the court acknowledged the "action clearly meets the commonality requirement" because all putative class members uniformly alleged defendants knowingly fraudulently bid on government contracts. *Id.* at *10–11. Here too, Plaintiffs, also proceeding under a mail fraud civil RICO claim, allege Defendants carried out a uniform scheme to defraud and mislead investors. If anything then, *Chaz* supports Plaintiffs' commonality argument.

Defendants also highlight *Maas v. Maas*, 161 N.E.3d 863, 871 (Ohio Ct. App. 2020), and *Johnson v. Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005), to show that the claims cannot be *completely* resolved on a class wide basis. (Doc. 183, #7612). Perhaps so. But again, in pressing that argument, Defendants are challenging predominance, not commonality. Commonality does not require the common issue to be dispositive. *See Am. Med. Sys.*, 75 F.3d at 1080. As stated previously, the Court finds at least some common issues, and so Plaintiffs' proposed class satisfies commonality as to the civil RICO, breach of fiduciary duties, and unjust enrichment claims.

### 3. Plaintiffs Are Typical Of The Proposed Class.

"[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Sprague*, 133 F.3d at 399). Typicality and commonality "tend to merge in practice." *In re Whirlpool*, 722 F.3d at 853 (cleaned up). "[A] necessary consequence of the typicality requirement is

30

that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Young*, 693 F.3d at 542 (quoting *Sprague*, 133 F.3d at 399).

The named plaintiff's claim need not "always involve the same facts or law, provided there is a common element of fact or law." *Beattie*, 511 F.3d at 561 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir. 1976)). And, as a general matter, "a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082.

Plaintiffs here are typical of the class as to their remaining three claims— civil RICO, breach of fiduciary duties, and unjust enrichment. All named Plaintiffs invested in Build Realty. (Doc. 155-1, #3201). All named Plaintiffs paid $10,000 "down" to buy into the investment. (*Id.*). All named Plaintiffs had trusts established with their LLCs as beneficiaries. (*Id.*). All named Plaintiffs paid interest immediately on rehab funds. (*Id.*). In short, all named Plaintiffs experienced the same transactional structure that Plaintiffs claim systematically defrauded them while enriching Defendants. Their common experiences, coupled with their invocation of common legal theories to remedy the harms they allegedly suffered, give the named Plaintiffs typicality within the class. *See Am. Med. Sys.*, 75 F.3d at 1082.

True, some differences no doubt exist between the named Plaintiffs and other class members, depending on their exact investment, rehabbing, and resale experience. For example, some investors in the putative class may have made money flipping the rehabbed homes, others may have lost the properties to foreclosure. Yet, all the investors' core fraud and fiduciary duty allegations overlap. As to those who profited, or those who did not, if the "Build Scheme" fraudulently misrepresented the nature of the $10,000 down payment, then each has been harmed. If Build took more than that to which it was entitled, then presumably even those who profited received less than they otherwise would have. That is enough to satisfy the low bar that typicality imposes.

Defendants take a different view. They contend that "[e]very named Plaintiff has unique and individual issues that put their claims, and defendants' defenses to those claims, in a different position than other putative Class members." (Doc. 183, #7615). To illustrate, they point to alleged differences among even the named Plaintiffs, including each named Plaintiff's anticipated use, time of buy in, rehab challenges, contractual addendums, and understanding of the "trust structure." (*Id.* at #7615–16).

Especially given typicality's lenient standards, though, such differences do not make the named Plaintiffs atypical, either as to each other or as to the other putative class members. *See Am. Med. Sys.*, 75 F.3d at 1082. "Where the class representative's claims vary from those of the class, a court will deny class certification only when the variation 'strikes at the heart of the respective causes of

actions.'" 1 Newberg & Rubenstein on Class Actions § 3:29 (2022) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006)). And here, any differences between the named Plaintiffs and the larger class do not "strike at the heart" of their common claims; those claims attack the structure of the transaction itself, not merely the way that structure gave rise to particular harms in a given case. For much the same reason that the class has commonality, then, the named Plaintiffs also satisfy typicality—each experienced the same, allegedly illegal and fraudulent, Build Realty business model. *See In re Whirlpool*, 722 F.3d at 853 (noting commonality and typicality overlap).

Defendants strike somewhat closer to home by noting four of the five named Plaintiffs defaulted on their investment obligations. (*Id.* at #7616–17). By all accounts, the proposed class did not default at that rate. (*See* Doc. 193-12). And the allegations suggest that those who did default experienced different and additional harms (through the loss of the property) as compared to those who completed the process without default.

Plaintiffs respond by arguing they "suffered the [typical] injuries at the core of their Complaint … at the time of closing," well before any default. (Doc. 191, #9305). But "at the time of closing" may be an overstatement. Any breach of fiduciary duties by Edgar Construction and/or Build Realty presumably could not occur *before* establishing the fiduciary relationship, which only occurred *upon* closing.[12]

---

[12] As discussed below, Plaintiffs may mean to argue that Edgar Construction and/or Build Realty violated their fiduciary duties by not disclosing the overarching fraudulent nature of

Still Plaintiffs' underlying point is that the allegedly fraudulent set-up and structure of the arrangement itself, rather than any investor's experience with that arrangement, is what gives rise to liability. Just because some putative class members did not default does not alter that Defendants still (allegedly) defrauded those putative class members out of their rights as mortgagees. Thus, named Plaintiff's claims "arise[] from the same … course of conduct … and … are based on the same legal theory" as the claims of the other class members. *Am. Med. Sys.*, 75 F.3d at 1082. That is enough to show typicality.

Granted, the differences Defendants highlight, including default rate, could factor into potential damages, but that does not alter the nature of the named Plaintiffs' (allegedly) typical injuries. *See In re Whirlpool*, 722 F.3d at 854 (noting that individualized questions of damages do not defeat class certification). And anyway, Plaintiffs have proposed a subclass of those who has defaulted. This further ensures the effect of some members' default will be separated out from the non-default class members in the minds of any potential jury.

