### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**COMPOUND PROPERTY
MANAGEMENT LLC, et al.,**

       **Plaintiffs,**                   **Case No. 1:19-cv-133**

       **v.**                          **JUDGE DOUGLAS R. COLE**

**BUILD REALTY INC., et al.,**

       **Defendants.**

### OPINION AND ORDER

The named Plaintiffs in this class action have filed an unopposed motion in which they seek preliminary court approval of a proposed class action settlement. For the reasons that follow, the Court **GRANTS** Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement and Release (Doc. 257), and **PRELIMINARILY APPROVES** the proposed settlement agreement as modified below.

### BACKGROUND

**A.    Factual and Procedural Background**

As the Court described at length in its previous Opinions and Orders, this is a long-running dispute over a real-estate investment scheme. (Doc. 131, #2232–37; Doc. 223, #10480–93). For brevity's sake—and because the factual background of this case hasn't evolved since the most recent of those rulings—the Court will only briefly summarize the complex business relationships out of which this case arose.

Plaintiffs (which are now class representatives—more on that shortly) are a "collection of small real-estate investor LLCs." (Doc. 223, #10480). Each investor worked with Defendants—a number of interrelated businesses—in connection with a real-estate "flipping" enterprise. (*Id.* at #10481). The basic plan was that the investors would "purchase, rehab, and resell homes." (*Id.*). The Court previously summarized how those transactions worked:

> (1) investors paid $10,000 to [Defendants] to receive a loan to "purchase" and remodel a house; (2) during the duration of the loan, investors paid only interest and fronted rehab expenses to be reimbursed by [Defendants] from the loan; and (3) investors then marketed and sold the property, reaping any profits above their accrued obligations under the loan and other fees. But [the investor never] held legal title to the property. Rather, during the entire process, an investor's only interest in the property was as a beneficiary … to a trust in which [one of the Defendants] served as trustee.

(*Id.* at #10486–87). On its face, that arrangement—which Plaintiffs call the "Build Scheme," (*id.* at #10492)—seems to have some potentially favorable attributes for both sides: the investors didn't have to put too much skin in the game, and if they "walked away or defaulted, no trouble" for Defendants since they already owned the property by holding legal title as trustee. (*Id.* at #10487).

The investor-Plaintiffs, however, allege that the scheme had a dark side. At a 30,000-foot level, they contend that Defendants failed to adequately disclose certain aspects of the deal. This included, for example, that the deal structure would make the investors into the beneficiaries of a trust that owned the property at issue, rather than outright owners, depriving the investors of certain important rights they otherwise would have had as owners. (*See id.* at #10487–91).

After some back-and-forth tussling over the proper claims and parties to the case, (*see, e.g.*, Op. & Order, Doc. 153, #3163 (denying leave to file an amended complaint, but allowing three new Plaintiffs to join in the claims already stated); Order, Doc. 157 (severing certain claims)), the investor-Plaintiffs settled on a few "main claims of misrepresentation and wrongdoing" they contend arose in connection with this scheme, including:

> a civil RICO claim predicated on mail fraud (part of Count I), an Ohio Corrupt Practices Act claim (part of Count I), claims for breach of fiduciary duties (Count II), civil conspiracy (Count III), and unjust enrichment (Count IV), along with declaratory judgment claims seeking a declaration that Defendants violated investors' foreclosure rights (Count V) and that [the] trusts are void or voidable (Counts VI & VII).

(Doc. 223, #10488, 10491–92 (citing Compl., Doc. 1, #52–95)).

In addition to suing, Plaintiffs also sought certification to prosecute the matter as a class action under Federal Rule of Civil Procedure 23. (Doc. 155). Their proposed class definition encompassed:

> Plaintiffs and all other persons and entities in Ohio and Kentucky, individually and collectively, that invested in real property and were named as beneficiaries to a trust created through a real estate transaction engaged in by, through, or with any of the Defendants named herein, using the Build Scheme further described and defined herein, for the longest period allowed by law (the "Class").

(Doc. 223, #10492). The Court, abiding the mandate to "treat[] each claim individually and certify[] the class with respect to only those claims for which certification is appropriate," certified a class with respect to a subset of the Plaintiffs' claims. (*Id.* at #10496 (quoting *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000)),

10542 (certifying a class with respect to some, but not all, of Plaintiffs' claims)).[1] Specifically, it certified the case to proceed as a Rule 23(b)(3) class action on behalf of the above-described class with respect to Plaintiffs' "civil RICO claim (part of Count I) and breach of fiduciary duties claim (Count II)." (*Id.* at #10542).

In connection with class certification, the Court also designated the named Plaintiffs to serve as class representatives, and their counsel to serve as class counsel. (*Id.* at #10540–42). And since it certified the class under Federal Rule of Civil Procedure 23(b)(3), the Court also ordered the parties to submit a plan within fourteen days for class-wide notice that provided class members an opportunity to opt out. (*Id.* at #10543).

But that didn't happen—at least not until more than a year later. After the Court certified the class in February 2023, Defendants appealed under Federal Rule of Civil Procedure 23(f). (Mot. to Stay, Doc. 225). But the Sixth Circuit declined to review the certification, since Defendants didn't "demonstrate[] that interlocutory appeal [was] appropriate" and "fail[ed] to carry their burden to show a likelihood of success on appeal."[2] (USCA Order, Doc. 238, #10705–07).

