# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

COMPOUND PROPERTY
MANAGEMENT LLC, et al.,

            **Plaintiffs,**                       **Case No. 1:19-cv-133**

        **v.**                            **JUDGE DOUGLAS R. COLE**

BUILD REALTY, INC., et al.,

            **Defendants.**

## OPINION AND ORDER

The named Plaintiffs in this class action have filed an unopposed motion in which they seek final court approval of a proposed class action settlement. (Doc. 261). Separately, Plaintiffs seek an order awarding attorneys' fees, litigation expenses, and service awards. (Doc. 260). For the reasons discussed below, the Court **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 261), and **APPROVES** the class action settlement. The Court further **GRANTS** Plaintiffs' Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 260). Specifically, it **AWARDS** class counsel attorneys' fees in the amount of one-third of the common fund (as further described below), alongside any potential later fees collected from Gary Bailey. Beyond that, the Court also **AWARDS $163,940.77 in litigation costs and expenses,** and **AWARDS** each named Plaintiff **$10,000 as a service award.**

## BACKGROUND

### A.    Nature of the Suit and Procedural Background

In its previous Opinions and Orders, the Court has described in detail the real-estate investment scheme at issue in this case. (*See* Doc. 131, #2232–37; Doc. 223, #10480–93; Doc. 259, #10900–05). Considering that the factual background of the case has not changed since those Opinions and Orders, the Court will only briefly summarize the facts here.

Plaintiffs, a "collection of small real-estate investor LLCs," worked with Defendants, several interrelated businesses, to "flip" homes. (Doc. 223, #10480–81). The Court has previously described the transactions as follows:

> (1) investors [such as Plaintiffs] paid $10,000 to [Defendants] to receive a loan to "purchase" and remodel a house; (2) during the duration of the loan, investors paid only interest and fronted rehab expenses to be reimbursed by [Defendants] from the loan; and (3) investors then marketed and sold the property, reaping any profits above their accrued obligations under the loan and other fees. But [the investor never] held legal title to the property. Rather, during the entire process, an investor's only interest in the property was as a beneficiary … to a trust in which [one of the Defendants] served as trustee.

(*Id.* at #10486–87). On one hand, this scheme benefitted Plaintiffs; they only had to pay limited expenses towards "flipping" the home. (*Id.* at #10487). And, on the other hand, Defendants held legal title the whole time, so they also benefitted in the form of facing less risk in the event a given investor "walked away or defaulted." (*Id.*).

That said, Plaintiffs allege that Defendants were less than honest in disclosing this arrangement. Particularly, they claim that Defendants failed to adequately inform investors that "the deal structure would make the investors into the beneficiaries of a trust that owned the property at issue, rather than outright owners,

2

depriving the investors of certain important rights they otherwise would have had as owners." (Doc. 259, #10901 (citing Doc. 223, #10487–91)).

So the Plaintiffs first sued Defendants in state court, (*see* Doc. 260, #10932 n.1), before moving the case to federal court on February 20, 2019, (Doc. 1). While they initially brought a slew of claims, after several procedural twists and turns, the Court certified a class under Federal Rule of Civil Procedure 23 only for Plaintiffs' civil RICO claim and breach of fiduciary duties claim. (Doc. 223, #10542). At the same time, the Court designated the named Plaintiffs as class representatives and their counsel as class counsel. (*Id.* at #10540–42).

From there, the parties continued with discovery and simultaneously pursued mediation with Magistrate Judge Bowman. (10/18/23 Min. Entry; Doc. 240). While the first settlement conference did not result in an agreement, (*see* 4/10/24 Min. Entry), the parties attempted mediation a second time, this time with the undersigned acting as the mediator. (7/16/24 Min. Entry; 8/23/24 Min. Entry). This did not resolve the matter either. But, several months later, the parties reached a settlement in principle. (11/7/24 Min. Entry).