### 4. Named Plaintiffs Are Adequate.

That leaves the last Rule 23(a) requirement—adequacy. As the Sixth Circuit has explained, "commonality and typicality tend to merge with the requirement of adequate representation." *In re Whirlpool*, 722 F.3d at 853. To be adequate, two

---

the scheme to the investors once that trust was created. That is, even if the injuries began with closing, Plaintiffs may contend that Edgar's breach was in allowing the Plaintiffs (who were beneficiaries to whom Edgar owed duties as trustee) to move forward with their rehab activities—thereby incurring additional liabilities—without disclosing to those investors the risks inherent in doing so. The Court takes no position at this time whether such non-disclosure could violate a trustee's fiduciary duties to a beneficiary.

criteria must be met: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525)). "The adequacy inquiry … serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beattie*, 511 F.3d at 562 (quoting *Amchem*, 521 U.S. at 625–26). "When the defendants have [a] defense unique to the named plaintiff, the named plaintiff will not meet the adequacy of representation element," at least where the defendant has "put forth sufficient evidence to establish that the issue would be a focus of the litigation." *Washington v. Rossen, Varchetti & Oliver, PLLC*, No. 1:11-cv-945, 2016 WL 11631241, at *4 (W.D. Mich. Jan. 25, 2016) (citing *O'Neil v. Appel*, 165 F.R.D. 479, 493 (W.D. Mich. 1996)); *see also Schuh v. HCA Holdings, Inc.*, No. 3:11-1033, 2014 WL 4716231, at *11–12 (M.D. Tenn. Sept. 22, 2014) (refusing to find class representative inadequate when defendant's proposed defenses did not threaten to become the focus of litigation).

Separately, this inquiry also includes a peek into the competence and qualifications of class counsel and any potential conflicts of interest. *Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n.13 (1982); *Senter*, 532 F.2d at 525; *see also Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 584 (S.D. Ohio 2004). "In the absence of a showing to the contrary, adequacy of counsel is often presumed." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Kelsey-Hayes Co.*, No. 2:11-cv-

14434, 2015 WL 1906133, at *3 (E.D. Mich. Apr. 28, 2015) (quoting *Abby v. City of Detroit*, 218 F.R.D. 544, 548 (E.D. Mich. 2003)).

Here, Plaintiffs are adequate representatives. They appear to be vigorously prosecuting their claims. Since filing on February 20, 2019, named Plaintiffs have consistently litigated their claims against Defendants. Moreover, as detailed *supra*, named Plaintiffs have common claims to the members of the class. Finally, named Plaintiffs proceed with the aid of qualified counsel in the Finney Law Firm, LLC, and Markovits, Stock & DeMarco, LLC, both experienced firms with class-action experience before this Court and elsewhere.

Defendants challenge adequacy on three fronts relating to both the class representatives' and putative class counsel's adequacy. (Doc. 183, #7617–25). First, Defendants argue that at least some of the class representatives are subject to individualized defenses. (*Id.* at #7623–24). Second, Defendants contend that class counsel is inadequate because counsel Chris Finney has a conflict of interest and has harmed the interests of the class as a whole. (*Id.* at #7618–23). Third, Defendants argue that named Plaintiffs are improperly abandoning post-closing damages potentially available to the class members. (Doc. 219, #10369). None have merit.

### a. Potential Individual Defenses Against The Named Plaintiffs Do Not Make Them Inadequate.

Defendants allege they plan to raise two individual defenses against named Plaintiffs. (Doc. 183, #7623). Defendants plan to accuse Compound Property Management, Leone1, and R&G Cincy Investments of spoliation of evidence, and

36

Leone1 and Pyramid Investment Group of pressing claims barred by the statute of limitations. (*Id.* at #7624).

According to Defendants, courts can find class representatives inadequate if subject to individualized defenses. (*Id.* at #7623–25). But the question is not whether individual defenses *exist*, but whether Defendants "put forth sufficient evidence to establish that the [defenses] would be a focus of the litigation." *Washington*, 2016 WL 11631241, at *4. And even that may not be enough. At least one court in this Circuit, responding to an allegation of spoliation of evidence, has cast doubt on whether a unique defense alone renders a representative party inadequate. *See Compressor Eng'g Corp. v. Thomas*, 319 F.R.D. 511, 527–28 (E.D. Mich. 2016) ("Critically, Defendant has failed to cite to any case law from the Sixth Circuit holding that a possible unique defense would render a party an inadequate class representative.").

In fairness to Defendants, though, some courts have found named plaintiffs inadequate where defendants credibly accused them of spoliation of evidence, at least where such claims "threaten to become the focus of the litigation." *See Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. 2008). Defendants' problem, though, is that its spoliation defenses are unlikely to steal the spotlight here.

The spoliation allegations consist of the following:

Here, the depositions of the principals of Compound Property Management, Leone1, and R&G Cincy Investments reveal several significant spoliation issues. Compound Property Management's principal, Theresa Robinson, admitted she did not fully search her

37

filing cabinets for documents, discarded a phone with relevant text messages and made no effort to preserve them, and even admitted she deleted relevant emails after the initial state court case was filed. Likewise, Richard Hardin, the principal of Leone1, testified that he used text messaging to communicate about Build Realty-related matters, but none were produced, and his counsel never asked him to preserve those document, and, when asked if he would gather them, he said he does not have them anymore. R&G Cincy Investment's principal Gwendolyn Broadnax similarly testified that she did not preserve relevant documents, and was never instructed to by counsel. Ms. Broadnax's husband, also a principal in R&G Cincy Investment, also testified that he was never instructed to preserve relevant documents. These plaintiffs' failure to preserve relevant documents and, in some instances, their admitted affirmative destruction of those documents, render them inadequate to serve as representatives of the putative class.

(Doc. 183, #7624) (internal citations omitted).

The Court can likely resolve this spoliation issue through straightforward inquiries that will not derail the overall litigation. *See, e.g.*, *Forest Lab'ys, Inc. v. Caraco Pharm. Lab'ys, Ltd.*, No. 6-cv-13143, 2009 WL 998402, at *5–7 (E.D. Mich. Apr. 14, 2009) (describing and applying the three-part test for assessing spoliation of evidence). Moreover, the evidence alleged to be lost does not appear to implicate absent class members' claims. Therefore, even if subject to a partial spoliation defense, these Plaintiffs are adequate to represent the class.[13] The Court is satisfied Defendants' spoliation defenses will not derail the action.