---

[1] The Court also certified a subclass, defined as:

> Members of the Class that had their properties reclaimed and resold as a result of default, without access to judicial foreclosure proceedings and the opportunity to redeem, and without receiving the excess proceeds (if any) upon subsequent sale of the property by [Defendants].

(Doc. 223, #10492). The parties have since consented to dropping that subclass from the case. (10/18/2023 Min. Entry).

[2] While it declined to review the Court's certification order as a premature appeal, the Sixth Circuit noted that "[t]he subclass definition … raise[d] a potential ascertainability issue." (Doc. 238, #10706–07). And while the court noted that the ascertainability issue "d[id] not … mean that [it] must [take the requested interlocutory appeal]," it based that abstention

Two parallel processes kicked off after the Sixth Circuit denied review. First, the parties continued taking depositions and exchanging discovery. (10/18/23 Min. Entry). Second—and more importantly for current purposes—they agreed to take a shot at resolving their dispute through Court-provided mediation. (*See* Order, Doc. 240 (setting settlement conference and instructing the parties on required negotiations)). To that end, Magistrate Judge Bowman held a settlement conference on April 10, 2024, which ended with her reporting that, while "[t]he matter did not resolve, … discussions are ongoing." (4/10/24 Min. Entry).

After that initial settlement conference, the class representatives at long last proceeded with their class-wide notice plan—over a year after the Court initially certified the class. (*See* Order, Doc. 251 (approving the class notice plan)). Under that plan, the class representatives "created a case website and caused all notices to be mailed and/or emailed" to the absent class members by the end of May 2024. (Doc. 257, #10781). That website and those notices informed class members of their right to opt out of the class and how to exercise that right. (*Id.* at #10781–82). Plaintiffs estimate having reached 94.77% of the class with those notices. (*Id.* at #10782). And they received only one request for exclusion. (*See* Doc. 255-1, #10776).

A couple months later, in July 2024, the parties agreed to take another stab at mediation, this time with the Court acting as mediator. (7/16/24 Min. Entry). That

---

on its "confidence that the district court will thoughtfully review its class and subclass definitions[.]" (*Id.* at #10707). After the Sixth Circuit docketed its Order, this Court conferred with the parties, who agreed to drop the subclass entirely. *See supra* note 1. So the potential issue the Sixth Circuit identified with the subclass is no longer germane to this case.

second settlement conference occurred on August 23, 2024. (8/23/24 Min. Entry). The conference ended with the class representatives extending a settlement demand to which Defendants were to respond within a week's time. (*Id.*). That didn't happen. But the parties kept at it (with the Court continuing to act as a mediator). The Court submitted a "mediator's proposal" to the parties on October 16, 2024, which ultimately led to a settlement in principle by November. (11/7/24 Min. Entry). And a couple of months after that, the class representatives filed the unopposed motion for preliminary approval currently before the Court. (Doc. 257).

### B.    Terms of the Proposed Settlement Agreement

The proposed Class Action Settlement Agreement and Release (Doc. 257-1) attached to the motion is (mostly) straightforward: Defendants will each contribute a certain sum of money to a non-reversionary Common Fund totaling $1,300,000 (the Gross Settlement Amount), out of which the class members may each receive a certain payout if they submit valid claims. (*Id.* at #10819–21; Markovits Decl., Doc. 257-2, #10873–74). Depending on the number of class members that end up submitting valid claims (alongside a few other factors), each class member would receive an equal estimated net payment of anywhere from approximately $1,600 to approximately $20,000. (*See* Doc. 257-2, #10873–74).[3]

---

[3] As described further below, the Court raised concerns about equal payments to class members in light of the class members allegedly having suffered different harms. Class Counsel therefore proposed, and Defendants do not oppose, a modification to the distribution arrangement under which each class member's payment is informed by certain specifics relating to that class member's property investment. The Court further addresses that in connection with its analysis of whether the proposed settlement (as amended) is equitable.

In exchange for receiving those payments, the class members agree broadly to "forever release and discharge" Defendants "from any and all claims, demands, actions, or causes of action of every kind and description, … that the [class member] had or has …, or may ever have[.]" (Doc. 257-1, #10830–31). That said, only those Defendants that "have made [] final payment" as described below will benefit from that release. (*Id.* at #10830). And while Defendants have agreed to pay cash in exchange for that release, they still "deny liability or wrongdoing of any kind associated with the [class's] claims[.]" (*Id.* at #10832–33).

But there's a wrinkle regarding the funding methodology for the Common Fund that bears mentioning. The funding scheme starts normally enough—three subgroups of Defendants are each allocated separate portions of the total Gross Settlement Amount, which is to be paid on certain terms and within a certain timeframe. (Doc. 257-1, #10819–21). The first subgroup is responsible for $366,670 of the total amount, to be paid in two installments due within 120 and 180 days, respectively, of the agreement's execution or upon final approval (whichever is later). (*Id.* at #10819). And the second subgroup is responsible for $658,330, to be paid in three installments due within 120, 210, and 365 days, respectively, of the agreement's execution or upon final approval (whichever is later). (*Id.* at #10819–20). The third subgroup is where the issue arises. That subgroup is responsible for the remaining $275,000. (*Id.* at #10820). But unlike the case with the other two subgroups, the settlement agreement does not set their contribution deadline on an order of months.