**B.     Terms of the Proposed Class Action Settlement**

On January 14, 2025, Plaintiffs filed an unopposed motion for preliminary approval, (Doc. 257), attaching the proposed Settlement Agreement, (Doc. 257-1). While the Court preliminarily approved the Agreement, it did so with a few modifications. (*See* Doc. 258 (supplemental memorandum); Doc. 259, #10927–28 (summary of modifications)). Accordingly, the Plaintiffs submit with their present

motion for approval an Amendment to the Settlement Agreement (Doc. 261-1, #11023–35), which seeks to address the Court's concerns. So the Court considers the two documents together (the original Agreement and the Amendment) as the Agreement for final approval purposes.

In the Agreement, the parties agree to settle the claims of the Settlement Class in exchange for Defendants paying a total sum of $1,300,000 (the common fund). (Doc. 257-1, #10819–21; Doc. 261-1, #11024). The Agreement contemplates funding and distributing that common fund in several steps.

To start, three subgroups of Defendants will contribute funding for the non-reversionary common fund. (Doc. 257-1, #10819–21; Doc. 261-1, #11024–25). The first two groups' obligations are straightforward: one group will pay $366,670 and the other $658,330, with those amounts to be paid in specific installments following the Court's final approval of the Agreement. (Doc. 257-1, #10819–21; Doc. 261-1, #11024–25). But the Agreement contemplates a different structure for the third group. That is due to that group's potential difficulties in obtaining funds to make the requisite $275,000 payment. Technically, this third group is comprised of several different entities (collectively, the Build Defendants). At the end of the day, though, Gary Bailey will be responsible for paying the amount. (Doc. 257-1, #10820).

The Court pauses to detail this third arrangement a little more fully, as it affects the Court's analysis of the appropriateness of the proposed attorneys' fees. *See* infra Part B.1. Under the Agreement, there are two potential tracks to Bailey's payment plan:

4

> (i) Fifty Thousand Dollars ($50,000) upon Final Approval from monies contingent upon the refinancing of Defendant Gary Bailey of his residence, which he in good faith will attempt to accomplish before Final Approval and will begin to seek no later than the execution of this Agreement; (ii) One Thousand Five Hundred Dollars ($1,500) per month for sixty (60) months beginning 90 days after Final Approval; and (iii) Two Thousand Two Hundred and Fifty Dollars ($2,250) per month beginning on the 61st month until the balance is paid (subtracting from this final payment the portion of the initial $10,000 paid by the Build Defendants). Should the anticipated refinancing identified in (i) not occur, upon Final Approval the Build Defendants will begin the periodic payments set forth in (ii) and (iii). If any of the payments above by the Build Defendants are missed, and upon notice the failure to pay is not corrected within ten business days, the entire balance for the Build Defendants shall become due and payable immediately.

(*Id.*; Doc. 261-1, #11025). So, in the worst-case scenario, i.e., if Bailey is unable to obtain refinancing, he would be in repayment for almost twelve years. Initially, the Agreement stated that Bailey's later payments would be paid to class counsel directly, specifically the Finney Law Firm, rather than flowing to the common fund. (Doc. 257-1, #10821). Due to concerns the Court raised in its preliminary approval Opinion and Order, though, the Amendment now states that the later payments will be wired to the Settlement Administrator. (Doc. 261-1, #11024). While the Settlement Agreement is not directly premised on the Court granting attorneys' fees, by accepting the terms of the Agreement described above, the Court "is also necessarily approving at least a portion of Class Counsel's requested fees (i.e., the part that the Build Defendants pay over time)." (Doc. 259, #10909).

As for distributing the common fund, the fund will first cover any administrative fees, attorneys' fees, litigation expenses, and service awards for the named Plaintiffs. (Doc. 257-1, #10818). And while the Settlement Agreement states that those payments will come out of the common fund, the Agreement itself does not

5

specify amounts. (*See id.* at #10817). That said, class counsel has separately moved for attorneys' fees consisting of (1) one-third of the amount of the common fund "as of the date when the Settlement Administrator is prepared to distribute funds," and (2) all later payments received from Gary Bailey. (Doc. 260, #10929). Beyond that, the attorneys seek $163,940.77 in costs and expenses. Finally, they also request $10,000 in service awards for each of the five named Plaintiffs. (*Id.*). And the parties expect that administration costs will be $13,000. (Doc. 261, #11007; Simpluris Decl., Doc. 261-2, #11059).