Second, Defendants allege they plan to bring a statute of limitation defense against Leone1 and Pyramid. (Doc. 183, #7624–25). Plaintiffs' civil RICO claim has

---

[13] Granted, if a named Plaintiff is found subject to a total bar on recovery based on a bad-faith spoliation of evidence, *see Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009), that would make that Plaintiff no longer adequate. But any potential sanction turns on proving the Plaintiff's culpable mental state. *See Forest Laby's*, 2009 WL 998402, at *5–7. For purposes of class certification, the Court cannot and will not delve so deeply into the merits.

a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Off the bat, the Court notes that Pyramid falls within the statutory timeline—Pyramid closed on April 22, 2015, and joined this suit on February 20, 2019. (Doc. 193-13, #9760). Instead, Defendants accuse Fatima Jones, the principle of Pyramid, of "struggl[ing] to recall even basic facts about the representations made to her or her rehab project generally," calling the Court's attention to four pages out of Jones' 293-page deposition. (Doc. 183, #7625). But the Court has reviewed Jones' deposition and satisfied itself that she understands the core allegations well enough to be an adequate class representative. (Doc. 193-13, #5370, 5431).[14]

As for Leone1, Defendants contend it filed outside the four-year statute of limitations. (*See* Doc. 183, #7625). Plaintiffs concede that Leone1 closed on July 31, 2014, while Plaintiffs filed this action February 20, 2019. (Doc. 193-14, #9764). This nominally falls outside the four-year limit. But Plaintiffs argue that a similar state-level class action—*see* Hamilton County Court of Common Pleas No. A1700624—filed on November 2, 2017, tolled the clock. (Doc. 191, #9305). The Court takes notice that counsel voluntarily dismissed that state action on February 20, 2019, the same day this action was filed.

---

[14] For example, Jones testified: "So I remember one of the key points was … we [i.e., Build Realty] buy this … property very low, and then we sell it to you wholesale. And … there's no credit check. You only need $10,000. … Build told me that they were selling me a property. They told me that. They didn't sell me a property. They sold it to the trust." (Doc. 193-13, #5370, 5431). That understanding is enough to make Jones adequate. (*See* Doc. 183, #7572–79)

"[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). "The limitations period 'remains tolled for all members of the putative class until class certification is denied.'" *Potter v. Comm'r of Soc. Sec.*, 9 F.4th 369, 374 (6th Cir. 2021) (quoting *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983)).

At least as an initial matter, the Court determines Leone1's claim falls within the statute of limitations with tolling accounted for. Defendants fail to respond to this argument. Accordingly, Defendants' timeliness arguments do not render Leone1 an inadequate named Plaintiff.[15]

### b.    Proposed Class Counsel Are Adequate.

Defendants next contend proposed class counsel are inadequate—directing their ire mainly against Chris Finney. First, Defendants argue Finney directly injured the interests of the putative class by disrupting individual class member's abilities to find underwriters to insure their Build Realty transactions. (Doc. 183, #7618–19). Finney repeatedly contacted Stewart Title, a title underwriter, allegedly threatening them with "reputational harm and litigation." (*Id.*; Doc. 183-3, #7679). Stewart Title balked at underwriting Build Realty sales, and thus many investors could not offload their properties. (*Id.*).

---

[15] Although neither party raised the issue, it appears Plaintiffs' breach of fiduciary duties claim, which the Court certifies below, also has a four-year statute of limitations. Ohio Rev. Code § 2305.09(D); *Antioch Co. Litig. Tr. v. Morgan*, No. 3:10-cv-156, 2013 WL 1338834, at *1 (S.D. Ohio Apr. 1, 2013) ("It is undisputed that the breach of fiduciary duty claims are subject to a four-year statute of limitations.").

Second, Defendants accuse Finney of having a financial conflict of interest. Finney operates his own title Agency, Ivy Pointe, which allegedly competes with Defendant First Title. (*Id.* at #7620). Defendants allege Finney secretly desires to put First Title out of business to capture its market share. (*Id.* at #7621–22). And Defendants say if Finney runs Defendants out of business, the investors cannot then recover on their investments, placing Finney's interests in further conflict with the class. (*Id.* at #7622).

Third, in their Surreply, Defendants accuse Markovits, Stock & DeMarco, the other firm representing Plaintiffs, of its own infidelity by "do[ing] nothing to control [Finney's] actions." (Doc. 219, #10371).

Finally, Defendants question the representative Plaintiffs' judgment and adequacy by employing such counsel. (*Id.* at #10372).

The Court begins by noting that Defendants do not challenge class counsels' competence, experience, or ability as attorneys. Instead, boiling down the four allegations above, Defendants question Finney's litigation tactics and potential personal conflict of interest.

First, Finney's tactics do not create antagonism against the putative class members. While Finney did repeatedly warn Stewart Title of litigation and reputational harm (Doc. 183-3, #7679), the record also shows Finney tried to minimize damage to the class. Finney emailed Stewart Title to assure it that this suit did not challenge the properties' title's validity. (Doc. 183-32, #7894). Indeed, Frank Long of Stewart Title emailed:

> [Finney] offered to place an entry of record stating that nobody is
> making any title claims against the roughly 130 titles we have agreed
> to insure to end buyers. He agrees that these homes need to be sold
> and out of the hands of the alleged bad actors, is not interested in
> harming third parties by creating title problems.

(*Id.*). Based on this email, the Court finds, at least for the preliminary inquiry at the

certification stage, that Finney has not taken an antagonistic position against the

class membership.

Second, the Court is uncertain if Rule 23(a)(4) is the appropriate vehicle for

probing Finney's alleged personal conflict of interest with First Title. Whether

Finney has a personal conflict of interest strikes the Court as a challenge to his

adequacy as class counsel. But as a textual matter, such concerns appear to sound

in Rule 23(g), rather than Rule 23(a). Rule 23(a)(4), by contrast, calls on the Court

only to determine whether "*representative parties* will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4) (emphasis added). Given that

language, allowing a freewheeling inquiry into the adequacy of class counsel pre-

certification seemingly collapses Rule 23(g) into 23(a)(4), rendering the former

redundant.