Rather, the settlement agreement establishes a payment plan with the potential to spread payments across *years*. (*Id.*).

Because this unique aspect of the proposed settlement agreement has consequences for the flow of funds to class members, it warrants a little further discussion. The third subgroup consists of Defendants Build Realty, Inc., Edgar Construction, LLC, Cincy Construction, LLC, McGregor Holdings, LLC, Cowtown Holdings, LLC, Build NKY, LLC, Greenleaf Support Services, LLC, Build SWO, LLC, and Gary Bailey (the Build Defendants). (*Id.*). But despite this lengthy list of entities, the sole source of funds for all of them is Gary Bailey (the rest are essentially defunct business entities). So it is Gary Bailey (an individual) who will be paying, and he must do so according to the following timetable:

> (i) Fifty Thousand Dollars ($50,000) upon Final Approval from monies contingent upon the refinancing of Defendant Gary Bailey of his residence, which he in good faith will attempt to accomplish before Final Approval and will begin to seek no later than the execution of this Agreement; (ii) One Thousand Five Hundred Dollars ($1,500) per month for sixty (60) months beginning 90 days after Final Approval; and (iii) Two Thousand Two Hundred and Fifty Dollars ($2,250) per month beginning on the 61st month until the balance is paid (subtracting from this final payment the portion of the initial $10,000 paid by the Build Defendants). Should the anticipated refinancing identified in (i) not occur, upon Final Approval the Build Defendants will begin the periodic payments set forth in (ii) and (iii). If any of the payments above by the Build Defendants are missed, and upon notice the failure to pay is not corrected within ten business days, the entire balance for the Build Defendants shall become due and payable immediately[.]

(*Id.*). Assuming best-case conditions—namely, that Defendant Bailey can secure the above-mentioned refinancing—this subgroup will take *ten years* to contribute their allotment to the Common Fund. That is, after the $50,000 initial lump-sum, they'll pay 60 monthly payments of $1,500, followed by another 60 monthly payments of

$2,250, for a total of $275,000. And it'll take even longer in the worst case. If Defendant Bailey is unable to refinance his house to raise the initial $50,000, the Build Defendants will pay 60 monthly payments of $1,500, followed by another 82 monthly payments of $2,250 (and a final fractional payment of $500). That's two months short of *twelve years*.

Does that mean that class members will be receiving payments over ten to twelve years? No—they are to receive their disbursements from the Common Fund as early as seven days after the second subgroup finishes paying its part (which will be 365 days after the later of the execution of the settlement agreement or final approval). (*Id.* at #10818).

So where do the remaining nine to eleven years of payments from the third subgroup go? "Payments by Defendants made after the Settlement Administrator has distributed checks to Class Members shall … be made to the Finney Law Firm[.]" (*Id.* at #10821). That is, the only potential distribution of these funds will be to the class attorneys as "an additional fee," or in other words, a fee above and beyond the "one third of the Common Fund" that Class Counsel intends to request as attorneys' fees. (*Id.* at #10829).

That structure gives the Court pause. On the one hand, the proposed settlement agreement expressly states that the parties' resolution "is not dependent or conditioned upon the Court's approving Class Counsel's fees and expenses." (*Id.* at #10830). But on the other, the settlement agreement effectively guarantees that the Court will approve at least a portion of the requested fees by the very act of approving

9

the settlement agreement. That is, if the Court accepts the terms of the proposed settlement agreement as written, it is also necessarily approving at least a portion of Class Counsel's requested fees (i.e., the part that the Build Defendants pay over time).

As explained in further detail below, though, that wrinkle doesn't stymy preliminary approval in this case. During a telephone status conference that the Court held to discuss the issue, the parties affirmed the proposed settlement agreement's assurance that "[i]n the event the Court declines *or modifies* Class Counsels' [fees and expenses], this Settlement will continue to be effective and enforceable[.]" (*Id.* at #10830 (emphasis added); 2/6/25 Min. Entry). So with a modification to address this issue that the Court explains below, the proposed settlement agreement is otherwise just as it seems at first glance: straightforward.

## C.   Notice Plan

In addition to establishing the substantive terms of the settlement, the agreement also addresses how the settlement is to be administered. On that front, the parties selected Simpluris, Inc., a "national full-service class action notice and claims administrator," to serve as Settlement Administrator. (Doc. 257-1, #10809; Doc. 257-2, #10870–71; Lechner Decl., Doc. 257-3, #10876). The proposed settlement agreement tasks Simpluris with notifying class members of the settlement; processing claims, requests for exclusion, and objections; disbursing settlement payments; maintaining a secure settlement website; and other administrative tasks. (Doc. 257-1, #10821–28).

Consistent with its charge, the Settlement Administrator proposed a notice program "designed to reach as many Class Members as practicable under the circumstances" to notify them of the proposed settlement. (Doc. 257-2, #10870). That plan calls for a multi-tiered approach. To start with, the parties must provide the Settlement Administrator, within fourteen days of preliminary approval, with the most accurate contact information they have for each Class Member. (Doc. 257-1, #10822). No later than thirty-five days after receiving that information (the Notice Date), the Settlement Administrator must distribute the Short Form Notice, (*id.* at #10862–64), to each Class Member by email and regular mail. (Doc. 257-1, #10806; Doc. 257-3, #10877). For any mailings returned as undeliverable, the Settlement Administrator will attempt to use publicly available information to trace the Class Member's updated email and regular mail addresses, as need be. (Doc. 257-3, #10878). In addition to the direct communications, the Settlement Administrator also will publish and maintain a settlement website that will explain the settlement. (Doc. 257-1, #10811). And the Settlement Administrator will update that website to reflect any scheduled events (or changes to such events) on the Court's docket regarding this settlement. (*Id.*).