As for how much the class members will receive, the parties have amended their formula in light of concerns the Court raised regarding whether the previous pro rata formula was equitable. (*See* 2/25/25 Not. Order (directing counsel to file additional briefing on the issue); Doc. 258 (supplemental briefing); Doc. 261-1 (amended formula)). Under that "more finely-tuned formula," the Settlement Administrator will "calculate[] for each claimant their Purchase Price Mark-Up [PPMU] damages (which are variable), then add[] to that 'down payment' [DP] damages of $10,000 (which are uniform), and use[] the total to calculate their pro rata share." (Doc. 259, #10924 (quoting Doc. 258, #10895)).[1] Stated differently, the formula is "(PPMU + DP) / (PPMU + DP for all claimants)." (Doc. 261, #11005). So for those claimants who submit valid claim forms, the formula reflects "their share of the total

---

[1] The Court further noted that the PPMU is defined as "'[t]he mark-up from the buy-side to the sell-side transactions,' which reflects the amount by which each class member overpaid Defendants for their investment properties above market price." (Doc. 259, #10924 n.9 (quoting Doc. 258, #10894 n.2)).

harm suffered by all class members." (Doc. 259, #10925). And the Settlement Administrator estimates the average expected payment to a given class member to be between $3,407.30 and $3,656.06, depending on how much the Build Defendants (i.e. Gary Bailey) contribute to the common fund upon Final Approval. (Doc. 261-2, #11059).

Finally, the Settlement Agreement contemplates the possibility of residual funds. (Doc. 257-1, #10818–19). Of course, as the payments are determined by dividing the numbers of claims into the remaining available amount, it may well be the case that no funds will remain. But the Agreement nonetheless addresses the potential that some of the payments paid by check may go uncashed within the 180 days that the checks are valid. (*See id.* at #10818). As to any such claimants, the Agreement allows for the check to be reissued for 30 days, at the discretion of the Settlement Administrator. (*Id.*). But if the time for reissuance passes, or if the reissued check also goes uncashed, the Settlement Administrator will redistribute those funds to Class Members to the extent it is "considered economical by the Settlement Administrator, Class Counsel, and Defendants." (*Id.*). After that, if there still are unclaimed funds, those will be "donated *cy pres* as proposed by the Parties and approved by the Court to an appropriate state fund or non-profit organization," an organization which has yet to be (and may never need to be) selected. (*Id.* at #10819).

On the other side of the equation, Class Members "forever release and discharge [Defendants who fully satisfy their financial obligations] from any and all

claims, demands, actions, or causes of action of every kind and description." (Doc. 257-1, #10830–31).[2]

## C.     Notice Plan and Results

Under the Settlement Agreement, the Settlement Administrator (here, Simpluris, Inc.) was charged with notifying the class members of the settlement. Simpluris sent "two rounds of direct mail notice and three rounds of email notice." (Markovits Decl., Doc. 261-1, #11020; *see also* Doc. 261-2, #11055–57 (detailing Simpluris's notice efforts)). Additionally, Simpluris maintained the Settlement Website, which it made public on May 5, 2025. (Doc. 261-2, #11057). As a result of the notice plan, Simpluris has received 134 valid claims, which represents a valid claim rate of approximately 46.85%. (Doc. 261, #11006–07; Doc. 261-2, #11058).[3] Beyond that, "neither Simpluris nor Class Counsel have received any opt outs or objections." (Doc. 261, #11007; Doc. 261-2, #11058).[4]

## JURISDICTION AND CHOICE OF LAW

As the Court noted in its Opinion preliminarily approving the Settlement Agreement, the Court has federal-question jurisdiction over the federal RICO claim and exercises its supplemental jurisdiction over the state-law trust claim. (Doc. 259,

---

[2] Some Defendants were previously dismissed from this lawsuit, (*see* Doc. 153, #3180–84 (denying leave to amend complaint and thus dismissing claims against several Defendants with prejudice)), and the release does not apply to them, (Doc. 257-1, #10808).