To the extent that the Court should consider potential counsel conflicts under

23(a)(4)—an issue on which courts seem to take differing views[16]—the Court further

---

[16] *Compare Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918
(7th Cir. 2011) (recognizing severe misconduct by counsel courts can prevent a class from being
certified), *Mandalevy v. Bofl Holdings, Inc.*, No. 3:17-cv-667, 2022 WL 4474263, at *5 (S.D.
Cal. Sept. 26, 2022), *and* Newburg & Rubenstein § 3:72 ("In 2003, Congress adopted … Rule
23(g), creating an explicit textual mooring for the class counsel analysis. However, many
courts continue to employ the substantive standards courts had generated under Rule
23(a)(4) prior to Rule 23(g)'s adoption in their analysis of counsel's adequacy."), *with Baffa
v. Donaldson, Lufkin & Jenerette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (cabining the

notes that Finney's conflict here appears minimal. Ivy Pointe occupies a very small market share in the greater Cincinnati title market. (*See* Doc. 194-2, Doc. 194-3, Doc. 194-4, Doc. 194-5). Finney attests he knows of no current lender that refers business to both Ivy Pointe and First Title. (Doc. 194, #9770). For their part, Defendants offer a declaration from Dan Orner to argue an unnamed bank is a common referral source for both First Title and Ivy Pointe. (Doc. 183-33, #7897). Finney believes Orner refers to Center Bank, but Finney argues that Center Bank ceased doing business with Ivy Pointe long ago. (Doc. 194, #9770). Defendants do not dispute this. Ultimately, Finney persuades the Court he does not suffer a personal conflict that would preclude him from serving as class counsel. And because Finney may serve as counsel, Defendants' derivative arguments questioning the judgment of Markovits, Stock & DeMarco, LLC, and plaintiffs for associating with Finney also fall flat.

### c. Named Plaintiffs Do Not Undercut The Proposed Class By Forfeiting Post-Closing Damages.

In their Surreply, Defendants accuse the Plaintiffs of forfeiting all post-closing damages in their Reply. (Doc. 219, #10368). Because Plaintiffs' Reply focuses on liability arising from conduct at closing, Defendants argue that Plaintiffs foreclose class members' ability to recover on any damages that arose after the closing. (*Id.*). Defendants believe this makes Plaintiffs antagonistic to the interests of the proposed class. (*Id.*). And to their credit, Defendants correctly note that a

---

Rule 23(a)(4) inquiry of counsel to issues directly affecting litigants), *and In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 218 (M.D. Pa. 2012).

named plaintiff may be inadequate "when the class representative abandons particular remedies to the detriment of the class." *W. States Wholesale, Inc. v. Synthetic Indus.*, Inc., 206 F.R.D. 271, 277 (C.D. Cal. 2002); *see also Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999).

But the Court does not read Plaintiffs' Reply as forfeiting anything. To be sure, Plaintiffs' Reply emphasizes the closing. (Doc. 191, #9284–85). But so far as the Court can tell, Plaintiffs were focusing on Defendants' allegedly unlawful actions that give rise to liability—not the calculation of damages. Plaintiffs argue individual post-closing differences, like rehab experiences and profit from resale, do not change the alleged misrepresentations and fraud that culminated at the closing.

The focus on the closing makes some sense. After all, at closing investors ratified their formal relationship with Defendants, paid the $10,000, and agreed to the cap on costs and fees. Therefore, if Plaintiffs ultimately prevail and show that Defendants' business model defrauded the class, all commercial damages proximately flowing from the closing may be potentially recoverable. 18 U.S.C. § 1964(c); *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (recognizing that consumers can recover for civil RICO for property losses "arising directly out of" the tainted sale). Of course, this is not to say that Plaintiffs will recover anything. The Court simply acknowledges that Plaintiffs did not "waive" these damages by focusing on the closing.

In sum, as to each of the three remaining claims, Plaintiffs have carried their burden of showing that they meet the four requirements that Rule 23(a) imposes.

**D.    The Court Finds Plaintiffs Meet Rule 23(b)'s Requirements As To Their Civil RICO And Fiduciary Duties Claims Only.**

Besides meeting the Rule 23(a) requirements, Plaintiffs must show that each claim qualifies under at least one Rule 23(b) category. As to the three remaining claims—civil RICO, breach of fiduciary duties, and unjust enrichment—Plaintiffs proceed solely under Rule 23(b)(3). The Court agrees that this subdivision works as to the civil RICO and breach of fiduciary duties claims but not the unjust enrichment claim.

**1.    Plaintiffs Meet Rule 23(b)(3) As To Their Civil RICO Claim.**

The Court opens the analysis with Plaintiffs' civil RICO claim because the parties dedicate much of their briefing to that topic. (Doc. 183, #7630; Doc. 191, #9314). Rule 23(b)(3) has two components: predominance and superiority. Both are present here. The Court concludes that common class wide questions will predominate in the civil RICO litigation even if some individual questions remain, and that class treatment is a superior method of adjudication.

**a.    Predominance**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). But "[a] plaintiff class need not prove that each element of a claim can be

45

established by classwide proof." *In re Whirlpool*, 722 F.3d at 858 (citing *Amgen*, 568 U.S. at 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

In deciding whether individual issues predominate over common questions, a court cannot rely on mere "speculation and surmise" that individual issues may arise. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)). Rather, a court "should consider only those issues that would *likely* arise if an individual class member's claims were being adjudicated on the merits." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021) (emphasis added). "In so doing, a court considers 'the probable course of the litigation' so as to 'formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate.' *Id.* (quoting *Mowbray*, 208 F.3d at 298); *see also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) ("[T]he key is to 'identify[] the substantive issues that will control the outcome,' in other words, courts should 'consider how a trial on the merits would be conducted if a class were certified.'" (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).

Turning to Plaintiffs' civil RICO claim, in order to prevail on the merits at trial, they must prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); 18 U.S.C. § 1962(c). A "pattern of racketeering activity" must include at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). "The alleged predicate acts may consist of offenses 'which are indictable' under any of a number of federal statutes, including the mail (18 U.S.C. § 1341) and wire fraud statutes (18 U.S.C. § 1343)." *Moon*, 465 F.3d at 723 (citing 18 U.S.C. § 1961(1)).