Starting on the Notice Date, the Class Members will have 60 to 90 days to take action, depending on how they'd like to proceed. First, Class Members can opt out of the proposed settlement by submitting a valid opt-out request to the Settlement Administrator within sixty days of the Notice Date (the Objection Deadline). (*Id.* at #10827). Any Class Member who doesn't opt out can submit an objection to the

proposed settlement agreement by the same deadline. (*Id.* at #10828). And no later than fourteen days before the Objection Deadline, Class Counsel will file their Fee Application with the Court and publish it to the settlement website. (*Id.* at #10811, 10829). Second, Class Members who wish to remain bound by the settlement must submit a valid Claim Form—available on the settlement website—within ninety days of the Notice Date. (*Id.* at #10825–26).

Within approximately six months of the Notice Date—once Class Members have had ample opportunity to opt out, object, or submit valid claims—the Court will hold a fairness hearing as Federal Rule of Civil Procedure 23(e) requires. (*Id.* at #10805). Then, no later than fourteen days before that hearing, Class Counsel will file their Final Approval Motion. (*Id.*).

Once all of that is done, the Court will decide whether to finally approve the proposed settlement and whether to award (1) Class Counsel's requested attorneys' fees, costs and expenses, and (2) service payments to the named Plaintiffs. If the Court approves the settlement, and if no appeal is either won or timely taken, the proposed settlement will be become effective. (*Id.*). And no later than seven days after the Effective Date (or after First Title, one of the Defendants, finishes paying its share of the Common Fund), those Class Members who submitted valid Claim Forms will receive their payments—finally bringing this litigation to a close. (*Id.* at #10818).

But what starts the whole process off is the Court's decision on whether to preliminarily approve the settlement. So that is the topic to which the Court now turns.

## JURISDICTION AND CHOICE OF LAW

The Court begins its analysis by addressing jurisdiction. At this juncture, this class action involves two claims: one under a federal statute (RICO) and the other under state trust law. (Doc. 223, # 10542). The Court thus has federal-question jurisdiction over the federal statutory claim and can exercise supplemental jurisdiction over the state-law claim. 28 U.S.C. §§ 1331, 1367.

While jurisdiction is straightforward, a choice-of-law issue warrants a brief detour. "[C]lass action settlements [implicating state-law claims] present peculiar choice of law problems that courts often overlook." *Hawes v. Macy's, Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *5 & n.13 (S.D. Ohio Dec. 20, 2023). Specifically, in cases involving interstate classes (like this one), due process problems can arise from the application of one state's law to Class Members whose citizenship lies with another.[4] *See id.* at *6 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–23 (1985)).

This case falls into that category. Here, Plaintiffs prosecute an Ohio state trust-law claim on behalf of a class that encompasses themselves "and all other persons and entities in Ohio *and Kentucky*" who signed up to the Build Scheme. (Doc. 223, #10482 n.2, 10492 (emphasis added)).

Luckily, though, "no conflict exists" when the implicated states' laws are "virtually identical." *Hawes*, 2023 WL 8811499, at *7. Here, both Ohio and Kentucky

---

[4] For what it's worth, Plaintiffs stopped referring to Kentucky law by the time they sought class certification. (*See* Doc. 223, #10482 n.2 (comparing Plaintiffs' Complaint (Doc. 1) to their Motion for Class Certification (Doc. 155))). Even if that omission constituted a dismissal of the Kentucky-law claim, it doesn't excuse the Court from considering the potential due process problems implicated by applying one state's law to evaluate claims belonging to another state's (absent) plaintiffs. *Hawes*, 2023 WL 8811499, at *5–7.

have adopted the Uniform Trust Code. Ohio Rev. Code §§ 5801 et seq.; Ky. Rev. Stats. chap. 386B; *see also Collins v. Flannery*, 2024-Ohio-5822 ¶ 32 (10th Dist.) (analyzing "Ohio's adaptation of the Uniform Trust Code, promulgated in 2000"); *Hauber v. Hauber*, 600 S.W.3d 204, 204–05 (Ky. 2020) (analyzing "Kentucky's version of the Uniform Trust Code"). Because of that consonance, the Court finds it proper to apply Ohio trust law to the entire class's claims for breach of fiduciary duty.

## LEGAL STANDARD

That brings the Court to the question of whether to approve the proposed settlement. Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Because of the unique concerns attendant to representative forms of litigation—where class members' rights are finally adjudicated in their absence— class actions require heightened judicial oversight. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810–11 (1985) (noting the multiple "safeguards provided for [absent class members'] protection"); Fed. R. Civ. P. 23.