[3] Simpluris also received twenty duplicate claim forms and two claim forms that were missing a signature and therefore invalid. (Doc. 261-2, #110058). While Simpluris sent a letter to the latter two claimants to cure the deficiency, those claimants never followed up. (*Id.*).

[4] The Court notes that when Class Counsel initially sent out Class Notice, one person requested exclusion from the class. (Doc. 255-1, #10775).

#10912). The Court's choice-of-law analysis, however, was slightly more involved because the action involves a state-law claim but the class covers two states (Ohio and Kentucky). (*Id.*). Ultimately, it found that "no conflict exists" because Ohio and Kentucky have both adopted the Uniform Trust Code. (*Id.* at #10912–13 (citations omitted)). Thus, the Court properly applies Ohio trust law to the breach of fiduciary duty claim.

## LAW AND ANALYSIS

### A.    Final Approval of the Settlement Agreement

The Court has already certified a class in this action. (Doc. 223; Doc. 259, #10916 (accepting amended definition)). So the Court proceeds directly to considering the fairness of the proposed settlement.

Before the Court can finally approve a proposed settlement in a class action, the Court must hold a hearing and find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To assess fairness, the Court considers whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and (4) the settlement treats class members equitably relative to each other. *Id.*; *Hawes v. Macy's, Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *10 (S.D. Ohio Dec. 20, 2023) (hereinafter *Hawes I*) (finding that Rule 23(e)(2)'s new factors subsume the factors described in *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). Applying those factors (and having held a fairness hearing), the Court ultimately finds that the Settlement Agreement is "fair,

reasonable, and adequate" under Rule 23(e)(2) for many of the same reasons analyzed at the preliminary approval stage.

### 1.    Adequacy of Representation

For the same reasons explained when certifying the class and when preliminarily approving the settlement, (*see* Doc. 223, #10512–21; Doc. 259, #10917–18), the Court finds that the class representatives and class counsel have adequately represented the class. The injuries among the various class members were sufficiently similar to allow the named Plaintiffs to act as representatives. And, relatedly, Class Counsel was not subject to any conflicts of interest among the class members. Moreover, as the Court found in its preliminary approval order, the settlement "terms were the result of 'extensive factual investigation' and 'extensive mediation efforts.'" (Doc. 259, #10917 (citing Doc. 257-2, #10869)). And the Court further agrees that the named Plaintiffs and Class Counsel "have spent the better part of a decade vigorously litigating this case in state and federal court." (Doc. 261, #11008 n.6).

On top of that, the reaction of the absent class members further supports the adequacy of class counsel's representation. The Settlement Administrator estimates 98% of Class Members received notice, and no class members have opted out of the class in response to that notice. (Doc. 261, #11007; Doc. 261-2, #11057). *See Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79 objectors out of an 11,000-member class "tend[ed] to support a finding that the settlement is fair").

## 2.    Arm's Length Negotiations

Based on counsel's representation at the fairness hearing, the Court's involvement in the mediation process, and the Settlement Agreement's mutual concessions, the Court is satisfied that the settlement was negotiated at arm's length. *See Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, at *2 (N.D. Ohio Sep. 21, 2018) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary." (cleaned up)).