Further, the Plaintiffs must show the asserted predicate act was both a but-for and a proximate cause of their injury with "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). Finally, the Plaintiffs need to show they suffered a commercial injury. 18 U.S.C. § 1964(c); *see Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (holding plaintiffs must "'allege that they were 'injured in [their] business or property,' … to state a claim for a civil RICO damages action" (quoting 18 U.S.C. § 1964(c)).

In terms of the required predicate acts, Plaintiffs focus this Motion for Certification on the crime of mail fraud. (Doc. 191, #9279–80). As a crime, mail fraud contains three elements: "(1) a scheme or artifice to defraud; (2) use of interstate [mail or] wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d

480, 485 (6th Cir. 2003) (quoting *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000)); 18 U.S.C. § 1343. "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.'" *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 484 (6th Cir. 2013) (quoting *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010)). Any mailing sent "incident to an essential part of the scheme satisfies the mailing element even if the mailing itself contains no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008) (citation and internal quotes omitted).

Plaintiffs need not prove reliance. To be sure, courts once held that mail fraud as a predicate for civil RICO included an additional element of reliance, mirroring common law fraud. *See Chaz*, 2006 WL 2453302, at *2. But in 2008 the Supreme Court clarified that mail fraud as a predicate for civil RICO does not include the element of a plaintiff's first-person reliance on any one misrepresentation. *Bridge*, 553 U.S. at 649. "Because an individual can commit an indictable act of mail or wire fraud even if no one relies on his fraud, he can engage in a pattern of racketeering activity, in violation of § 1962, without proof of reliance." *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 476 (2006) (Thomas, J., concurring)). That said, some reliance by somebody may be needed to satisfy RICO's causation element. *Id.* at 478; *see Anza*, 547 U.S. at 478 ("Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way.") (quoting *Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 105 (1st Cir. 2002)).

48

In other words, causation, not reliance, is an element of civil RICO predicated on mail fraud, but reliance offers a way to establish causation.

The upshot is that Plaintiffs, alone or as a class, must prove ten elements to prevail in their civil RICO claim against Defendants. In particular, they must show that Defendants engaged in (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering, through (5) at least two acts of mail fraud, in which Defendants created (6) a scheme or artifice to defraud, (7) that used interstate mail or wire communications in furtherance of the scheme, and (8) that intended to deprive a victim of money or property, ultimately (9) causing Plaintiffs an (10) injury to their commercial interests. As claims go, it's no walk in the park.

While complex, the Court agrees that common questions predominate over this analysis. Of the above elements, the majority can be proven or disproven on a uniform class wide basis because they revolve around the operations of Build Realty and its affiliates, under their common business plan. As Plaintiffs contend, and the Court agrees, the core inquiry is the legality of Build Realty's business practices and the legal meanings of certain agreements. These central questions are subject to class wide resolution with one opinion by this Court or one verdict by a jury. Indeed, only two of the ten elements must be proven by an individualized showing of the class membership: causation and injury (as well as damages[17]). For these reasons, common questions predominate over individual questions as to Plaintiffs' civil RICO claim.

---

[17] Plaintiffs will also need to show damages, but that inquiry can be addressed individually if and when Defendants are found liable.

Defendants respond in various ways. First, Defendants argue that individual questions of reliance, either for their own sake or to prove causation, will overwhelm any common questions. (Doc. 183, #7630). They argue that "[a]t heart, all of Plaintiffs' claims rely on a purported series of oral and written misrepresentations about the structure and nature of Build Realty's business model upon which the putative Class members purportedly relied to their detriment." (*Id.*). In short, Defendants warn that to recover, every class member needs to testify as to the exact statement that they relied on to their detriment.

But this misunderstands Plaintiffs' cause of action. Plaintiffs do not bring a common law fraud claim where reasonable reliance must be shown based on a specific misrepresentation. Instead, Plaintiffs allege Defendants engaged in a *scheme* to routinely and uniformly defraud investors through deceptive marketing, ambiguous contract terms, and illegal trusts. After all, mail fraud criminalizes creating a "scheme or artifice to defraud"—not fraud itself. Therefore, causation need only stem from the scheme overall, not from an isolated misrepresentation. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) ("A RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement."); *Peterson v. H.R. Block Tax Servs., Inc.*, 174 F.R.D. 78, 84 (N.D. Ill. 1997) ("The mail fraud statute, 18 U.S.C. § 1341, focuses on the defendant's conduct in devising or intending to devise a scheme to defraud, not the individual experiences of each defrauded person."). With this standard in mind, the

50

Court believes an individualized showing of causation will not overwhelm common issues, and that common issues will still predominate.

Moreover, in a civil RICO action predicated on mail fraud, the causation element is often based on a plaintiff's participation in the fraudulent scheme, without need to show reliance on an isolated misrepresentation. *See Wallace v. Midwest Fin. & Mortg. Servs. Inc.*, 714 F.3d 414, 420 (6th Cir. 2013) ("Thus, the appropriate inquiry in this case is not whether Wallace actually relied on the allegedly inflated appraisal, but whether the fraudulent scheme furthered by that appraisal proximately caused his financial injuries."); *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 640 (5th Cir. 2016) ("Whether the Plaintiffs relied on a misrepresentation about the scheme is thus not determinative of whether the Plaintiffs can prove proximate causation under *Bridge*. … The participants' injuries arise from the scheme's payment structure, and the inherent concealment of the inevitableness of those injuries."); *Williams v. Duke Energy Corp.*, No. 1:08-cv-46, 2014 WL 12652315, at 14 (S.D. Ohio Mar. 13, 2014) ("[B]ecause Plaintiffs allege that the conduct of Duke and the other alleged conspirators was part of the same illegal pattern and scheme, the common issues of fact and law arising from that conduct predominate over any individual issues and satisfy the predominance requirement of Rule 23(b)(3)."); *Castellanos*, 2016 WL 11678220, at *3–5 (certifying a mail fraud civil RICO class action based on a scheme to enticed immigrants to seek jobs that were not guaranteed).