One aspect of that supervisory role arises when the parties to a class action seek resolution by settlement. Unlike direct-representation cases—where the parties are free to settle their disputes out of court on whatever terms they wish—class action settlements can proceed "only with the court's approval." Fed. R. Civ. P. 23(e); *see also Stanley v. Turner Oil & Gas Props., Inc.*, No. 2:16-cv-386, 2018 WL 2268138, at *1

(S.D. Ohio Mar. 6, 2018) ("[T]o protect the rights of absent parties, courts review class action settlements[.]").

Judicial approval of a class action settlement is a three-step process. A court must: (1) preliminarily approve the proposed settlement; (2) distribute notice of the proposed settlement to the class; and finally (3) hold a fairness hearing and determine whether the settlement is fair, reasonable, and adequate. *Smith v. Fifth Third Bank*, No. 1:18-cv-464, 2021 WL 11713313, at *2 (S.D. Ohio Aug. 31, 2021) (citing *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *1 (S.D. Ohio Jan. 26, 2011)).

The first step—preliminary approval—requires a court to determine whether it is "likely" to find that the proposed settlement is "fair, reasonable, and adequate."[5] Fed. R. Civ. P. 23(e)(1)(B), (e)(2). That determination is "more an art than a science." *Smith*, 2021 WL 11713313, at *2. But it's an art with some guiding principles. Rule 23(e) directs courts to consider whether:

    (A)    the class representatives and class counsel have adequately represented the class;

    (B)    the proposal was negotiated at arm's length;

    (C)    the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

---

[5] When a class is not yet certified, courts must also consider whether they are "likely" to "certify the class for purposes of judgment on the proposal" at the preliminary approval stage. Fed. R. Civ. P. 23(e)(1)(B). But here that does not apply, as the Court has already certified the class. (Doc. 223).

> > (iv)   any agreement required to be identified under Rule 23(e)(3); and
>
> (D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Hawes*, 2023 WL 8811499, at *10.[6] The bar to clear those factors isn't high at the preliminary approval stage. *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Pracs. Litig.*, No. 2:22-md-3025, 2022 WL 20178514, at *1 (S.D. Ohio Oct. 28, 2022). Though not a mere "rubber stamp," the Court "applies a less strict standard … than is required for final approval because the Court considers only whether the [proposed settlement] will 'likely' satisfy the above requirements." *Id.*

The second step—directing notice of the agreement to the class—requires the Court to determine whether the proposed notice plan would give notice "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The notice plan need only provide "the best notice that is practicable under the circumstances," describing in "plain, easily understood language," the nature of the action, the individual class member's right to opt-out, and the binding consequences of remaining in the class, among other things. Fed. R. Civ. P. 23(c)(2)(B).

---

[6] Before Rule 23 was amended in 2018, it "required a court to find only that the settlement was 'fair, reasonable, and adequate,' with no elaboration as to what factors were relevant to that finding." *Hawes*, 2023 WL 8811499, at *10. So courts in the Sixth Circuit made that determination by applying the seven factors laid out in *UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007). But as this Court has explained elsewhere, the *UAW* factors "fold[] into" the factors now elaborated by Rule 23 after the 2018 amendments. *Hawes*, 2023 WL 8811499, at *10. So given that redundancy, the Court will refer only to the Rule 23 factors in its analysis here.

## LAW AND ANALYSIS

As the legal standard makes clear, the Court faces two tasks. First, it must determine whether the proposed settlement agreement is likely to satisfy Rule 23(e)'s requirements. Then, if so, the Court must decide whether the proposed notice plan will adequately apprise the absent class members of their rights under Rule 23(c)(2)(B). As discussed below, the Court answers both questions in the affirmative.

### A. The Court Accepts the Slightly Altered Class Definition.

First, some housekeeping. As part of their motion for preliminary approval, Plaintiffs seek to tweak the already-certified class definition to the following:

> Plaintiffs and all other persons and entities in Ohio and Kentucky, individually and collectively, that invested in real property and were named as beneficiaries to a trust created through a real estate transaction engaged in by, through, or with any of the Defendants named herein during the Class Period. "Class Period" means from February 1, 2013, through May 24, 2019. Excluded from the Class are: Defendants and their past or present officers, employees, agents, directors, lawyers, and immediate family members; judicial officers and their immediate family members and associated Court staff assigned to this case; and any entities owned or controlled by an individual excluded from the Class.

(Doc. 257, #10790). The updated class definition does three things: (1) removes the old definition's reference to the alleged "Build Scheme," as superfluous and potentially confusing; (2) specifies dates for the Class Period; and (3) excludes entities for whom relief would be inappropriate. (*Id.*). All three of those changes are sensible, and none of them affect the Court's earlier class-certification analysis. (*See generally* Doc. 223). So the Court accepts the new definition without further discussion and instructs the parties to include it in all future notices to class members. *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (explaining

17

that "district courts have broad discretion to modify class definitions … as the litigation progress[es]").

**B. The Court is "Likely" to Find that the Proposed Settlement Agreement is Fair, Reasonable, and Adequate Under Rule 23(e).**

With the class definition squared away, the Court turns to assessing the proposed settlement agreement against Rule 23(e)'s four factors: (1) adequacy of representation; (2) non-collusive, arm's length negotiation; (3) adequacy of relief; and (4) equitable treatment between class members. But because this is a request for preliminary—not final—approval, the Court need only determine whether the proposed settlement agreement is "likely" to measure up to those four requirements. Fed. R. Civ. P. 23(e)(1)(B). It considers each in turn.