## 3.    Adequacy of Relief

Rule 23(e)(2)(C) asks whether "the relief provided for the class is adequate." To assess the adequacy of relief, the Court considers: (1) "the costs, risks, and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[5] *Id.*

The settlement's proposed relief far outweighs the potential costs and risks of continued litigation. To start, Class Members will receive an estimated average payout of roughly $3,500. (Doc. 261-2, #11059). Further, the Court agrees that this case presents "particularly complex" issues involving real estate, trusts, and civil RICO conspiracies. (Doc. 261, #11011); *see also Marinac v. Todd*, No. 1:20-cv-1571, 2022 WL 3904049, at *14 (N.D. Ohio Aug. 30, 2022) (finding that litigating a civil RICO claim "is no small feat"). The parties have already incurred significant expenses litigating the case for nearly a decade, and they face expending a considerable amount

---

[5] The parties have identified no agreements (other than the Settlement Agreement and Amendment) that are relevant to the Court's consideration, so the fourth adequacy-of-relief prong is inapplicable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

more if the case were to continue. (Doc. 261, #11011; *see generally* Doc. 260 (discussing significant costs and attorneys' fees leading to a negative lodestar for Class Counsel)). Moreover, Plaintiffs face an additional risk: that the Defendants "would not be collectible." (Doc. 261, #11011; *see* Doc. 259, #10920 (noting that some Defendants "had very limited assets")). And on the other side, Defendants risk a substantial adverse judgment if the case proceeds to trial. The settlement thus provides an efficient mechanism to resolve this dispute with overall cost, time, and risk avoidance for all parties.

The second and third factors are interrelated in this case. In its previous preliminary-approval Opinion and Order, the Court reserved judgment on this issue because of concerns about approving a portion of attorneys' fees before Class Members had an opportunity to review the Proposed Settlement Agreement. (Doc. 259, #10921–23). Recall, the majority of the common fund, approximately $1,025,000, will be funded by two of the Defendant subgroups in time for payment to Class Members. (*See id.* (citing Doc. 257-1, #10817–18)). The third subgroup of Defendants (essentially Bailey), however, will contribute $275,000 over a longer timeframe, potentially up to twelve years, if the amount ends up being paid at all. (Doc. 257-1, #10820). While the arrangement is still "atypical," (Doc. 259, #10921), the Court finds that it is effective for distributing relief to Class Members and understandable given the collectability risks relating to payments from Gary Bailey. As the Court noted previously, "the parties understandably don't want to make the class members wait until those contributions are complete before receiving their payouts." (*Id.* at #10922). Instead,

12

"class counsel is bearing the risk of the Build Defendants' non-payment (or, at the very least, of having to police their payments for the next 12-odd years)." (*Id.*). While the Court wanted Class Members to have an opportunity to object to this arrangement, it appears no claimants have taken up that charge. (*See* Doc. 261-2, #11058 (noting no objections)). And as the Court finds below, *see* infra Part B.1, the Court finds the request of attorneys' fees to be reasonable. The Court reiterates though that "any payments received from the Build Defendants are to be understood as accruing to the common fund, and *not* directed solely to amounts for class counsel's fees." (Doc. 259, #10923). True, the amounts may ultimately flow to the attorneys as fees. But the point here is that in assessing "the effectiveness of any proposed method of distributing relief to the class" and "the terms of any proposed award of attorney's fees," Fed. R. Civ. P. 23(e), the Court treats the Bailey amounts as belonging to the common fund. And given the already noted timing issues with those payments, the Court finds these two factors support approval.

Beyond that, the settlement's formula for payments appropriately compensates all class members for their damages from the down payment dispute as well as compensating for their relative harm from the purchase-price mark-up. (Doc. 261, #11005). And the parties have further contemplated that the checks be distributed via certified mail "for security purposes." (*Id.* at #11013). Taken together, this relief is adequate.

###### 4. Equitable Treatment Among Class Members

The Settlement Agreement, for the most part, treats class members equitably. The formula devised both equally compensates class members for any loss from the down payment structure while also equitably compensating them for their relative loss on the purchase price mark-up side. (Doc. 261, #11005). This formula "reflects [Plaintiffs'] share of the total harm suffered by all class members … [and] is directly linked to the financial harm [they] suffered." (Doc. 259, #10925). So even though the Agreement "doesn't treat members strictly *equally*, it does treat them *equitably*." *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2025 WL 892586, at *12 (S.D. Ohio Mar. 24, 2025) (emphasis in original).