And some courts have even held reliance can be inferred class wide in situations similar to those alleged here. *See Orlowski v. Bates*, No. 2:11-cv-01396, 2018 WL 7272053, at \*4 (W.D. Tenn. Dec. 19, 2018) (presuming reliance based on non-disclosure that investment payments were not buying coins as promised); *Cohen v. Trump*, 303 F.R.D. 376, 385 (S.D. Cal. 2014) ("Courts have found that reliance can be established [in civil RICO] on a class-wide basis where the behavior of plaintiffs and class members cannot be explained in any way other than reliance upon the defendant's conduct."); *Peterson*, 174 F.R.D. at 84–85 ("[C]ourts will presume class members' reliance when it is logical to do so or when the complaint's allegations make reliance apparent."). To be sure, at this stage the Court takes no position on whether causal reliance can be inferred. Rather, the point is merely that there are reasons to doubt individualized causation issues will pose a significant problem here.

Defendants contend that the caselaw supports their view that individual showings of causation and reliance will swamp common questions. Defendants cite to *Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568, 571–72 (W.D. Tenn. 2004), for the proposition that "non-uniform oral presentations and issues of reliance are generally unsuited for class certification." (Doc. 183, #7630). But *Bradberry* concerned common law fraud—where first-person reliance must be reasonable—not mail fraud. *Bradberry*, 222 F.R.D. at 571–72. As discussed, *Bridge v. Phoenix Bond & Indem. Co.* rejected first-person reliance as an essential element for a mail fraud civil RICO claim.

Defendants also point to cases where courts found issues of individualized reliance and causation overwhelmed common issues and defeated class certification for a mail fraud civil RICO claim. (Doc. 183, #7630–31). But these cases all preceded, and so appear undermined by, *Bridge*. For example, Defendants direct the Court to *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), which held the plaintiffs could not show the necessary reliance to proceed in a class action under civil RICO when predicated on mail or wire fraud. But *Bridge* directly abrogated *McLaughlin*'s understanding of the RICO statute. *See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 444 (E.D.N.Y. 2009) ("*McLaughlin* has been partially abrogated by the Supreme Court's subsequent decision in *Bridge v. Phoenix Bond & Indem. Co.* … with respect to *McLaughlin*'s interpretation of the federal civil racketeering statute."). Many of Defendants' other citations on this point hit the same dead end.

Defendants next point to a handful of post-*Bridge* cases to show that individual questions of reliance and causation can still prevent class certification. These too are distinguishable. For example, Defendants analogize to *Johnson v. ITS Fin. LLC*, 314 F.R.D. 441 (S.D. Ohio 2015). (Doc. 219, #10348). In *Johnson*, the plaintiff sought to certify a mail fraud civil RICO claim based on "additional taxes, penalties, and interest" charged on class members because of fraudulent tax preparation services. *Id.* at 448. The court denied the motion because the class member's injuries "may have resulted from any number of errors, omissions, or irregularities—including mere negligence, oversight, or even the taxpayer's own

fraud." *Id.* Here, by contrast, each class member's alleged injuries can be traced back to the scheme's structure itself. So, unlike in *Johnson*, Plaintiffs' injuries resulting from the scheme will be ascertainable. (Assuming, of course, Defendants are liable.)

Moving beyond reliance and causation, Defendants next argue injury cannot be uniformly shown. They cite *Lester v. Percudani*, 217 F.R.D. 345 (M.D. Pa. 2003), which denied a motion for civil RICO class certification, in part because "the very fact of injury, apart from the amount of damages, depends almost entirely on individual circumstances." *Id.* at 352–53. That is not so here as to the civil RICO claim. If the underlying structure of the transaction and the mailing associated with it constituted fraud, then that same injury occurred to each class member. To be sure, determining the quantum of harm suffered, if any, requires an individualized assessment. But that is often the case in class actions, and it rarely prevents certification.

That also answers Defendants' final argument, in which they claim that "individual issues unquestionably predominate on the question of damages." (Doc. 183, #7633). That may well be, but "individual damages calculations do not preclude class certification under Rule 23(b)(3)." *In re Whirlpool*, 722 F.3d at 850. Assuming Plaintiffs can show class members overpaid for their investments or lost money because of Defendants' fraudulent and unlawful actions, individual damages can be readily calculated.[18]

---

[18] As Plaintiffs propose, damages calculation would be largely rote and formulaic. (Doc. 191, #9284). For example, if Defendants exceeded the capped "closing costs and funding fees"

In sum, the Court agrees that each class member ultimately must show causation, injury, and damages to recover under the civil RICO claim. But the Court believes these determinations will not swamp the more predominant questions presented by the legality or illegality of Defendants' business model. Causation can be shown (maybe even presumed) from general reliance on the scheme itself; the fact of injury likewise arises on a class wide basis from the structure itself; and damages, while individualized, are formulaic. Thus, the Court agrees that, with respect to the civil RICO claim, common questions predominate over individual questions within the class.

### b. Superiority

On to superiority. Under Rule 23(b)(3), a plaintiff must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent here, a court should consider— (1) "the class members' interests in individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) "the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).

---

with the $10,000 down payment, class members could recover the difference. Further, if Edgar/Build Realty violated their fiduciary duties by surreptitiously profiting off of the interest rate markup, class members could recover the ill-gotten profits paid over fair market value. If individual class members intend to seek further recovery from individualized harm, the Court can address that when it arises.

The superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Amchem*, 521 U.S. at 615). "Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861. Potentially small individual recoveries to class members support the use of class treatment. *See Beattie*, 511 F.3d at 567.

Plaintiffs have shown a class action is superior to other methods to litigate their civil RICO claim. First, Plaintiffs argue that many of the class members will be entitled to "relatively small individual recoveries," although conceding that some members suffered larger harms. (Doc. 155-1, #3206). The Court agrees the potential recovery to many in the class may be minor, supporting the use of a class action. Second, the Court takes note that no other actions have been filed, besides the related state action brought by largely the same parties and counsel. This supports the notion that individual class members have minimal interest in controlling their own actions. Third, the Court agrees that a class action is a desirable and efficient manner to dispose of Plaintiffs' allegations—individual actions relating to the Defendants' same business model would be redundant and time consuming.