**1. Adequacy of Representation**

The adequacy-of-representation inquiry at the settlement approval stage "mirrors the adequacy prong … that the Court analyzed when certifying the class." *Hawes*, 2023 WL 881499, at *11; (Doc. 223, #10512–22). But it's also more specific: the question at this point focuses on the class representatives' and class counsels' "adequacy … *in relation to the settlement terms and notice process.*" *Hawes*, 2023 WL 881499, at *11 (emphasis added).

Here, the settlement terms affirm that the class representatives and class counsel adequately represented the class in negotiating the proposed settlement agreement. The Court described the agreement above, so it suffices here to note that its terms were the result of "extensive factual investigation" and "extensive mediation efforts" on class counsel's and the class representatives' parts. (Doc. 257-2, #10869,

18

10872; *see also* Doc. 257, #10782–83). The voluminous record generated by those efforts show as much. (*See* Doc. 257, #10782 (collecting docket entries reflecting depositions and discovery disputes)). Indeed, class counsel represent that they've spent enough time litigating this case to render their expected fee—if the Court eventually approves their requested attorneys' fees—less than what they would have earned at their standard hourly rates (a situation known as a "negative lodestar multiplier"). (Doc. 257-2, #10872).

For those reasons, the Court finds that Class Counsel and the Class Representatives have adequately represented the absent class members in connection with the proposed settlement agreement.

### 2. Arm's Length Negotiations

Based on the record before the Court, its experience facilitating the parties' many disputes along the way, and its extensive efforts in mediating the matter, the Court is satisfied that the proposed settlement agreement "arose out of arms-length, noncollusive negotiations." *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 279814, at *6 (E.D. Mich. Jan. 23, 2017). "Where the proposed settlement was preceded by a lengthy period of adversarial litigation involving substantial discovery, a court is likely to conclude that settlement negotiations occurred at arms-length." *Id.* (quoting *Newberg on Class Actions* § 13:14 (5th ed.)). This case bears all those hallmarks. The parties have been litigating—vigorously and unabatedly—for five years. (*See* Doc. 1 (complaint filed February 2019)). And as noted above, those five years have seen more than their fair share of discovery, depositions, and spirited

disputes over the same. *Supra* Part B.1. Beyond that, and perhaps even more to the point, the settlement process itself was time-consuming and hard fought. Based on its first-hand involvement in those efforts, the Court has no concerns that the settlement here was in any way collusive.

### 3. Adequacy of Relief

The Court determines the adequacy of relief accorded by the proposed settlement agreement by reference to "(1) the costs, risks[,] and delay of trial and appeal; (2) the effectiveness of any proposed method of distributing relief to the class; and (3) the terms of any proposed award of attorney's fees."[7] *Hawes*, 2023 WL 8811499, at *11 (cleaned up) (quoting Fed. R. Civ. P. 23(e)(2)(C)). After addressing the first prong—costs and risks of continued litigation—the Court will take the latter two together in light of the proposed settlement agreement's somewhat peculiar structure around payments and attorneys' fees.

### a. The Costs, Risks, and Delays of Trial and Appeal Favor Settlement.

"There is no question that a settlement avoids costs, risks, and delay that would be attendant to trial." *Raymo v. FCA US LLC*, No. 2:17-cv-12168, 2023 WL 6429548, at *3 (E.D. Mich. Sept. 30, 2023); *see also Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019) (affirming the district court's finding that the risk of long and protracted litigation counseled in favor of final approval). That is

---

[7] A fourth factor—"any agreement required to be identified under Rule 23(e)(3)"—is irrelevant here, since the parties identified no such agreement. (Doc. 257-1, #10837–38); *see Hawes*, 2023 WL 8811499, at *11 n.21.

especially true where, as here, the parties have engaged in extensive discovery and mediation at considerable expense. (Doc. 257, #10782; Doc. 257-2, #10870, 10872). That protracted engagement with the claims, their merits, and the expected costs of seeking and producing whatever information will be required in the future, puts the parties "in the best position to assess the risks of trial compared with the certainty of settlement." *Raymo*, 2023 WL 6429548, at *3.

But apart from the parties' own well-founded beliefs about the risks and costs of continued litigation, it's worth noting that "[p]leading a [civil] RICO claim"—one of the claims in this case—"is no small feat." *Marinac v. Todd*, No. 1:20-cv-1571, 2022 WL 3904049, at *14 (N.D. Ohio Aug. 30, 2022); *see also In re Rio Hair Naturalizer Prods. Liab. Litig.*, No. MDL 1055, 1996 WL 780512, at *12 (E.D. Mich. Dec. 20, 1996) (finding that the complexity of continued litigation warranted settlement approval where the class brought "civil RICO claims, which raise a substantial number of complicated legal issues"). And the civil RICO claim is only half of this case, joined as it is by the state-law trust claim as described above. (*See also* Doc. 223, #10542).

Then, beyond the typical litigation risks, there were also substantial collectability risks in connection with any judgment that Plaintiffs may receive. At least some of the Defendant subgroups had very limited assets, and further litigation efforts would be likely to convert any remaining assets into fees for defense attorneys, rather than monies that could be distributed to class members. (*See* Doc. 257-1, #10820 (describing how Defendant Gary Bailey's contributions are contingent on his ability to refinance his house)). That risk also cuts in favor of resolution.