That said, as the Court noted in its previous Opinion and Order, the size of class representatives' service awards can affect whether the settlement is equitable. (Doc. 259, #10925–26). After all, named plaintiffs are also class members. So outsize awards to the named plaintiffs could mean that the absent class members are receiving inequitably small amounts. Here, though, the Settlement Agreement doesn't require a fixed service award, (*see* Doc. 259, #10926), so the Court concludes that the Settlement Agreement's inclusion of *potential* service awards does not categorically render the agreement inequitable under Rule 23. And, like the attorneys' fees, the Court finds them reasonable below. *See* infra Part B.3.

In sum, the Court finds that the Settlement Agreement meets Rule 23(e)'s requirements in that it is "fair, reasonable, and adequate."[6] Thus, the Court grants final approval of the settlement. With that, the Court turns to the other pending motion, which involves attorneys' fees, expenses, and service awards.

## B.    Attorneys' Fees, Expenses, and Service Awards

### 1.    Attorneys' Fees

The Court starts with Class Counsel's request for fees. But before undertaking the analysis, the Court begins by briefly addressing why this is even a topic of conversation. The Court has covered the issue in some detail before, *see In re Cinfed Fed. Credit Union Data Breach Litig.*, No. 1:23-cv-776, 2025 WL 1637686, at *10 (S.D. Ohio June 10, 2025), so in the interest of brevity the Court incorporates that discussion by reference and merely hits the high points here.

Typically, attorneys' fees are a matter between attorneys and their clients. But, in class actions, absent class members typically play no role in selecting class counsel,

---

[6] The Agreement also contemplates a cy pres award in the event there are unclaimed funds after distributing the funds to class members. (Doc. 257-1, #10819). "While analysis of the cy pres award does not fall under any of the [Rule 23(e) factors], the Court nonetheless must evaluate the award when determining whether the proposed settlement agreement is fair." *Thomas v. Mitsubishi Elec. Auto. Am., Inc.*, No. 1:24-cv-422, 2025 WL 2959527, at *9 (S.D. Ohio Oct. 20, 2025) (citing *Hawes I*, 2023 WL 8811499, at *13). And "[t]o determine whether the proposed cy pres award is procedurally fair under Rule 23, the Court considers both the timing and nature of the award." *Id.* Here, the cy pres award will only come into play if there are unclaimed funds after the Settlement Administrator distributes the common fund to class members that are small enough in amount that it would be uneconomical to redistribute those remaining funds to class members. (Doc. 257-1, #10819). From a timing standpoint, that arrangement makes sense. As for the nature of the award, meaning its recipient, the Court will only approve an organization dedicated to consumer fraud or some related area to receive any cy pres award that may occur. With that, the Court finds the cy pres award does not affect the fairness of the settlement.

nor do they "agree" to the fees. Rather, at best, they get notice and an opportunity to be heard on the topic in connection with settlement. So courts end up playing a role in policing the conflicts of interest that might otherwise arise between attorneys and the absent class members. *See Evans v. TIN, Inc.*, No. CIV.A. 11-2067, 2013 WL 4501061, at *11 (E.D. La. Aug. 21, 2013) ("The court is well aware of its obligation to protect the interests of the class in its role as a fiduciary and to ensure the reasonableness of attorney's fees.").

At the same time, the Court must also remain mindful that counsel are entitled to be "fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). After all, absent counsel's efforts, the class would not have recovered from the Defendants.

Federal Rule of Civil Procedure 23(h) specifically authorizes a court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." From there, "[d]istrict courts apply a two-part analysis to assess the reasonableness of an attorney fee petition." *Harsh v. Kalida Mfg., Inc.*, No. 3:18-cv-2239, 2021 WL 4145720, at *8 (N.D. Ohio Sep. 13, 2021) (citation omitted). The first step is to "determine the appropriate method to calculate the fees, using either the percentage of fund or the Lodestar approach." *Id.* After that, the Court turns to the six *Ramey* factors. Those factors include:

> (1) the value of the benefit rendered to the [plaintiff] class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an

16

> hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Swigart v. Fifth Third Bank*, No. 1:11-cv-88, 2014 WL 3447947, at *6 (S.D. Ohio July 11, 2014) (modification omitted) (quoting *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)).