Defendants do not meaningfully argue that a class action is not superior. Instead, Defendant summarily argue "[f]or all the reasons stated above [i.e.,

referring to the predominance arguments], a class action is not the superior way to resolve the controversy." (Doc. 183, #7634). But the Court has already rejected these reasons. So the Court agrees a class action is a superior method to adjudicate Plaintiffs' civil RICO claim.

### 2. Plaintiffs Meet Rule 23(b)(3) As To Their Breach Of Fiduciary Duties Claim.

Plaintiffs also request certification for their breach of fiduciary duties claim under Rule 23(b)(3). Plaintiffs allege that Defendants (either Build Realty or Edgar Construction) violated their fiduciary duties, owed as a trustee, to the investor LLC beneficiaries. (Doc. 191, #9281–82). Violations allegedly include charging undisclosed fees from the purchase price markup and self-dealing through profiting off the resold loan interest. (Doc. 1, #78–82). As with the civil RICO claim, the Court finds this claim meets Rule 23(b)(3).

Trust law is a creature of equity established in state law. *Fulton v. Gardiner*, 186 N.E. 724, 725 (Ohio 1933). As a bedrock principle, a trustee owes the highest duty of loyalty to its beneficiary. Ohio Rev. Code § 5801.04; *id.* § 5808.02; *see also Muth v. Maxton*, 119 N.E.2d 162, 167 (Ohio Ct. Com. Pl. 1954) ("The highest degree of good faith is a well established rule. It prohibits the trustee from gaining any personal advantage or from accepting any responsibility inconsistent with his duty to the trust.").

The duty calls for "scrupulous integrity and fair dealing." *In re Binder's Estate*, 27 N.E.2d 939, 947 (Ohio 1940). "The law is jealous to see that a trustee shall not engage in double dealing to his own advantage and profit." *Id.* This duty

cannot be offloaded onto others. *See Wayne Sav. Cmty. Bank v. Gardner*, No. 08CA0016, 2008 WL 4901700, at *5 (Ohio Ct. App. Nov. 19, 2008). To recover on a claim for breach of fiduciary duties, a beneficiary must show "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury proximately resulting from that failure." *Maas*, 161 N.E.3d at 871.

Plaintiffs allege that, in every trust Defendants established, the trustee uniformly violated its duty of loyalty to each investor beneficiary. (Doc. 191, #9282–83). Indeed, Plaintiffs argue the trustee did not even realize it owed duties to the investor beneficiaries. (Doc. 193, #9619 (alleging Gary Bailey emailed the "trust model 'was developed to protect the Lender's interest in the property above all else'")). And because it is unclear to what extent this duty can be waived, Plaintiffs argue that individual factual discrepancies cannot alter the circumstances underlying each breach. (*See id.*). Finally, Plaintiffs contend Defendants failed to properly license these trusts under Ohio law, rendering them per se unlawful. (Doc. 191, #9295–96).

The Court agrees that Plaintiffs' breach of fiduciary duties claim can be properly resolved through class treatment under Rule 23(b)(3). Take predominance. Common trust-law questions will predominate over individual questions. In the Court's view, one of this claim's operative question is whether Edgar, as trustee, violated a duty by not disclosing to its beneficiaries (e.g., Plaintiffs) the scheme's allegedly fraudulent nature. Answering that question will require the Court to determine whether trust law created a duty for Edgar to inform the investors of

Build Realty's (allegedly) fraudulent dealings. Separately, the Court will need to assess whether Edgar's wrongful inaction may be imputed onto, and so create liability for, Build Realty. And if Edgar and/or Build Realty had some duty of disclosure (or other intervention) to protect the beneficiaries, they violated that duty uniformly class wide.

True, no trust named Build Realty trustee. And the nominal trustee, Edgar, did not create the scheme, nor did it directly benefit at the Plaintiffs' expense. To illustrate, Edgar did not profit from an inflated loan interest rate. Rather, any (allegedly) improper profits ran to Build Realty. Moreover, Plaintiffs' injuries relate to the "scheme" itself—a scheme set in motion *before* Edgar took on any fiduciary duty. Perhaps these facts absolve Edgar and/or Build from trust liability. But these questions cut to the merits of the fiduciary duties claim, not predominance. For now, it is enough for the Court to recognize that the answers to those questions affect Defendants' liability class wide.

For their part, Defendants argue fiduciary claims can only be certified "when a reasonable person in the same position as one of the plaintiffs would repose special confidence and trust in a defendant." (Doc. 219, #10354). To Defendants, such an inquiry would require mini-trials into each class member's circumstances, defeating predominance. (*Id.*). In support, they cite *Cope v. Metro. Life Ins. Co.*, 696 N.E.2d 1001, 1009 (Ohio 1998), a fraud case involving a potential fiduciary relationship between insurance salesmen and consumers. But there, the parties disputed the very existence of a fiduciary relationship. *See id.* at 1008–09. Here, the

existence of fiduciary duties can be resolved class wide—either the trusts created such duties or they didn't. And anyway, the court in *Cope* found the fiduciary relationships could be *inferred* class wide based on common facts, further showing no "mini-trials" need occur here. *Id.* at 1009–10.

That leaves superiority. The Court finds that a class action is the superior method to adjudicate Plaintiffs' fiduciary duties claim for essentially the same reasons as the civil RICO claim. Importantly, Edgar's conduct is entirely uniform across the class, meaning individual suits would create needless duplication of litigation. No party seriously disputes this.

Thus, the Court finds Plaintiffs' breach of fiduciary duties claim properly falls within Rule 23(b)(3).

### 3. Common Questions Do Not Predominate Over Plaintiffs' Unjust Enrichment Claim.

On the other hand, Plaintiffs' unjust enrichment claim does not meet Rule 23(b)(3). Here again, Plaintiffs only seek certification through Rule 23(b)(3). In particular, they argue that questions surrounding the legality of Defendants' practices predominate and so can be resolved on a class wide basis. (Doc. 191, #9303). But their argument is half-hearted at best. Plaintiffs do not even bother to brief the elements of an unjust enrichment claim. And the reason for that is clear. Unjust enrichment, at least on the facts here, is too individual specific to satisfy the predominance inquiry.