21

In short, the cost and complexity of litigation so far, coupled with the inherent complexity of at least some of the class's claims, and the meaningful collectability risks, convinces the Court that the costs, risks, and delays of further litigation favor settlement.

>    **b.** **The Court Reserves Judgment on the Proposed Method of Distribution to the Class and Any Attorneys' Fees.**

As described earlier in this Opinion and Order, the proposed settlement agreement's terms involving the payouts to class members and pay-ins by Defendants are fairly straightforward. Three groups of Defendants are each separately responsible to contribute a certain amount to what will then be an aggregate Common Fund, and the individual class members are each entitled to a share of those monies, after any court-approved deductions for attorneys' fees, costs and expenses, and service payments. (Doc. 257-1, #10817–18). Money in, money out. But, as noted above, there's a wrinkle: because of the Build Defendants' schedule for making payments and the way it fails to intersect with class members' schedule for receiving funds, it's possible that up to $275,000—a little over 20%—of the money won't be in the Common Fund by the time it's disbursed to class members. (*See id.*).

That's an atypical arrangement, though an understandable one given the circumstances here. As to the latter, it's understandable because, as the parties informed the Court at a telephone status conference it held to discuss the matter, (*see* 2/6/25 Min. Entry), the Build Defendants are simply unable to contribute the entire $275,000 for which the settlement agreement makes them responsible at one time. As noted, the "Build Defendants" consist of Gary Bailey, and he has little by way of

assets to his name (see the discussion of collectability risks above). So the only way he could agree to pay the specified amount is on a monthly basis over an extended period of time—potentially up to about 12 years. And because the parties understandably don't want to make the class members wait until those contributions are complete before receiving their payouts, the Build Defendants' $275,000 (at least any amount that isn't received by the time of distribution) is earmarked up-front to go to class counsel as fees. (*See id.*; Doc. 257-2, #10871–72). Essentially, class counsel is bearing the risk of the Build Defendants' non-payment (or, at the very least, of having to police their payments for the next 12-odd years) so that the settlement may otherwise proceed.

But for present purposes, that arrangement is problematic in that it runs up against Rule 23's procedural requirements for approving attorneys' fees. Rule 23(h) provides that a court, upon motion, may approve a request for reasonable attorneys' fees so long as notice of that motion is "served on all parties and … directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h). And class members have the right to object to fee requests before they're granted. *Id.* So if the Court preliminarily approved the provisions in the proposed settlement agreement earmarking the Build Defendants' contributions as attorneys' fees, it would come dangerously close to awarding attorneys' fees in disregard of the absent class members' rights. After all, no class member (apart from the class representatives) has yet been apprised of the proposed settlement agreement *at all*—let alone the fact that it earmarks a substantial portion of the Common Fund for attorneys' fees.

23

Even so, the cited provisions aren't a bar to preliminary approval. The settlement agreement provides that "[i]n the event the Court declines *or modifies* Class Counsels' [fees and expenses], this Settlement will continue to be effective and enforceable[.]" (Doc. 257-1, #10830 (emphasis added)). So the Court modifies the proposed settlement agreement's terms to clarify that any payments received from the Build Defendants are to be understood as accruing to the Common Fund, and *not* directed solely to amounts for class counsel's fees.[8] With that understanding, class counsel is of course free to petition the Court for a fee award that captures some (or all) of the Build Defendants' contributions further down the line. But what they cannot do is collapse two separate inquiries—preliminary settlement approval and approval of attorneys' fees—into one.

### 4. Equitable Treatment

Finally, the Court must consider whether the proposed settlement agreement treats the class members equitably. Fed. R. Civ. P. 23(e)(2)(D). Relevant considerations include "whether the apportionment of relief among class members takes appropriate account of differences among their claims[.]" *Id.* (advisory committee notes).

The proposed settlement agreement, as originally written, treats class members *equally*—but arguably not equitably. It treats the vast majority of class

---

[8] This modification must carry through to all affected provisions of the proposed settlement agreement and the proposed notice documents before they are sent to absent class members or posted to the Settlement Website. (*E.g.*, Doc. 257-1, ¶¶ 74–75, 102–03, #10818–19, 10829–30, 10857, 10864).

members (all of them aside from the class representatives, who might seek additional service payments—more on that below) identically, since they'll all receive equal payouts from the Common Fund. (Doc. 257-1, #10818 (explaining that the exact payment amount will be pro rata based on the number of valid claims—that is, divided equally among all the claimants)). That kind of treatment, while equal, is at least arguably inequitable in cases—like this one—where some class members have suffered substantially different damages than others and ought to be compensated according to those differences. *See, e.g.*, *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2024 WL 3236614, at *36–37 (E.D.N.Y. June 28, 2024) (explaining that "the Second Circuit rejected a settlement in which differently-situated class members … were treated identically"); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999).

Because of that concern, the Court directed class counsel to submit supplemental briefing on the issue. (2/25/25 Not. Order). In their briefing, class counsel proposes—and Defendants don't oppose—a more finely-tuned formula for class member distributions. (Doc. 258, #10896). That formula "calculates for each claimant their Purchase Price Mark-Up [PPMU] damages (which are variable), then adds to that 'down payment' [DP] damages of $10,000 (which are uniform), and uses the total to calculate their pro rata share."[9] (*Id.* at #10895 (footnote omitted)). That pro rata share is calculated as follows: "(PPMU + DP) / (PPMU + DP for all

---

[9] The PPMU measure is defined as "[t]he mark-up from the buy-side to the sell-side transactions," which reflects the amount by which each class member overpaid Defendants for their investment properties above market price. (*See* Doc. 258, #10894 n.2).

claimants)." (*Id.* at #10894–96).[10] The formula basically assigns to each class member a portion of the Common Fund that reflects their share of the total harm suffered by all class members.