So how does that play out here? Due to the somewhat complicated way in which Bailey is contributing to the common fund, Class Counsel's request for attorneys' fees is not a simple dollar amount. Rather, it is comprised of two components. First, they request one-third of the common fund "as of the date when the Settlement Administrator is prepared to distribute funds." (Doc. 260, #10929). Second, they also request any of the payments received by Defendants after that date, i.e. from Bailey's payment plan. (*Id.*). That second funding source could be up to $275,000 (if Bailey is unable to refinance his house and thus unable to contribute the contemplated $50,000 up front), but spread out over potentially twelve years. (Doc. 257-1, #10820). All in though, while they say they are requesting one-third of the fund, if Class Counsel recovered the full amount from Bailey, along with their share of the amounts contributed up front to the common fund, the percentage of the fund would be closer to 42%. (Doc. 260, #10938).[7] Counsel requests this modified percentage-of-the-fund approach and suggests it is more favorable to class members because it results in a

---

[7] Class Counsel calculated that if Bailey "does not refinance, and accounting for the time value of money, the effective percentage fee is 39.44% using a discount rate based on Ohio's statutory judgment interest rate of 8%. Even using a conservative discount rate of 4% for the present value calculation, if all payments are timely made using the maximum percentage fee to Class Counsel would approximate 42.21%" of the common fund. (Doc. 260, #10938; Doc. 260-1, #10954).

significantly lower fee than a lodestar approach. (*Id.* at #10935). The Court ultimately agrees and finds that the attorneys' fee award is reasonable.

To start, district courts routinely award attorneys' fees of 20% to 50% of the common fund. *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 910 (S.D. Ohio 2001); *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *12 (S.D. Ohio Jan. 26, 2011) (collecting cases). So whether Class Counsel ultimately recovers 33% of the fund or something closer to 42%, either figure falls well within the normal range. While the Court has some reservations that all future payments collected from Gary Bailey will flow solely to Class Counsel, the Court agrees that it would be impractical to delay payment to Class Members and appreciates Class Counsel instead shouldering the risk of non-payment. (*See* Doc. 260, #10937).

Beyond that, the *Ramey* factors also show that the requested fee is reasonable. First, Class Counsel have achieved considerable beneficial results for the class, particularly given the collectability issues at play here. (*See* Doc. 260, #10939). Additionally, Plaintiffs will receive an estimated average payout of $3,500, which is not insignificant, particularly in a class action. (Doc. 261-2, #11059). And the class will receive it now (or shortly after final approval), unlike if this complex case continued. As already mentioned, "[s]ociety has a stake in awarding attorneys who achieve a result that the individual class members probably could not obtain on their own." *Myers v. Mem'l Health Sys. Marietta Mem'l Hosp.*, No. 15-cv-2956, 2022 WL 4079559, at *6 (S.D. Ohio Sep. 6, 2022) (quotation omitted). And Class Counsel's lodestar, described in a moment, shows that this case was resource-intensive even as

18

a class action, let alone if it had been brought by any one individual. And it also bears note that Class Counsel worked on a contingency basis, meaning they undertook considerable expense for almost a decade at this point. (Doc. 260, #10940; Doc. 260-1, #10954).

As for the fourth factor, the value of the services on an hourly basis, the Court performs a lodestar cross-check. This check prevents counsel from "receiving a windfall" and "ensure[s] that the fee award is still roughly aligned with the amount of work the attorneys contributed." *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007). The Court, however, does not "exhaustively scrutinize[]" counsel's hours and documentation, unlike a full lodestar analysis. *Id.* at 767 (quotation omitted). Here, Class Counsel alleges they have spent approximately 12,300 hours on this matter. (Doc. 260, #10941–42; Doc. 260-1, #10955; Doc. 260-2, #10967). Based on their normal rates, they estimate the current combined lodestar is $6,245,697.35. (Doc. 260, #10942; Doc. 260-1, #10956–58; Doc. 260-2, #10968). Contrast that with one-third of the fund at the time of distribution, plus any amounts later collected from Bailey. Discounting those later-collected amounts using a 4% discount rate, Class Counsel estimates that the net present value of the attorneys' fee award is $548,785.67. (Doc. 260, #10943). That represents a lodestar multiplier of 0.09. (*Id.*). In other words, counsel will collect, at best (i.e., assuming Bailey continues to pay and does so on time) 9% of the fees they would have received at their stated hourly rates. That does not strike the Court as a windfall.