"In Ohio, unjust enrichment is a claim under quasi-contract law against a person in receipt of benefits that he is not justly and equitably entitled to retain."

*U.S. Bank, Nat'l Ass'n v. Mitchell*, 2018 WL 6436727, at *6 (Ohio Ct. App. Dec. 7, 2018) (quoting *Crawford v. Hawes*, 995 N.E.2d 966, 975 (Ohio Ct. App. 2013)). To prevail on a claim for unjust enrichment, "a plaintiff must that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit 'under circumstances where it would be unjust to do so without payment.'" *Anderson, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (quoting *Brown-Graves Co. v. Obert*, 648 N.E.2d 1379, 1383 (Ohio Ct. App. 1994)). "[T]he plaintiff must show that enrichment that is unjust [because] the plaintiff has a superior equity so that, as against ... [the plaintiff], it would be unconscionable for the ... [defendant] to retain the benefit." *Id.* (internal citations omitted).

Plaintiffs haven't shown predominance as to this claim. Perhaps common issues arise as to the first two elements—whether a plaintiff conferred a benefit and whether a defendant knew of it. But the real work of unjust enrichment occurs at step 3, and that inquiry is simply too fact specific. It relies on issues such as "superior equity" and "unconscionability," issues that make each class member's individual circumstances highly probative. As with most equitable claims, assessing liability here will require a fact-sensitive, totality-of-the-circumstances analysis. And Plaintiffs do not even attempt to provide factual support that each class member's circumstances are sufficiently common to meet the predominance inquiry.

Instead, Plaintiffs substitute case law for facts, citing to instances where courts have certified claims for unjust enrichment. (Doc. 191, #9303). But so what?

The Court is not saying that an equitable claim can *never* be certified under Rule 23(b)(3). Rather, the point is merely that parties seeking certification must do a thorough job of explaining why each class member's individual circumstances justify class treatment. Plaintiffs here have not.

In sum, the Court finds that Plaintiffs have made the necessary showings under Rule 23(b)(3) to obtain class certification as to Plaintiffs' civil RICO and breach of fiduciary duties claims but not as to Plaintiffs' unjust enrichment claim.

## E. The Court Appoints The Finney Law Firm, LLC, And Markovits, Stock & DeMarco, LLC, As Class Counsel.

After certifying a class action, a Court must appoint class counsel under Rule 23(g). Plaintiffs request the Court appoint the Finney Law Firm, LLC, and Markovits, Stock & DeMarco, LLC, as class counsel. (Doc. 155-1, #3196). Defendants for their part object to Chris Finney for the reasons discussed above but do not argue that Finney, the Finney Law Firm, LLC, or Markovits, Stock & DeMarco, LLC, are incompetent, inexperienced, or otherwise unable to serve as class counsel.

A court must consider several factors in appointing counsel. Fed. R. Civ. P. 23(g). The rule states:

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E) may make further orders in connection with the appointment.

*Id.*

The Court concludes that Finney Law Firm, LLC, and Markovits, Stock & DeMarco, LLC, are fit to serve as class counsel. First, counsel identified and investigated the claim. (Doc. 194, #9767). Before filing this action, counsel pursued a similar state court action, demonstrating their efforts to recover on the class's behalf. *See* Hamilton County Court of Common Pleas No. A1700624. Second, the Court notes that the two firms are experienced in conducting class litigation. Third, the Finney Law Firm specializes, in part, in commercial real estate law, while Markovits, Stock & DeMarco specializes in class actions, making the combination of the two effective given the nature of the claims here. Fourth, the Court finds that counsel have the resources to carry out this litigation effectively.

As noted, Defendants contend that Finney has taken a position antagonistic to the class as a whole, that Finney has a conflict of interest, and that Markovits, Stock & DeMarco are tainted by affiliation. For the reasons discussed above, the Court rejects these allegations.

63

**F. The Court Adopts The Proposed Class Definitions.**

The Court further adopts the above amended class and subclass definitions put forth by Plaintiffs. And, the Court will, for now, permit the class to include both Ohio and Kentucky plaintiffs. If Defendants have reason to believe either certified claim cannot proceed with citizens of both states, or that the citizens of the two states should be separated into subclasses for one or both claims certified, the Court can entertain that motion at a later date.

Finally, although Plaintiffs request the Court appoint all five named Plaintiffs as class representatives for both the class and subclass (Doc. 155, #3191), the Court cannot appoint Pyramid Investment Group, LLC, as a subclass representative. Pyramid is not a member of the subclass because Build Realty did not reclaim Pyramid's property as a result of default. (*See* Doc. 179, #5440).

## CONCLUSION

For the reasons discussed, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Certify (Doc. 155). Specifically, the Court **GRANTS** certification with respect to Plaintiffs' civil RICO claim (part of Count I) and breach of fiduciary duties claim (Count II), but **DENIES** certification with respect to Plaintiffs' Ohio Corrupt Practices Act (part of Count I), civil conspiracy (Count III), and unjust enrichment (Count IV) claims.

The Court **APPOINTS** Plaintiffs Compound Property Management LLC, Leone1, LLC, R&G Cincy Investments, LLC, Pyramid Investment Group, LLC, and Ratio Models, LLC as class representatives for the class, and **APPOINTS** Plaintiffs

Compound Property Management LLC, Leone1, LLC, R&G Cincy Investments, LLC, and Ratio Models, LLC as class representatives for the subclass. The Court **APPOINTS** the Finney Law Firm, LLC, and Markovits, Stock & DeMarco, LLC as class counsel.

The Court **ORDERS** counsel for the parties to meet and confer and submit a proposed agreed class notice to this Court within fourteen (14) days of this Opinion's issuance. If counsel cannot reach agreement, Plaintiffs shall file their proposed notice by the same deadline, and Defendants shall file their specific objections to the proposed notice within fourteen (14) days after Plaintiffs file. If desired, Plaintiffs may respond to Defendants' objections within five (5) days after Defendants object.

Finally, the Court finds Plaintiffs lack standing to pursue their declaratory relief claims and so **DISMISSES** Plaintiffs' Count V, Count VI, and Count VII **WITHOUT PREJUDICE**.

**SO ORDERED.**

February 21, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

65