In other words, each class member's entitlement under the proposed settlement agreement is directly linked to the financial harm it suffered. That arrangement "takes appropriate proportional account of differences among [] [c]lass members' claims." *Jones v. Varsity Brands, LLC*, No. 2:20-cv-2892, 2024 WL 3049464, at *12 (W.D. Tenn. June 18, 2024). So the Court is now satisfied that it "treats all class members equitably," *id.*, at least with regard to proposed payouts, and directs class counsel to incorporate the updated distribution formula in all communications to class members under the notice plan.

The reason for the qualifier in the previous sentence, though, is that the Court has one more asterisk on the proposed settlement's equitability. In addition to the standard class recovery, the class representatives plan to request additional service payments of $10,000 each (a request they say they will submit alongside class counsel's fee petition). (Doc. 257-1, #10828–29). But as this Court has explained elsewhere, there are limits on such service payments. True, "Rule 23's equitable treatment requirement does not prohibit—indeed, it may be furthered—by appropriate incentive awards to class representatives." *Hawes*, 2023 WL 8811499, at

---

[10] Class counsel represents that this formula will be "easily managed," since each class member's DP is the same (that is, $10,000), and the information necessary to determine each class member's PPMU is publicly available "through the appropriate County Recorder's office." (Doc. 258, #10895–96).

*13. But "appropriate" refers to service payments that seek to compensate named plaintiffs for efforts that they have expended on behalf of the class. *Id*. Service payments exceeding that amount are, to say the very least, problematic. And the Court is not yet in a position to know on which side of the divide the soon-to-be requested service payments fall.

Fortunately though, that is a matter for another day. The proposed settlement agreement "is not dependent or conditioned upon the Court[] approving … the Class Representatives' [s]ervice [a]wards." (Doc. 257-1, #10830). So the only question at this stage is whether Rule 23 *categorically* prohibits service payments as inequitable, not whether the class representative's anticipated request (which is not yet before the Court) is ultimately reasonable. And Rule 23 does no such thing. *Hawes*, 2023 WL 8811499, at *13. So while the Court reserves judgment on the particular amount—if any—to award in service payments to the class representatives, the settlement agreement's equitability is not put into question by its contemplation of such payments.

## C. The Proposed Notice Plan is Reasonable Under the Circumstances.

Last, but not least, the Court must determine whether the proposed notice plan is "the best [] that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Court finds that it is.

The proposed notice plan, described in detail earlier in this Opinion and Order, apprises absent class members of the nature of the claims and their rights. The

proposed Short Notice, which the settlement administrator will send to class members via both email and regular mail, contains all the information mandated by Rule 23, describing, among other things: the nature of the action, the class definition and its claims, and each class member's right to object, opt out, or be bound by the settlement. (Doc. 257-1 #10862–64). Moreover, the settlement administrator will maintain a settlement website, which will be regularly updated with filings on the Court's docket, along with the Long Form Notice and Claim Form (with submission instructions). (*Id*. at #10853–60, 10866–67).

And it's likely that the notices will reach the overwhelming majority of the class. As class counsel describes, they reached approximately 95% of the class with their initial class notices after obtaining certification. (Doc. 257-2, #10871). So it stands to reason that the settlement administrator "will likely improve on [that] direct notice rate after running skip traces on" previously unreachable class members' addresses. (*Id*.).

For those reasons, the Court finds that the proposed notice plan satisfies Rule 23(c)(2)(B)'s requirements. *See Eaton v. Ascent Res.-Utica, LLC*, No. 2:19-cv-3412, 2024 WL 3925884, at *2 (S.D. Ohio Aug. 23, 2024) (finding a substantially similar notice plan satisfactory).

## CONCLUSION

For the foregoing reasons, the Court:

1. **PRELIMINARILY APPROVES** the proposed Class Action Settlement Agreement and Release (Doc. 257-1) **AS MODIFIED** to reflect (1) that the

Build Defendants' payments are deemed to be assigned to the Common Fund, not a separate stream of payments directly to class counsel; and (2) that the class members are to receive payments according to the updated formula provided by class counsel in its supplemental briefing, (Doc. 258);

2. **APPROVES** the proposed notice plan and **AUTHORIZES** the settlement administrator to distribute the proposed notices **AS MODIFIED** to reflect (1) that the Build Defendants' payments are deemed to be assigned to the Common Fund, not directly to Class Counsel's fees; and (2) that the class members are to receive payments according to the updated formula provided by class counsel in its supplemental briefing, (Doc. 258);

3. **ADOPTS** the proposed calendar deadlines to govern notice, claims administration, and the motions for attorneys' fees and final approval, (Doc. 257-4, #10890–91); and

4. **SCHEDULES** a final fairness hearing for October 16, 2025, at 11:00 a.m. in Courtroom 805.

**SO ORDERED.**

March 31, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**