For the final two factors, the Court has already mentioned that this case involves complex issues of real estate law, trusts, and RICO conspiracies. (*See* Doc. 259, #10920–21 (remarking on complexity of civil RICO claims)). And the Court finds that counsels' professional skill on both sides merits the requested fee. While not determinative, the Court also notes that Class Counsel has attached affidavits from the named Plaintiffs supporting this award. (Docs. 260-3–7).

Putting that all together, the Court finds the requested attorneys' fees are reasonable. The Court thus awards one-third of the common fund as of the time that the Settlement Administrator is prepared to distribute the fund to Class Members, plus any amount later collected from the Build Defendants (i.e., Gary Bailey).

### 2.    Litigation Expenses and Administration Costs

Additionally, "[u]nder the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims, and in obtaining settlement, including [but not limited to] expenses incurred in connection with document productions, consulting with [and deposing] experts …, travel and other litigation-related expenses." *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153, 2021 WL 757123, at *9 (S.D. Ohio Feb. 18, 2021) (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich 2003)). Here, Class Counsel requests $163,940.77 for costs and expenses, and they have submitted affidavits describing those expenses. (Doc. 260, #10945; Doc. 260-1, #10959; Doc. 260-2, #10966). Having reviewed the affidavits, the Court finds these costs and expenses are reasonable considering the duration and complexity of this

litigation. Thus, the Court awards Class Counsel $163,940.77, to be paid from the common fund.

### 3. Class Representatives' Service Awards

Lastly, Plaintiffs move for service awards of $10,000 for each named Plaintiff. (Doc. 260, #10945–49). Awards are generally appropriate for "class representatives who have had extensive involvement in a class action litigation [and] deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone." *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010). That said, service awards should not be windfalls either. *Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2024 WL 2125640, at *6 (S.D. Ohio May 13, 2024).

Here, Class Counsel provides a detailed description of each named Plaintiff's contribution to this litigation. (Doc. 260, #10946–49). Each named Plaintiff estimates they spent at minimum 35 hours and potentially upwards of 50 hours on the case. (*Id.*). Across the board, they were available during the mediations, were deposed, and responded to discovery. (*Id.*). Moreover, they have been engaged with the matter for at least the past five years, and some over eight years. (*Id.* at #10948). So they have had "extensive involvement" in the matter. *Lonardo*, 706 F. Supp. 2d at 787. Considering that the average payout is around $3,500, (Doc. 261-2, #11059), and that some class members will likely receive more than $10,000, (Doc. 260, #10948–49), the Court also finds that awards of $10,000 would not represent a windfall for the class representatives as compared to the other class members, and instead adequately compensates them for their efforts on behalf of the class.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Motion for Final Approval of Class Action Settlement (Doc. 261), and **ACCEPTS** the proposed settlement agreement. Finally, the Court **GRANTS** the Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 260). Specifically, the Court **AWARDS** class counsel attorneys' fees of **one-third of the common fund (as of the time that the Settlement Administrator is prepared to distribute the fund), as well as any future payments by the Build Defendants, and $163,940.77 in litigation costs and expenses,** and **AWARDS named Plaintiffs $10,000 in service awards**. Finally, the Court **DIRECTS** the Clerk to enter judgment and to **TERMINATE** this case on its docket.

      **SO ORDERED.**

February 27, 2026
  **DATE**

           **DOUGLAS R. COLE**
           **UNITED STATES DISTRICT JUDGE**